CUSTODY, TERMINATED,

# U.S. District Court
## District of Oregon (Portland (3))
## CRIMINAL DOCKET FOR CASE : <u>3:16−mj−00014</u> All Defendants

Case title: USA v. Bundy

Other court case number:  16−MJ−127−PAL USDC Nevada

Date Filed: 02/11/2016

Date Terminated: 02/18/2016

Assigned to: Unassigned

**<u>Defendant (1)</u>**

**Cliven D. Bundy**
79563−065
*TERMINATED: 02/18/2016*

represented by **Noel Grefenson**
Noel Grefenson, PC
1415 Liberty Street, SE
Salem, OR 97302
(503)371−1700
Fax: (503)375−4214
Email: ngrefenson@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Ruben L. Iniguez**
Office of the Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR 97204
(503) 326−2123
Fax: (503) 326−5524
Email: ruben_iniguez@fd.org
*TERMINATED: 02/12/2016*
*Designation: Public Defender or Community Defender Appointment*

**<u>Pending Counts</u>**                          **<u>Disposition</u>**

None

**<u>Highest Offense Level (Opening)</u>**

None

**<u>Terminated Counts</u>**                       **<u>Disposition</u>**

None

**<u>Highest Offense Level (Terminated)</u>**

None

| **Complaints** | **Disposition** |
|---|---|

18:371 – Conspiracy to Commit
An Offense Against the United
States; 18:111(b) – Assault on a
Federal Law Enforcement Officer;
18:924(c) – Use and Carry of a
Firearm In Relation to a Crime of
Violence; 18:1503 – Obstruction of
the Administration of Justice;
18:1951 – Interference with
Commerce by Extortion; 18:2
–Aiding and Abetting

---

**Plaintiff**

**USA**                                    represented by   **Charles F. Gorder , Jr.**
United States Attorney's Office
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204–2902
(503) 727–1021
Fax: (503)727–1117
Email: charles.gorder@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Steven W. Myhre**
US Attorney's Office
District of Nevada
333 Las Vegas Blvd South
Suite 5000
Las Vegas, NV 89101
702–388–6336
Fax: 702–388–6296
Email: steven.myhre@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

Email All Attorneys

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/11/2016 | 1 | 4 | Documents Received From Other Court as to Cliven D. Bundy from USDC District of Nevada(Las Vegas); Their Case No: 2:16–mj–000127–PAL. (Attachments: # 1 arrest warrant from Las Vegas) (cib) (Entered: 02/11/2016) |
| 02/11/2016 | 2 | | Defendant Information Relative to a Criminal Case Sheet as to Defendant |

| | | | |
|---|---|---|---|
| | | | Cliven D. Bundy. (In accordance with Fed. R. Crim. P. 49.1 this form document containing personal data identifiers is filed under seal). (cib) (Entered: 02/11/2016) |
| 02/11/2016 | 3 | 37 | **Minutes of Proceedings:** Initial Appearance pursuant to Rule Rule 5(c)(3) Proceedings before Magistrate Judge Janice M. Stewart as to Cliven D. Bundy on complaint from the District of Nevada. Defendant concedes identity. Defendant advised of rights and waived reading of the charges. Order Appointing Counsel Ruben L. Iniguez for Cliven D. Bundy for today only. Order appointing CJA panel attorney if defendant qualifies for appointed counsel. Financial Affidavit to be submitted. A Detention Hearing is set for Tuesday, **2/16/2016 at 01:30PM** before the duty magistrate judge. A Preliminary Hearing is set for Friday, **2/19/2016 at 01:30PM before the duty magistrate judge. Order DETAINED pending the 2/16/16 detention hearing. Counsel Present for Plaintiff: Charles Gorder. Counsel Present for Defendant: Ruben Iniguez. (Court Reporter Jill Jessup) (jlr) (Entered: 02/11/2016)** |
| 02/12/2016 | 5 | 72 | Financial Affidavit – CJA23 (document filed under seal) by Cliven D. Bundy (schm) (Entered: 02/16/2016) |
| 02/12/2016 | 6 | 73 | CJA 20 as to Cliven D. Bundy Appointment of Attorney Noel Grefenson for Cliven D. Bundy. signed on 2/12/16 by Magistrate Judge John V. Acosta. (schm) (Entered: 02/16/2016) |
| 02/16/2016 | 4 | 38 | Memorandum in Support of Motion by USA as to Cliven D. Bundy *(Styled as Memorandum in Support of Motion for Pretrial Detention)* (Gorder, Charles) (Entered: 02/16/2016) |
| 02/16/2016 | 7 | 74 | **Minutes of Proceedings:** Detention Hearing before Magistrate Judge Janice M. Stewart as to Cliven D. Bundy(USM #79563–065). Order DETAINED: Flight/Danger. Counsel Present for Plaintiff: Steven Myhre, Charles Gorder. Counsel Present for Defendant: Noel Grefenson. (Court Reporter Nancy Walker) (jlr) (Entered: 02/16/2016) |
| 02/16/2016 | 8 | 75 | Order of Detention as to Defendant Cliven D. Bundy.Signed on 2/16/16 by Magistrate Judge Janice M. Stewart (jlr) (Entered: 02/16/2016) |
| 02/18/2016 | 9 | 76 | Motion for Cancellation of Preliminary Hearing and for Issuance of Order of Commitment to the District of Nevada filed by USA as to Defendant Cliven D. Bundy. (Attachments: # 1 Attachment Nevada Indictment) (Gorder, Charles) (Entered: 02/18/2016) |
| 02/18/2016 | 10 | 129 | ORDER by Magistrate Judge Janice M. Stewart Granting 9 Government Motion To Cancel Preliminary Hearing And For Issuance of Order of Commitment To The District of Nevada as to Cliven D. Bundy (1) (jlr) (Entered: 02/18/2016) |
| 02/18/2016 | 11 | 130 | Commitment to Another District as to Cliven D. Bundy Defendant committed to District of Nevada, (Las Vegas). (schm) (Entered: 02/18/2016) |

1  DANIEL G. BOGDEN
   United States Attorney
2  STEVEN W. MYHRE
   NICHOLAS D. DICKINSON
3  Assistant United States Attorneys
   NADIA J. AHMED
4  ERIN M. CREEGAN
   Special Assistant United States Attorneys
5  333 Las Vegas Blvd. South, Suite 5000
   Las Vegas, Nevada  89101
   PHONE: (702) 388-6336
6  FAX: (702) 388-6698

FILED

2016 FEB 11   A 8: 56

[illegible] MAGISTRATE JUDGE
BY _____

7              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA

8  UNITED STATES OF AMERICA,            )
9                                       )
              Plaintiff,                )  **CRIMINAL COMPLAINT**
10                                      )
                                        )  Case No.: 2:16-mj-00127-PAL
         v.                             )
11                                      )  **VIOLATIONS:**
   CLIVEN D. BUNDY,                     )
12                                      )  18 U.S.C. § 371 – Conspiracy to Commit
                                        )  An Offense Against the United States;
13            Defendant.                )
                                        )  18 U.S.C. § 111(b) – Assault on a Federal
14                                      )  Law Enforcement Officer;
                                        )
15                                      )  18 U.S.C. § 924(c) – Use and Carry of a
                                        )  Firearm In Relation to a Crime of
16                                      )  Violence;
                                        )
17                                      )  18 U.S.C. § 1503 – Obstruction of the
                                        )  Administration of Justice;
18                                      )
                                        )  18 U.S.C. § 1951 – Interference with
19                                      )  Commerce by Extortion;
                                        )
20                                      )  18 U.S.C. § 2 – Aiding and Abetting
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24                                      )
                                        )

**BEFORE** the United States Magistrate Judge, Las Vegas, Nevada, Joel P. Willis, Special Agent, Federal Bureau of Investigation, Complainant herein, being first duly sworn deposes and states as follows:

## COUNT ONE
Conspiracy to Commit an Offense Against the United States
(Title 18, United States Code, Section 371)

Beginning in at least March 2014 and continuing to on or about the date of this Complaint, in the State and Federal District of Nevada and elsewhere,

### CLIVEN D. BUNDY,

defendant herein, did conspire, confederate, and agree with others to commit an offense against the United States, to wit:

a.  Assault on a Federal Officer, in violation of Title 18, United States Code, Sections 111(a)(1) and (b);

b.  Use and Carry a Firearm During and In Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c);

c.  Interference with Commerce by Extortion, in violation of Title 18, United States Code, Section 1951; and

d.  Obstruction of the Administration of Justice, in violation of Title 18, United States Code, Section 1503.

In furtherance of the conspiracy, defendant **BUNDY** and other members of the conspiracy committed, attempted to commit, and caused to be committed, the overt acts described herein and all of those comprising the offenses charged in Counts Two through Six.

All in violation of Title 18, United States Code, Section 371.

2

**COUNT TWO**
Assault On a Federal Officer By Use of Deadly And Dangerous Weapon
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did use a dangerous and deadly weapon to forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers while they were engaged in, and on the account of, the performance of their official duties, to wit: guarding and protecting government personnel and equipment located at the Impoundment Site at or near Bunkerville, Nevada, while executing federal court orders to remove cattle from the federal public lands, as described herein.

All in violation of Title 18, United States Code, Sections 111(a)(1) and (b), 1114, and 2.

**COUNT THREE**
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, assault on a

3

federal law enforcement officer, in violation of Title 18, United States Code, Section 111(b), as charged in Count Two of this Complaint.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT FOUR
### Interference with Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

### CLIVEN D. BUNDY,

defendant herein, did obstruct, delay and affect commerce, and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that defendant **BUNDY** attempted to obtain approximately 400 head of impounded cattle at or near Bunkerville, Nevada, from the care, custody, and possession of the Special Agent in Charge of impoundment operations on federal public lands at or near Bunkerville, Nevada, their consent having been induced by the wrongful use of force, fear, and violence as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

4

## COUNT FIVE
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, extortion by force, fear and violence, in violation of Title 18, United States Code, Section 1951, as charged in Count Four of this Complaint.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT SIX
Obstruction of the Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

On or about April 12, 2014, in the State and Federal District of Nevada,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did corruptly, and by threats and force, and by threatening communications, influence, obstruct and impede, and attempt to influence, obstruct and impede, the due administration of justice, in that the defendant threatened force and violence and used force and violence to impede, obstruct, and thwart the execution of federal court Orders by assaulting and extorting federal officers at the Impoundment Site near Bunkerville, Nevada, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

5

In support of probable cause of the aforementioned charges, I state as follows.

1.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over 12 years and, since November 2009, I have been assigned to the Las Vegas Field Office.   My training in law enforcement includes agency specific training in all aspects of conducting federal criminal investigations, including the planning, preparation, and execution of search warrants and criminal complaints.   I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), authorized to make arrests and conduct investigations in connection with alleged violations of federal law.   Over the course of my career, I have led or participated in numerous federal investigations to include the drafting and execution of search warrants and criminal complaints.

2.     I am currently assigned to conduct an investigation into events that occurred in and near Bunkerville, Nevada, during April 2014 in connection with a cattle impoundment operation conducted by federal law enforcement officers.   I submit that the evidence adduced during the investigation to date establishes probable cause to believe that, at all times relevant to the Complaint:

6

## SUMMARY

3.     Defendant Cliven D. **BUNDY** ("**BUNDY**") was a resident of Bunkerville, Nevada, and the operator of a ranch referred to as "Bundy Ranch." His ranching operations included grazing cattle unlawfully on federal public land.

4.     On April 12, 2014, **BUNDY** and his co-conspirators organized and led a massive armed assault against federal law enforcement officers in and around Bunkerville, Nevada, in order to extort the officers into abandoning approximately 400 head of cattle that were in their lawful care and custody. In addition to conspiring among themselves to plan and execute these crimes, **BUNDY** and his confederates recruited, organized, and led hundreds of others in using armed force against law enforcement officers in order to achieve their criminal objectives.

5.     One of the conspiracy's objectives was to thwart the seizure and removal of defendant **BUNDY**'s cattle from federal public lands.  **BUNDY** had trespassed his cattle on federal public lands for over 20 years, refusing to obtain the legally-required permits or pay the required fees to keep and graze his cattle on the land.

6.     Since 1998, **BUNDY** was under federal Court Order to remove his trespass cattle, an Order **BUNDY** refused to recognize or follow.  In 2013, a federal court issued two more Orders for removal, each declaring that, in keeping with the law, the United States was authorized to seize and remove the cattle from the land in the event **BUNDY** refused to do so.  **BUNDY** refused.

7.     The removal operation began on April 5, 2014.  While it was ongoing, **BUNDY** and his co-conspirators used deceit and deception to recruit others to help

them to force BLM to stop operations, flooding the internet with false and deceitful images and statements to the effect that law enforcement officers were abusing **BUNDY** and stealing his cattle. Deliberately lying, **BUNDY** and his co-conspirators pleaded for others to travel to Nevada to "stop the abuse" by "making a show of force against [the officers]" in order "to get them to back down" and "return the cattle." By the morning of April 12, hundreds of people, many armed with assault rifles and other firearms, had traveled to Bunkerville, becoming **BUNDY**'s "Followers," conspiring with, and aiding and abetting him and his co-conspirators to execute a plan to recover **BUNDY**'s cattle by force.

8. On the morning of April 12, **BUNDY** organized his Followers and gave them the order to get the cattle, directing a crowd of hundreds to travel more than five miles to the site where the cattle were corralled. One group of Followers kept law enforcement officers occupied at the main entrance of the site by threatening to enter there, while another group – ultimately consisting of more than 200 Followers led by Co-conspirator 2 – assaulted the site from below, converging on its most vulnerable point: a narrow entrance located in a wash that ran under highway bridges. Seeing the assault unfold, the officers responded to the wash to prevent entry.

9. The 200 Followers in the wash included a significant number brandishing or raising their assault rifles in front of the officers. Some of these gunmen took tactically superior positions on high ground, while others moved in and out of the crowd, masking their movements behind other unarmed Followers. The most immediate threat to the officers came from the bridges where gunmen

8

took sniper positions behind concrete barriers, their assault rifles aimed directly at the officers below.

10. Having seized the tactical advantage, Co-conspirator 2 and the 200 Followers pressed forward to and against the wash entrance, demanding that the officers leave and abandon the cattle, threatening to enter by force if the officers did not so do. Outnumbered by more than 4:1, unwilling to risk harm to children and other unarmed bystanders who had accompanied the Followers, and wishing to avoid the firefight that was sure to follow if they engaged the snipers on the bridge who posed such an obvious threat to their lives, the officers had no choice and were forced to leave and abandon the cattle to **BUNDY** and his co-conspirators, who promptly released and returned the cattle to **BUNDY**.

11. Thereafter, the conspirators organized armed security patrols and checkpoints in and around **BUNDY**'s property to deter and prevent any future law enforcement actions against **BUNDY** or his co-conspirators and to protect his cattle from future removal actions, cattle he continued to hold, graze and keep on federal public lands unlawfully and continues to do so as of the date of this Complaint.

## TERMS AND DEFINITIONS

12. "Federal public land" or "public land" was land owned by the United States and managed through various agencies of the United States, including, among others, the United States Department of Interior, Bureau of Land Management ("BLM") and National Park Service ("NPS").

13. The BLM and NPS employed Rangers, Officers, and Special Agents to enforce federal laws and regulations on public land under their management.

9

14.     BLM and NPS Rangers, Officers, and Special Agents were "federal law enforcement officers" under Title 18, United States Code, Section 115(c)(1), that is, they were officers, agents, and employees of the United States authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of federal criminal law.

15.     The Bunkerville Allotment ("the Allotment") was an area of federal public land near Bunkerville, Nevada, under the management of BLM. The United States has owned the land comprising the Allotment since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

16.     The Lake Mead National Recreational Area ("LMNRA") was an area of federal public land located near or adjacent to the Allotment, under the management of the NPS. The United States has owned the land comprising the LMNRA since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

## BUNDY TRESPASSED CATTLE ON PUBLIC LAND AND REFUSED TO COMPLY WITH FOUR COURT ORDERS TO REMOVE THEM

17.     Federal law required a rancher to obtain a grazing permit from the BLM and to pay fees to the United States to graze cattle on the Bunkerville Allotment.  Grazing cattle without a permit constituted a trespass on public land.

18.     From 1993 to the date of this Complaint, **BUNDY** knowingly refused to pay fees or obtain permits as he kept and grazed his cattle on the Allotment year-round, constituting a continuing trespass on public land.

19.    In 1998, and because of **BUNDY**'s continuing trespass, the United States District Court for the District of Nevada (hereinafter "District Court" or "Federal Court") Ordered **BUNDY** to remove his cattle permanently from the Allotment. **BUNDY** deliberately ignored the Order and continued to trespass by keeping and grazing his cattle unlawfully on public land.

20.    In 1999, the District Court fined **BUNDY** for each day he refused to remove his cattle.  **BUNDY** refused to pay the fines and continued to trespass by keeping and grazing his cattle unlawfully on public land.

21.    By 2012, **BUNDY**'s herd had multiplied substantially and spread into the LMNRA where BUNDY kept and grazed them year-round, refusing to pay fees or obtain permits, constituting a continuing trespass on public land.

22.    In 2013, the District Court issued two Orders.  One ordered **BUNDY** to remove his trespass cattle permanently from the LMNRA and the other re-affirmed the 1998 and 1999 Orders that required him to remove his cattle permanently from the Allotment. Both Orders declared that, in keeping with the law, the United States was authorized to seize and remove **BUNDY**'s trespass cattle if he did not comply with the Court's Orders.  One of the Orders expressly stated that **BUNDY** was "not to interfere" with any removal.

23.    **BUNDY** ignored the Orders and continued to keep and graze his trespass cattle unlawfully on public land.

11

## THE BLM PLANNED TO SEIZE AND REMOVE THE CATTLE
## FROM THE PUBLIC LANDS PURSUANT TO COURT ORDERS

24.     In keeping with the law and the 2013 federal court Orders, the BLM planned to seize and remove **BUNDY**'s trespass cattle, following well-established rules and regulations governing this procedure, referred to hereinafter collectively as "impound" or "impoundment."

25.     A preliminary survey revealed that the BLM would have to impound almost 1,000 head of trespass cattle scattered over hundreds of thousands of acres of arid and difficult terrain.   Given these circumstances, BLM estimated that it would take a month or more to complete the impoundment.

26.     It was part of the plan that BLM would establish a base of operations (hereinafter referred to as "the Impoundment Site") located on the public lands near Bunkerville, about 7 miles away from Bundy Ranch in an area commonly referred to as the Toquop wash.

27.     It was part of the plan that on February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round-up and gather the trespass cattle.  The contract required the contractor to bring people and equipment to Nevada to conduct impoundment operations.

28.     It was part of the plan that the civilian contractor and crew would gather and move the trespass cattle from public land into corrals at the Impoundment Site where they would be held until such time as they could be further transported.

29.    It was part of the plan that on March 20, 2014, BLM entered into a contract for the services of an auctioneer in Utah.   The contract required the trespass cattle to be trucked from the Impoundment Site in Nevada to the contract auctioneer in Utah, who would then sell them at public sale.

30.    It was part of the plan that BLM would use BLM and NPS Rangers, Officers, and Special Agents to provide security for impoundment operations, including securing the cattle at the Impoundment Site and protecting the civilian contractors and government employees engaged in impoundment operations.

31.    It was part of the plan that BLM designated the Special Agent-in-Charge of BLM's Nevada and Utah region (hereinafter the "SAC") to lead impoundment operations.

**BUNDY THREATENED TO "DO WHATEVER IT TAKES"**
**TO PREVENT THE IMPOUNDMENT OF HIS CATTLE**

32.    On October 23, 2012, and in connection with legal proceedings culminating in the 2013 Court Orders, **BUNDY** threatened to interfere with any impoundment by stating that he "would do whatever it takes" to stop the impoundment.  When asked whether that included soliciting support from others to help him, **BUNDY** responded: "Yes."

33.    On March 14, 2014, the BLM formally notified **BUNDY** that impoundment operations would take place.

34.    On March 15, 2014, **BUNDY** threatened to interfere by stating publically that he "[was] ready to do battle" with the BLM and he would "do whatever it takes" to protect "his property."

13

35.     On March 17, 2014, a BLM Special Agent notified one of **BUNDY**'s adult sons that the Special Agent was available to answer any questions about the impoundment operation. **BUNDY**'s son became angry and threatened to interfere, stating that he and his family would "do whatever it takes" and he would "have several hundred" with him to prevent the BLM from removing the trespass cattle. When asked whether his use of "whatever it takes" included physical force or violence, **BUNDY**'s son replied: "I will do whatever it takes; you interpret that the way you want."

36.     On March 24, 2014, **BUNDY** threatened to interfere, stating publically that he intended to "organize lots of groups" to "come from hundreds of miles away" and he was in a "range war" with BLM that could "last a long time."

37.     On March 25, 2014, **BUNDY** threatened to interfere, stating publically that: "BUNDY's ready . . . whenever [the federal government's] got the guts to try it . . tell them to come . . . I'll do whatever it takes."

38.     On March 28, 2014, **BUNDY** threatened to interfere, stating publically that: "all of those cowboys are going to be thieves who steal my cattle . . . [i]t's like they're staging for a war . . . I told them I'd do whatever it takes . . . I'll stick with that."

**BUNDY CARRIED OUT HIS THREATS
BYCONSPIRING TO LIE, THREATEN FORCE
AND VIOLENCE AND USE FORCE AND VIOLENCE**

**A.     Object and Nature of the Conspiracy.**

39.     The scope, nature, and objects of the conspiratorial agreement were to use threats of force and violence and actual force and violence to: (1) impede,

14

obstruct and interfere with BLM's impoundment operation; (2) obtain BUNDY's impounded cattle from federal law enforcement officers; (3) threaten, intimidate and prevent by force federal law enforcement officers from taking action against the conspirators; and (4) threaten, intimidate and prevent by force federal law enforcement officers from taking law enforcement actions against **BUNDY** and his co-conspirators and prevent by force BLM from exercising regulatory and law enforcement authority over the public lands.

40.    In order to achieve the objects of the conspiracy, **BUNDY** conspired, confederated, and agreed to commit numerous federal offenses, as charged herein.

**B.    Manner and Means of the Conspiracy.**

41.    To achieve his objectives, **BUNDY** and his co-conspirators recruited, organized, and led a force of hundreds of people to threaten and use force and violence to prevent the law enforcement officers from discharging their duties and to coerce their consent to abandon the cattle that were, pursuant to court order, lawfully in their care and custody and which they were duty bound to protect.

42.    As a part of the manner and means of the conspiracy, **BUNDY** and his co-conspirators, among other things:

a.    Used deceit and deception to knowingly recruit Followers, that is, to encourage, counsel, and incite others to travel to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal court orders, and using force and violence against federal law enforcement officers while they were performing their duties.

b.    Used the internet and other facilities in interstate commerce to

15

1   knowingly broadcast false, deceitful, and deceptive images and messages for the

2   purpose of recruiting Followers.

3         c.     Used the internet and other facilities in interstate commerce to

4   encourage, counsel, and incite Followers to bring guns to Bundy Ranch for the

5   unlawful purposes of interfering with impound operations, obstructing the

6   execution of federal court orders, and using force and violence against federal law

7   enforcement officers to prevent them from discharging their duties.

8         d.     Traveled in interstate commerce and used other facilities in

9   interstate commerce to threaten force, violence, and economic harm to private

10  contractors providing services to the BLM during impound operations.

11        e.     Threatened and used force and violence against BLM civilian

12  employees engaged in impound operations for the purpose of obstructing the

13  execution of federal court orders and interfering with impound operations.

14        f.     Counseled, incited, and led Followers to use, carry, brandish,

15  and aim firearms, including assault rifles, for the purpose of assaulting federal law

16  enforcement officers.

17        g.     Counseled, incited, and led Followers to use, carry, brandish,

18  and aim firearms, including assault rifles, for the purpose of extorting federal law

19  enforcement officers.

20        h.     Organized Followers into body guards, armed patrols, and

21  security checkpoints for the purpose of using threats, force, violence, and

22  intimidation to protect the conspirators, prevent law enforcement actions against

23  the conspirators, prevent the execution of federal court orders, and prevent law

16

enforcement officers from discharging their duties.

## C.    Roles of the Conspirators.

43.    **BUNDY** was the leader, organizer, and chief beneficiary of the conspiracy, possessing ultimate authority over the scope, manner, and means of conspiratorial operations and receiving the economic benefits of the extortion.

44.    **BUNDY** and Co-Conspirators 1, 2, 3, and 4 were leaders and organizers of the conspiracy who, among other things: recruited Followers; interfered with impoundment operations through threats and use of force and violence; interfered with impoundment operations by attempting to extort BLM contractors; led an armed assault against federal law enforcement officers; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers.   Co-Conspirators 1, 2, 3, and 4 have been arrested and are detained on federal charges lodged in another district.

## D.    Overt Acts in Furtherance of the Conspiracy.

49.    It was a part of the conspiracy that from March 28 to April 11, 2014, and for the purpose of carrying out the objects of the conspiracy, **BUNDY** and his co-conspirators performed, or caused to be performed, the following overt acts, among many others.

### 1.    March 28 to April 11:  The Conspirators Interfered with Impoundment Operations and Used Deceit and Deception to Recruit Followers.

50.    On or about March 28, 2014, **BUNDY** and others working with him, blocked a convoy of vehicles carrying horses and equipment intended for use in impoundment operations, confronting and threatening civilian contractors,

17

1   endangering the safety of the personnel in the convoy, and interfering with

2   impoundment operations.

3        51.   Shortly thereafter, and in an effort to recruit Followers, **BUNDY**

4   caused the broadcast of a video of the confrontation with the contractors entitled

5   "Range War," depicting images captured during the confrontation, combining them

6   with false, deceitful and deceptive statements to the effect that the BLM was

7   stealing **BUNDY**'s cattle.

8        52.   On or about April 2, 2014, Co-conspirator 1 traveled from Nevada to

9   Utah to threaten force, violence, and economic harm to the contract auctioneer

10   providing services to the BLM, by, among other things, entering upon the

11   contractor's property for the purpose of interfering with business operations,

12   threatening and intimidating customers and employees, interfering with business

13   operations, and threatening to shut down the business if the contractor fulfilled his

14   contractual obligations with BLM.

15        53.   On or about April 5, 2014, **BUNDY** threatened force and violence

16   against federal law enforcement officers by publically stating, among other things:

17   "I've done quite a bit so far to keep my cattle, but I guess it's not been enough . . .

18   they took 75 of my cattle today . . . I have said I'd do what it takes to keep my cattle

19   so I guess it is going to have to be more physical."

20        54.   On or about April 6, 2014, co-conspirator 1 and another conspirator

21   interfered with impoundment operations by positioning themselves to block a BLM

22   convoy and refusing to leave the area when asked to do so.  Failing to leave after

23   repeated requests, a co-conspirator was arrested by law enforcement officers.

18

55.   Shortly thereafter, **BUNDY** caused images of the arrest to be broadcasted over the internet, combining them with false, deceitful and deceptive statements to the effect that the BLM supposedly: employed snipers against Bundy family members; used excessive force during the arrest; and arrested a conspirator for exercising his First Amendment rights.

56.   On or about April 7, 2014, Co-conspirator 2 traveled from Arizona to the Bundy Ranch in Nevada.

57.   On or about April 7, 2014, Co-conspirator 3 in Montana, contacted **BUNDY** in Nevada, by telephone.

58.   On or about April 7, 2014, Co-conspirator 3, who referred to himself as a leader of a network he referred to as Operation Mutual Aid ("OMA"), used the internet and other facilities in interstate commerce to recruit others whom Co-conspirator 3 referred to as "militia" belonging to the OMA network.  Attempting to incite the so-called OMA "militia" members to travel to Bundy Ranch for unlawful purposes, Co-conspirator 3 falsely, deceptively, and deceitfully stated, among other things, that the ranch was surrounded by BLM snipers, the Bundy family was isolated, and BLM wanted **BUNDY** dead.

59.   On or about April 7, 2014, **BUNDY** and others working with him established a site only minutes travel distance from the Bundy Ranch along Nevada State Route 170, a state road that also served as the main route between the Impoundment Site and the public land where impoundment operations were taking place.  Strategically located between the Impoundment Site and various ingress and egress points to public land, the location of the site served as both a natural vantage

19

point from which to observe impoundment operations and a potential choke-point for disrupting BLM convoys. Conspicuous for, among other things, a stage and two tall flagpoles, one of which flew the Nevada State flag above the flag of the United States, this site (hereinafter referred to as "the Staging Site") served as a base of operations from which the conspirators made speeches, received and organized Followers as they arrived at Bundy Ranch, and gathered and organized Followers before initiating their assaults on federal law enforcement officers.

60. On or about April 8, 2014, Co-conspirator 4 in California, contacted **BUNDY** in Nevada, by telephone.

61. On or about April 8, 2014, Co-conspirator 4 and **BUNDY** broadcasted messages over the internet. Using deceit, deception, and threats to incite others to travel to Bundy Ranch for unlawful purposes, **BUNDY** told listeners, among other things, that: "they have my house surrounded . . . the federal government is stealing my property . . . [the BLM] are armed with assault rifles . . . they have snipers . . . I haven't called no militia but, hey, that looks like where we are . . . there is a strong army out here . . . we are going to have to take our land back . . . somebody is going to have to back off . . . we the people will put our boots down and walk over these people . . . they are up against a man who will do whatever it takes."

62. In that same broadcast, Co-conspirator 4 used threats to incite listeners to travel to Bundy Ranch for unlawful purposes, telling listeners, among other things, that: "if this is not the issue right now where we stand and fight to the absolute death there is no other option; the federal government must get out of the State of Nevada . . . if they don't want it to be peaceful it is by their choice. . . I'm

20

1   calling on all Americans anywhere in the vicinity of Clark County, Nevada . . . if

2   you're in Nevada and can legally carry, get weapons out there, o.k. . . . we are going

3   to stand and fight in Clark County, Nevada . . . they will leave or else."

4       63.    On or about April 8, 2014, Co-conspirator 3 sent a message from

5   Montana to Pennsylvania to another person who referred to himself as one of the

6   leaders in OMA, stating, among other things, that it was "time to invite everyone to

7   the first annual Patriots (sic) Picnic at the Bundy Ranch" and telling the OMA

8   leader that the Bundys "still want help."

9       64.    On or about April 8, 2014, and for the purpose of recruiting Followers,

10  Co-Conspirator 3 sent a message over the internet, stating that Co-Conspirator 3

11  had spoken with BUNDY and that "he knows we're coming and has opened his land

12  up to everyone willing . . . OMA is moving . . . not going public with this until more

13  are enroute."

14      65.    On or about April 8, 2014, Co-conspirator 3 caused an email to be sent

15  to OMA members stating: "we have made the decision to mobilize in Nevada, units

16  are underway as I type this  . . . the feds arrested some protestors today, and the

17  words 'we need you now' were uttered . . . we have approximately 150 responding,

18  but that number is [gr]owing by the hour." The message provided directions and

19  grid coordinates to Bundy Ranch.

20      66.    On or about and between April 8 and 9, 2014, Co-conspirator 4

21  traveled from California to Bundy Ranch in Nevada.

22      67.    On or about and between April 8 and 9, 2014, Co-conspirator 3

23  traveled from Montana to Bundy Ranch in Nevada.

24

21

68.     On or about April 9, 2014, Co-conspirators 3 and 4 met with **BUNDY** and other conspirators at Bundy Ranch.

69.     On the morning of April 9, 2014, Co-conspirator 4 met with the SAC and stated that he was acting as a liaison between Bundy Followers and the BLM. Threatening the SAC, Co-conspirator 4 stated: "What are you guys going to do if 10,000 people show up? . . . Are you prepared for this? . . . I don't believe in firing a single bullet unless in absolute defense and it's legal and constitutional."

70.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, the conspirators caused a message to be broadcasted over the internet, stating: "The Bundy family has requested help from militia groups including Operation Mutual Aid, 3 Percenters club, freedom fighters, and other operations to come and stand with us and regain our rights and freedom."

71.     On April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a message over the internet, stating, among other things: "the BLM knows if they are outnumbered and outgunned . . . they will stand down . . . we want BLM to get out of the state of Nevada . . . I fully expect the standoff will occur when thousands go to repossess the rightfully owned property of the Bundys . . . we need strength in numbers."

72.     On or about April 9, 2014, Co-conspirator 1, and others working with him, traveled for a second time from Nevada to Utah to threaten force, violence, and economic loss to the contract auctioneer providing services to the BLM by, among other things: intimidating customers; interfering with business operations; and

22

instilling fear and apprehension in customers and employees.

73.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a message over the internet, stating, among other things: "now is the time to show up for something like this . . . we need ten thousand people to come here . . . I only have one fear is that people that don't respond to this call . . . it's time to make a stand against tyranny . . . we need to let everyone know that BLM has zero authority."

74.     On April 9, 2014, Co-conspirators 2 and 4 assaulted federal officers by, among other things: intercepting and blocking a convoy of BLM vehicles engaged in impoundment operations; colliding an ATV into a truck in the convoy in order to stall the truck and gain entry by force; attempting to forcibly gain entrance to the stalled truck; attempting to throw a rock at law enforcement officers while the officers were protecting the truck and the civilian passengers inside; threatening physical harm to law enforcement officers while they were protecting the truck and the civilian passengers inside; and causing physical contact with an officer while the officer was engaged in protecting the truck and the civilian passengers inside.

75.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-Conspirator 4 broadcasted a message over the internet, stating, among other things:  "we were serious about stopping the convoy . . . [the BLM] were caught off guard and tried to push past us . . . they couldn't do it . . . we outnumbered them and they retreated . . . we know how they will come back after they retreat . . . my biggest fear is if we don't respond . . . they retreated and will come back with a bigger force . . . we need to disperse them

23

with tens of thousands . . . we want BLM to always retreat because we will always

outnumber them . . . we have all been waiting for that ultimate moment . . . there is

so much at stake . . . we can win with numbers . . . I've got people coming from

Michigan . . . militia members who are fully armed are here . . . it's good to watch

the BLM with its tail between its legs . . . get out here . . . this is going to get

exciting . . . ultimately get the feds to leave."

76.     On April 10, 2014, and for the purpose of inciting others to travel to

Bundy Ranch for an unlawful purpose, Co-conspirator 3 caused an email to be sent

to self-described "militia" members of OMA under the subject line "Bundy

Objectives," as follows:

> Nevada Alert!  We are requesting help to distribute the following to
> any and all media, blog, patriot groups etc.
>
> 1.      Secure the Bundy family from government incursion which
> includes protection of all personnel responding in support of the
> Bundys ie. Protestors, extended family, and friends.
>
> 2.      To return the confiscated Clark County Nevada property
> currently blocked by federal personnel to it's (sic) rightful stewards,
> the people of Clark County, Nevada.
>
> 3.      To secure and return to Mr. Bundys (sic) ranch the mounting
> number of cattle which have been confiscated by BLM agents and
> private contractors.
>
> These objectives are in cohesion with Cliven Bundy and the Bundy
> ranch . . . .

77.     On or about April 10, 2014, and for the purpose of inciting others to

travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a

message over the internet, stating, among other things: "there is not enough militia

here . . . we have 1000's of very organized constitutional militia . . . they are

24

trickling in . . . where we will fail is for us not to at least match the overwhelming

force . . . we have about 50 members here now . . . where we will fail is for us not to

not match the BLM force . . . we need a show of force . . . we did a recon and found

that BLM have hundreds of vehicles . . . BLM needs to vacate immediately . . . we

need the numbers for the feds to leave . . . they will come back with a bigger force .

. . we need tens of thousands of people so they retreat . . . come out here . . . we've all

been waiting for the ultimate moment . . . we can win with numbers . . . get out here

no matter where you are . . . militia members here are fully armed."

78.     On or about April 10, 2014, and for the purpose of inciting other to

travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a

message over the internet, stating, among other things: "there is a court order, but

the court is corrupt . . . BLM believes they are acting constitutionally . . . BLM is in

violation of every God-given right of every human being . . . [BLM's] closure orders

are 'shelter in place'. . . [BLM] aimed AR-15's at me [during confrontation on April

9] . . . Waco and Ruby Ridge was a show of force by government and violated

sovereign rights . . . if we have 10,000 people, [the BLM] will have to get past us."

79.     On the morning of April 11, 2014, Co-Conspirator 4 met with the SAC

and stated, among other things: "we are going to have a face-to-face confrontation .

. . we have thousands of people . . . we are going to come here and it is non-

negotiable . . . if that comes about, we want to make sure that any [BLM officer]

who wants to stand down will not be retaliated against . . . this is non-negotiable . .

. if you make the decision to go face-to-face and someone gets hurt we are going to

hold you responsible . . .   tell D.C. that the justification for this is from a corrupt

25

court . . . I'm relaying a message . . . if anyone is acting unconstitutionally they will be arrested . . . I came here to allow you to prevent a scenario where someone gets hurt."

80.    By on or about April 11, 2014, hundreds of Followers traveled to Nevada, many armed with assault rifles and other firearms and many of whom identified themselves as "militia" and wore military style clothing and equipment.

81.    By on or about April 11, 2014, Co-conspirator 3 and others working with him, received the armed Followers, including those who identified themselves as "militia." The leaders of the conspiracy placed them into camps, which the leaders described as "militia camps," from which camps the conspirators would organize and deploy the militia and other armed Followers.

82.    By on or about April 11, 2014, Co-conspirator 3, and others working with him, organized armed Followers and militia into patrols and armed checkpoints to provide security to the conspirators and their criminal enterprise.

### 2.    April 12: The Conspirators Assaulted and Extorted Law Enforcement Officers.

83.    It was further a part of the conspiracy that on April 12, 2014, **BUNDY** and his co-conspirators, organized, led and executed a mass assault on federal law enforcement officers in order to obtain the seized cattle, as follows.

84.    By the morning of April 12, the BLM had seized approximately 400 head of cattle and had them corralled at the Impoundment Site, awaiting further shipment out of the state of Nevada.

85.    On the morning of April 12, **BUNDY** led a rally of hundreds of his

26

Followers, including militia and other armed Followers, at the Rally Site where he told them that "God [is] going to be with us" and that it was time "to take our land back." He then commanded his Followers to get the cattle.

86. **BUNDY** directed his Followers that "horse people" (Followers riding horses) would leave the Rally Site and travel a dirt road to the Toquop wash, the location of the Impoundment Site, a distance of about 3.5 miles. While that was happening, so commanded **BUNDY**, the other Followers, including militia and other armed Followers, were to travel the highway by vehicle, a distance of about 5 miles, and "shut down the freeway" at the Impoundment Site. The Followers, so directed **BUNDY**, were then to meet with the "horse people" in the Toquop wash.

87. The Followers did as **BUNDY** ordered. Armed with their weapons, the Followers hurriedly loaded themselves into cars and trucks and moved *en masse* to the Impoundment Site, jamming the roads and slowing traffic on northbound I-15 to a trickle, making it difficult for state and local law enforcement vehicles to respond. When the Followers arrived at the Impoundment Site, they jumped out of their vehicles and many of them moved quickly on foot to a position across from the main entrance.

88. Other Followers took positions on the bridges overlooking the Impoundment Site. The few local law enforcement officers who were able to respond formed a human line in the I-15 median to block the Followers, many of whom carried and brandished assault rifles, from entering at the main entrance to the Impoundment Site.

89. Many Followers then moved a few hundred yards east and below the

27

main entrance and met Co-conspirator 2 in the Toquop wash, gathering about 150 yards opposite from a makeshift metal rail gate that blocked the wash entrance beneath the southbound bridge of I-15.

90. By 12:00 noon, over 400 of **BUNDY**'s Followers had converged upon the Impoundment Site, many of the Followers were comprised of Bundy's militia openly brandishing assault rifles, others bearing side arms, the combined group grossly outnumbering the officers that protected the site. About 60 yards across from the metal rail gate at the wash entrance to the site, between the north and southbound I-15 bridges, a crowd of more than 270 Followers – a combination of militia and non-militia on foot and about 40 men and women on horseback – formed into a line along the bottom of the wash about 60 yards across. This position was guarded by about 50 federal law enforcement officers, positioned beginning about 15 to 20 yards behind the gate.

91. The officers at the gate were dangerously exposed. They were in the open on low ground at the bottom of the wash, below highway bridges that towered more than 40 feet above them and surrounded on the sides by steep embankments of high ground. The terrain acted like a funnel with them at the bottom and no natural cover or concealment to protect them from the gunmen on the high ground, their only protection being their body armor and the vehicles they happened to drive to the gate. At this point approximately 40 Followers were either carrying or brandishing firearms in front of the officers, many of them moving in and out of the line, taking high ground on the sides of the wash. Meanwhile, more than 20 Followers carried or brandished firearms while on the bridges that towered move

28

than 40 feet above the officers, some of them aiming assault rifles at the officers from covered and concealed sniper positions.

92.    The officers guarding the gate could readily observe gunmen bobbing up and down from behind the concrete barriers that bordered the northbound I-15 bridge, indicating to the officers that the gunmen were acquiring, and determining the range to, their officer-targets.  The officers could also observe armed gunmen dressed in military-style tactical gear and wearing body armor, moving in and among the unarmed Followers, using them as human shields to mask their movements while still others took tactically superior positions on the sides of the wash.

93.    The Followers' close proximity to the officers, their array and formation in the wash, their refusal to disperse upon command, their angry taunts, their numbers carrying or brandishing firearms, their movement to the gate while brandishing assault rifles and wearing body armor, and their superior sniper positions on the bridge above, all caused the officers to fear immediate bodily harm or death.

94.    Around 12:15, the Followers in the wash, led by Co-conspirator 2, advanced to the gate.  The gunmen moved with him, openly brandishing their rifles and taking over-watch positions on the high ground within full view of the tactically disadvantaged officers, the snipers in concealed positions on and under the bridges now aiming their assault rifles at the officers.  Seeing the combined force arrayed against them – an organized crowd of more than 400, more than 60 among the crowd carrying or brandishing rifles or pistols, 40 supporters on horseback, militia

29

snipers concealed on the bridges above them with their rifles zeroed-in on the officers, militia gunmen intermingled with the crowd using the unarmed people to shield their movement, militia gunmen in over-watch positions on the high ground – the officers believed they were going to be shot and killed. They were stymied – prevented from shooting the gunmen who posed such an obvious threat to their lives out of concern they would spark a firefight that would kill or injure unarmed people. Unable to surgically remove the deadly threats before them, outnumbered, outgunned, and located in a dangerously exposed and tactically inferior position, the officers knew they were easy targets. They still held their ground.

95. Upon reaching the gate and backed by his gunmen and snipers, Co-conspirator 2 told the SAC that he and the rest of his force would not leave until the BLM left the impoundment site. When asked to move his gun-backed crowd away from the gate so the officers could disengage, Co-conspirator 2 refused and demanded that the officers leave first stating, among other things, "You need to leave . . . that's the terms . . . no, you need to leave . . . you are on Nevada State property . . . the time is now . . . no, the time is now."

96. To prevent the disaster that was sure to follow if they remained longer, the SAC was forced to give in to Co-conspirator 2's demands and ordered his officers to leave, abandoning the post, the impoundment site, and the cattle to **BUNDY**.

97. Having made the decision to meet the conspirators' demands, the SAC met with Co-conspirator 1 near the main entrance to the Impoundment Site to negotiate the departure of the law enforcement officers. While the armed Followers held their positon below at the wash entrance, Co-conspirator 1 demanded that the

30

BLM officers pack all of the equipment and leave the Impoundment Site within two hours.

98. The law enforcement officers were forced to abandon the Impoundment Site and the cattle to the conspirators and their Followers, who promptly released and returned them to **BUNDY** and took down the fences comprising the corrals.

**3. Continuing Conspiracy – Post-Assault: The Conspirators Organized Bodyguards, Patrols and Checkpoints to Prevent and Deter Future Law Enforcement Actions.**

99. It was further a part of the conspiracy that following the April 12 assault and extortion, **BUNDY** and the co-conspirators took such other actions as necessary to protect themselves and their ill-gotten gains and to further interfere with and prevent future federal law enforcement actions on the public lands.

100. From April 12 to at least the end of May 2014, the BUDNY and the co-conspirators established, organized, and maintained militia camps to provide housing and logistical support to armed gunmen who continued to travel to the Bundy Ranch.

101. From April 12 to at least the end of May 2014, **BUNDY** and his co-conspirators established armed checkpoints and security patrols to prevent and deter law enforcement actions against the conspirators, including recovering the extorted cattle.

102. From April 12, 2014 through September 2014, Co-Conspirator 4 made statements to the SAC, threatening similar assaultive conduct in the event the BLM attempted further law enforcement actions.

103. From April 12, 2014 through the date of this Complaint, **BUNDY**

31

made public statements threatening that he would continue to interfere with federal law enforcement actions against him or the cattle.

104. From April 12, 2014 through the date of this Complaint, **BUNDY** continued to employ body guards to protect him and other co-conspirators from federal law enforcement actions.

105. From April 12, 2014, through the date of this Complaint, the **BUNDY** and his co-conspirators continue to take such actions as necessary to hold, protect, and prevent the impoundment of the extorted cattle and such other trespass cattle that are subject to the 2013 Court Orders.


Joel P. Willis
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me

this 11th day of February 2016.


PEGGY A. LEEN
United States Magistrate Judge

32

AO 442 (Rev. 11/11) Arrest Warrant

I attest and certify on __2/11/2016__ that
this is a full true and correct copy of the
original document.

# UNITED STATES DISTRICT COURT

PEGGY A. LEEN
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

for the

District of Nevada

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| CLIVEN D. BUNDY | ) |
| | ) |
| | ) |

By _L. Nixxxx_    ✓ Deputy
_____ Secretary

$2:16-mj-000127-PAL$

Defendant

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    CLIVEN D. BUNDY                                                            ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment        ❏ Superseding Indictment        ❏ Information        ❏ Superseding Information        ☑ Complaint
❏ Probation Violation Petition        ❏ Supervised Release Violation Petition        ❏ Violation Notice        ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 371 – Conspiracy to Commit An Offense Against the United States;
18 U.S.C. § 111(b) – Assault on a Federal Law Enforcement Officer;
18 U.S.C. § 924(c) – Use and Carry of a Firearm In Relation to a Crime of Violence;
18 U.S.C. § 1503 – Obstruction of the Administration of Justice;
18 U.S.C. § 1951 – Interference with Commerce by Extortion; and
18 U.S.C. § 2 – Aiding and Abetting

Date:    02/11/2016

*Issuing officer's signature*

PEGGY A. LEEN
U.S. MAGISTRATE JUDGE

City and state:    Las Vegas, Nevada

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                                 _____ |
| *Arresting officer's signature* |
| _____ |
| *Printed name and title* |

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants: Ruben L. Iniguez (neysa_bogar@fd.org, ruben_iniguez@fd.org), Charles
F. Gorder, Jr (charles.gorder@usdoj.gov, lori.mcbryde@usdoj.gov)
--Non Case Participants: U.S. Marshal Service (pdx.operations@usdoj.gov), U.S. Pretrial
Services (cmecf@orpt.uscourts.gov)
--No Notice Sent:

Message-Id:5397567@ord.uscourts.gov
Subject:Activity in Case 3:16-mj-00014 USA v. Bundy Initial Appearance - Out of District
Warrant
```
Content–Type: text/html

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 2/11/2016 at 4:51 PM PST and filed on 2/11/2016

**Case Name:**       USA v. Bundy
**Case Number:**     3:16–mj–00014
**Filer:**
**Document Number:** 3(No document attached)

**Docket Text:**
 **Minutes of Proceedings: Initial Appearance pursuant to Rule Rule 5(c)(3) Proceedings
before Magistrate Judge Janice M. Stewart as to Cliven D. Bundy on complaint from the
District of Nevada. Defendant concedes identity. Defendant advised of rights and waived
reading of the charges. Order Appointing Counsel Ruben L. Iniguez for Cliven D. Bundy for
today only. Order appointing CJA panel attorney if defendant qualifies for appointed
counsel. Financial Affidavit to be submitted. A Detention Hearing is set for Tuesday,
2/16/2016 at 01:30PM before the duty magistrate judge. A Preliminary Hearing is set for
Friday, 2/19/2016 at 01:30PM before the duty magistrate judge. Order DETAINED pending the
2/16/16 detention hearing. Counsel Present for Plaintiff: Charles Gorder. Counsel Present for
Defendant: Ruben Iniguez. (Court Reporter Jill Jessup) (jlr)**

**3:16–mj–00014–1 Notice has been electronically mailed to:**

Charles F. Gorder , Jr   charles.gorder@usdoj.gov, Lori.McBryde@usdoj.gov

Ruben L. Iniguez   ruben_iniguez@fd.org, neysa_bogar@fd.org

**3:16–mj–00014–1 Notice will __not__ be electronically mailed to:**

BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR.**, OSB #912874
Assistant United States Attorney
1000 SW Third, Suite 600
Portland, OR 97204-2902
Charles.Gorder@usdoj.gov
Telephone:   (503) 727-1000
Facsimile:    (503) 727-1117

DANIEL G. BOGDEN
United States Attorney
District of Nevada
**STEVEN W. MYHRE**
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada  89101
Telephone:   (702) 388-6336
Facsimile:    (702) 388-6698
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:16-MJ-00014 |
| **v.** | **GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR** |
| **CLIVEN D. BUNDY,** | **PRETRIAL DETENTION** |
| Defendant. | |

The United States, by and through undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act, Title 18, United States Code, Section 3142.  As explained herein, the government seeks the continued pretrial detention of defendant Cliven Bundy ("Bundy") both as a risk of non-appearance and as a danger to the safety of others and the community.

Bundy is lawless and violent.  He does not recognize federal courts – claiming they are illegitimate – does not recognize federal law, refuses to obey federal court orders, has already used force and violence against federal law enforcement officers while they were enforcing federal court orders, nearly causing catastrophic loss of life or injury to others.  He has pledged to do so again in the future to keep federal law enforcement officers from enforcing the law against him. As of the date of this hearing, he continues to violate federal court orders and continues to possess the proceeds of his illegal activities.

Bundy is currently charged with crimes of violence including using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c).  As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community.  18 U.S.C. § 3142(e)(3)(B).  Here, no evidence has been adduced during the investigation of the instant charges that even remotely hints at a rebuttal to that presumption.  In fact, all the evidence suggests that Bundy will continue to act

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 2**

lawlessly, will not abide by court orders, and will use violence to ensure that federal laws are not enforced as to him.

## I.   INTRODUCTION

Bundy was charged in and arrested on a six-count Criminal Complaint filed on February 11, 2016, in the District of Nevada, charging Bundy with conspiring to assault federal officers, obstruct justice, extort federal officers, and use and brandish a firearm in relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371, 111(a)(1) and (b), 1114, and 2; 924(c); 1503; and 1951.  Bundy was arrested on February 10, 2016, upon arriving at the airport in Portland, Oregon, the probable cause for the arrest arising from evidence of his involvement in a massive assault on federal officers that occurred on April 12, 2014, as detailed in the Complaint.

Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention.

### A.   Background.

Bundy, 69, is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state.  Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada.  Bundy Ranch is surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area (and

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 3**

includes an area formerly known as the Bunkerville Allotment).  Bundy uses that entire range of land to graze his cattle unlawfully.

While Bundy claims he is a cattle rancher, his ranching operation – to the extent it can be called that – is unconventional if not bizarre. Rather than manage and control his cattle, he lets them run wild on the public lands with little, if any, human interaction until such time when he traps them and hauls them off to be sold or slaughtered for his own consumption.  He does not vaccinate or treat his cattle for disease; does not employ cowboys to control and herd them; does not manage or control breeding; has no knowledge of where all the cattle are located at any given time; rarely brands them before he captures them; and has to bait them into traps in order to gather them.

Nor does he bring his cattle off the public lands in the off-season to feed them when the already sparse food supply in the desert is even scarcer.  Raised in the wild, Bundy's cattle are left to fend for themselves year-round, fighting off predators and scrounging for the meager amounts of food and water available in the difficult and arid terrain that comprises the public lands in that area of the country.  Bereft of human interaction, his cattle that manage to survive are wild, mean and ornery. At the time of the events giving rise to the charges, Bundy's cattle numbered over 1,000 head, straying as far as 50 miles from his ranch and into the Lake Mead National Recreation Area ("LMNRA"), getting stuck in mud, wandering onto golf courses, straying onto the freeway (causing accidents on occasion) – foraging aimlessly and wildly, roaming in small groups over hundreds of thousands of acres

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 4**

of federal lands that exist for the use of the general public for many other types of commercial and recreational uses such as camping, hunting, and hiking.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution. These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially. Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands. The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season. It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail. But despite losing, he continued in his scofflaw

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 5**

ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order").  Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle.  He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail.  The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like

**Gov't's Memo in Support of Its Motion for PT Detention**                **Page 6**

every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days.  The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle.  Thus, the 2013 Orders in hand, the BLM planned for and commenced impoundment operations beginning around April 5, 2014.

### B.    The April 12, 2014, Armed Assault

On April 12 and for the purpose of thwarting the impoundment, Bundy organized and led over 400 Followers to assault the BLM officers as they guarded the Impoundment Site, all for the purpose of getting his cattle back.  The Complaint sets out the nature of the assault that day as well as many of the threats and acts of violence that led up to the assault, which started even before the impoundment operation began.  While the government does not intend to repeat those allegations here, it incorporates them by reference and proffers the following.

/////

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 7**

### 1.   The April 12 assault was an extremely violent act.

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer.  And contrary to the fiction recited by Bundy and his Followers to others, including children, there is no First or Second Amendment right or other right recognized in the law anywhere that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not.  While that should be obvious to any law abiding citizen, Bundy espouses to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry mob of more than 270 people directly in front of them, the mob being backed up by gunmen brandishing or carrying rifles and firearms among the unarmed Followers, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges.  The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded.  Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day.  Witnesses have described the level of threatened violence as so intense that something as innocent as the

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 8**

backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Complaint alleges and the investigation shows that Bundy was responsible for recruiting the gunmen to come to Nevada to confront the BLM. He and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations. The justification, according to Bundy and his followers: BLM was acting unconstitutionally in impounding his cattle. In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

### 2. Bundy, his co-conspirators and Followers have pledged to do it again.

The evidence shows that this was an unprecedented act. The gunmen traveled great distances in a short period of time, answering Bundy's call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12. The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site. Indicative of his intent that day was his statement to another person as he was drove his truck to the

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 9**

impoundment site: "These federal agencies have a lot of power and they are not just going to give that power up. The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the BLM and coercing the officers into leaving by threatening violence, Ammon Bundy was asked whether BLM was gone for good. Ammon responded: "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

We the people expressed our power and as a result the Sheriff took control of his county. The Sheriff must protect the agency of man. The people have the power – it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook postings and other social media outlets, have pledged to support Bundy again if BLM takes any action against him. There is no evidence to suggest that Bundy cannot quickly muster his gunmen again if any law enforcement action is taken against him.

### C.    Post-Assault:  April 13 and thereafter.

Immediately after the assault, Bundy openly celebrated his role in driving the BLM out of the area. In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence." *See* https://www.youtube.com/watch?v=dI-

**Gov't's Memo in Support of Its Motion for PT Detention**                         **Page 10**

3qYTMGgU (last visited February 11, 2016).  In the same interview, Bundy

expressed dismay that the BLM officers were allowed to leave with their weapons

on April 12:  "we haven't won the war, we've just won one chapter of it."  *Id.*

Bundy's characterization of the assault as part of a larger "war" makes clear that

his efforts to thwart and interfere with BLM law enforcement officers would carry

on.

   To that end, Bundy relied on armed individuals who continued to travel to

Bundy Ranch in the months after the assault.  These individuals, camping in and

around what the Bundys designated as "militia camps," engaged in reconnaissance

missions, manned check points on public roads, and conducted armed patrols of the

area around Bundy Ranch to ensure BLM officers were not present and would not

return.  Bundy and his conspirators established a firing range on public land which

his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten

gains.

   Bundy's gunmen also took up over-watch positions along State Route 170, the

main artery into the town of Bunkerville, and attempted to threaten their way into

public facilities in the neighboring town of Mesquite, creating an environment of

fear for these communities.

   From April 11 through the present, Bundy has rarely been seen in public

without an armed escort.  His lead bodyguard, Brian Cavalier, currently detained

and facing charges for his involvement in the MNWR occupation, was a constant

companion of Bundy everywhere he went immediately after April 12 through the

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 11**

following year.  Just days after the stand-off, Bundy and two of his sons were seen giving news interviews surrounded by armed guards:



Bundy's bodyguards effectively protected Bundy from arrest for his criminal activities.  Indeed, on or about April 16, 2014, in an interview with a national media person, Bundy stated that if the Federal Government came for him in the night "these feds, I don't recognize their jurisdiction or authority, so no, I wouldn't go with them."  *See* https://www.youtube.com/watch?v=hg646sJU3EI (last visited on February 11, 2016).  Also in this interview, Bundy stated, "I break federal laws almost every time I turn around, every step I take. . . I do try to abide by all of the sovereign state of Nevada laws though."  *Id.*

On April 17, 2014, a local television news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road.  Some of the supporters attempted Thursday to keep a [local] news crew from entering the area, despite it

Gov't's Memo in Support of Its Motion for PT Detention                    Page 12

being a public road. . . .  The armed men say they'll be at the site for weeks to come

to defend the Bundy family."  The news segment included footage of a Bundy guard

blocking access to a public road.

Organized patrols of the public lands continued all through the summer into

the fall of 2014.  Additionally, evidence shows that telephone lines with roster

information were set up, donation pages on the internet continued to be utilized to

solicit funds, and gunmen traveled back and forth from other states to do duty at

the Ranch.  The purpose of these missions was to ensure Cliven Bundy was not

arrested and that BLM did not return to the public lands either to impound the

cattle or for any other purpose.

On April 26, 2014, Bundy's son, Ryan Bundy, and Ryan Payne, both currently

detained and pending charges for their role in the MNWR occupation and other

members of the armed patrols, physically stopped a truck driving through Mesquite

hauling a livestock trailer.  Ryan Bundy demanded to see the written documents

reflecting the ownership of the cattle in the trailer.  The driver of the truck complied

with Ryan Bundy's demands and after determining the cattle were not from among

Bundy's feral herd, Ryan allowed the driver to continue on.  The driver left the area

and called police.

On February 17, 2015, an Arizona-based BLM fire crew traveling in a

marked BLM truck decided to take a shortcut through Bunkerville, Nevada to their

project site located at Pakoon Spring, Arizona.  The crew drove southwest on Gold

Butte Rd, Bunkerville, Nevada, in the vicinity of the Bundy Ranch.  Just after

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 13**

turning on to Gold Butte Rd, the two-person BLM fire crew noticed that they were being followed closely by a vehicle.  When they attempted to allow the car to pass, it stopped and the firemen observed Ryan Bundy as a passenger in the vehicle. Bundy asked questions in an aggressive tone and the fire crew, feeling the tension, decided to drive on.  Ryan Bundy's vehicle followed them for over ten miles until the terrain made it difficult for the vehicle to do so.  The fire crew contacted law enforcement and were safely escorted out of the area.

On March 27, 2015, a Las Vegas Metropolitan Police Department (LVMPD) officer agreed to escort two BLM civilian employees to the Bunkerville area to conduct an annual plant survey.  The officer provided escort in his patrol vehicle and the BLM employees were in an unmarked BLM vehicle with government plates.  As the cars neared the Bundy Ranch, the officer sent the BLM employees onward and then stopped and made contact with Ryan Bundy who was in a truck near the Bundy Ranch property.  During his conversation with Ryan Bundy, the officer advised Bundy that he would be escorting the federal employees in the Gold Butte area.  Ryan Bundy twice asked what agency they employees were with and wanted to know which plants they were counting.  He stated "do they know the plants belong to us not them."  Ryan Bundy also made statements to the effect of "I know that we want those guys off of here and out of here.  We really don't want them here. . . . Put it this way: every time we see a government plate we follow them out . . . We have been doing that and we have not been stopping anybody but

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 14**

we usually will take our security and let them know we are there and we're watching."

On June 5, 2015, three civilians working on behalf of the BLM traveled to the Gold Butte region for an overnight assignment involving site surveys, which included surveying cattle troughs and other cattle-related sites. At the final site a truck came up the road at around 6:30 p.m. and parked behind the civilians' truck, blocking them in. One female employee approached the truck and observed a man who appeared to be 50-65 and who was subsequently identified by her as Cliven Bundy, and a younger man (18-25), subsequently identified by her as Arden Bundy, in the truck. Bundy said to her in a joking manner that they had been chasing these BLM employees all day. He asked why they were there and she said they were there to camp. Bundy said they were welcome to stay and that he was there to fix a leaky pipe and then feed the cattle.

At approximately 9:00 pm that night, the employees heard a vehicle coming up the road and stop approximately 500 meters from their camp. Three gunshots or popping noises were fired in fairly rapid succession. The vehicle then drove away. At approximately 10:00 pm, a vehicle came to the same spot and again three gunshots were fired in rapid succession, which one employee understood is sometimes meant to signal danger. The employees also heard several male voices but could not make out what was being said. They could see headlights in the direction of their camp. After a few minutes, the vehicle drove away. The

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 15**

employees immediately packed up their camp and left Gold Butte, returning to Las Vegas after 1:30 in the morning.

On March 6, 2015, at a public meeting in Mesquite regarding pending BLM initiatives in the region, Bundy's sons, Ryan and Dave Bundy both spoke publicly, stating the BLM should stay away from the region and had no title to the land at issue.  Bundy's bodyguard, Brian Cavalier stated, "If the BLM wants to go to the field to play ball, then me and my crew will come play ball too."

On September 12, 2015, the Bundy Ranch Facebook page – the official Facebook page for Cliven and Carol Bundy – posted a YouTube video featuring Ammon Bundy denouncing federal agencies with the following status update, "The Federal Government Does NOT have authority to be acting the way they are. PLEASE WATCH AND SHARE - Federal agencies are the greatest DANGER the American people have ever faced."

In the fall of 2015, the Bundy Family, both on Bundy's blog, bundyranch.blogspot.com, and on the Bundy Ranch Facebook page, began efforts to amass a movement to prevent two men, Dwight and Steven Hammond, convicted of federal arson-related charges in Oregon, from self-surrendering in January for their federal prison sentence.   On December 11, 2015, the following message was posted on the Bundy Ranch Facebook page:

> To all People, Patriot groups, Militias, Coalitions, Churches, Families and other Supporting entities . . . If we felt we could wait until after Christmas to give you this information we would. The Adversary never sleeps. We must stay aware, and act in these matters of defense. It is our duty to do so. . . . It is certain that what has happened to the people of Harney County and the Hammond family is a type and a

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 16**

shadow of what will happen to all people across these United States if we do not put an end to it. . . . . Please understand that we must exhaust all prudent measures before taking a physical stand against the horrific actions that the People of Harney County are enduring (including the Hammond's). If this Notice is ignored, then one more Notice of Demand will be sent, it will list the many petitions that have been ignored and demand that the Hammond's rights be restored. If that final Notice is rejected then People across the Union will have justification to assemble and once again restore individual rights. . . . Thank you,

The Bundy Family

The Hammonds were scheduled to report to federal prison on January 4, 2016. The following message was posted to the Bundy Ranch Facebook page:

FOR IMMEDIATE PRESS RELEASE:
CLIVEN D. BUNDY
PO Box 7175
Bunkerville, NV 89007
702-346-5564
January 1, 2016

With great concern and love and much consideration from prayer, I come to you Harney County Sheriff of Oregon David M. Ward, rancher Steven Dwight Hammond, and rancher Dwight Lincoln Hammond, Jr.,

I, Cliven D. Bundy, have been involved for several weeks in the background striving to understand and comprehend your dilemmas in Harney County, Oregon. . . .

The United States Justice Department has NO jurisdiction or authority within the State of Oregon, County of Harney over this type of ranch management. These lands are not under U.S. treaties or commerce, they are not article 4 territories, and Congress does not have unlimited power. These lands have been admitted into statehood and are part of the great State of Oregon and the citizens of Harney County enjoy the fullness of the protections of the U.S. Constitution. The U.S. Constitution limits United States government.

It is my suggestion, Steven Hammond, that you go and check yourself into Harney County jail asking for protective custody. It is my suggestion, Dwight Hammond, that you go and check yourself into

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 17**

Harney County jail asking for protective custody. It is my suggestion, Harney County Sheriff David Ward, accept these two ranchers into your jail, notify the United States Solicitor in Washington DC that you have these two ranchers in Harney County jail, that they will remain there indefinitely under your protective custody and the protection of We the People of Harney County and We the People of the United States of America.

I suggest an Evidentiary Hearing or a Grand Jury be formed by We the People.

I feel that this action is immediately important, that it should be taken place before 10:00 am Saturday, January 2, 2016. I will hold these suggestions private until that time then I will release this letter to those having state and county jurisdiction and to the media.

Cliven D. Bundy

Despite Bundy's efforts otherwise, the Hammonds reported for their federal sentence as directed to do so on January 4, 2016. However, on January 2, 2016, Ammon Bundy, Ryan Bundy, Ryan Payne and others took over the MNWR, occupying it with guns and openly stating their intention to prevent federal officers from returning to do their work on the refuge.

Bundy made statements in the media, linking the April 12, 2014, assault to the MNWR occupation. In a video and article from a Las Vegas television channel website, titled "Rancher responds to calls for his arrest," posted on or about January 19, 2016, Bundy stated, "I'm not gonna ever let the federal government come here and abuse me, and my ranch, and my cattle and the public again. . . . We have really enjoyed our freedom and liberty out here and enjoyed the land, and that's what the Bundy standoff was all about. It was to give access to the people, and I would be able to continue ranching and tradition. . ." With respect to the

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 18**

MNWR takeover, Bundy stated, "Somebody has to stand up, and it happened to be my sons that stood, and they will stand.  They're not going to give up."

http://www.lasvegasnow.com/news/rancher-responds-to-calls-for-his-arrest (last visited February 13, 2016).

On January 22, 2016, weeks into the MNWR occupation, in a video and an article from another Las Vegas television channel website, titled "Activists call on government to arrest Cliven Bundy, sons," Bundy stated about the MNWR occupation, "They did something they had to do.  It has been extreme but the world has been listening."  In the same interview, addressing the April 12 assault, Bundy stated, it was "very much a success. We are standing in the freest place on earth. . . Quit worrying about the Bundys, and if we're terrorists, so what?  We're terrorists . . . .  We the People are enjoying freedom here."

http://www.fox5vegas.com/story/31036532/ activists-call-on-government-to-arrest-cliven-bundy-sons (last visited February 13, 2016).

On January 26, 2016, in a video and a caption from a Las Vegas newspaper article titled "Rancher Cliven Bundy responds to sons' arrests in Oregon standoff," Bundy stated "What's going to happen tomorrow, I don't know.  You know there's going to be a rally across America, maybe around the world.  I don't know what side they are going to take.  You know, this will be a wakeup call to America.  This whole battle is over a constitutional issue, where the Federal Government has no rights within the state, or at least rights within a sovereign state. . . . ."

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 19**

(http://www.reviewjournal.com/news/nation-and-world/rancher-cliven-bundy-responds-sons-arrests-oregon-standoff-video) (last visited February 15, 2016).

On January 30, 2016, in a video and article on a local Utah news website titled "Cliven Bundy: It was murder," Bundy stated:

> [S]omebody had to make a stand. Well, if you make a stand without guns, what kind of stand do you make? You know, the government just come in there with bing bangs and smoke bombs and you don't you don't have no strength. . . . You know, I hate to see me sons and anybody suffer and I don't believe that Federal Government has any jurisdiction authority, I believe it's up to the public. It's going to be a public opinion and I don't even know at this point if the public opinion makes any difference. Those people are murderers; they threatened Dwight Hammond to the point that he was scared. They basically had the community scared and they proved how powerful they was when they assassinated LaVoy Finicum, and I don't think there is any limit to the Federal government's wickedness . . . You sign contracts with the Federal Government giving them unlimited power. You wind up in their Federal courts and you never win. Why don't you stand up for your preemptive grazing right? Why don't you stand up for property rights? That's what LaVoy would tell you today . . . .

https://www.stgeorgeutah.com/news/archive/2016/01/30/tds-cliven-bundy-it-was-murder/ (last visited February 13, 2016).

In a national media online article dated on or about January 31, 2016, titled "Bundy clan leader unrepentant even as Oregon protest collapses," Bundy stated: "They're leaving me alone . . . In this part of Clark County and on Bundy Ranch, we say we're the freest place on Earth . . . They [the federal government] have no jurisdiction or authority, and they have no policing power  . . . They have no business here . . . "  https://www.washingtonpost.com/national/health-science/bundy-clan-leader-unrepentant-even-as-oregon-protest-collapses/2016/01/30/842a4750-c6c5-11e5-8965-0607e0e265ce_story.html (last visited February 15, 2016).

Gov't's Memo in Support of Its Motion for PT Detention                    Page 20

On February 1, 2016, Bundy sent the following notarized "Notice to Harney County Sheriff" which was addressed also to the Governor of Oregon and the President of the United States, indicating that "We the People," intended to retain possession of the "Harney County Resource Center," the name given to the MNWR by the occupiers.

In an interview quoted in an article posted to a news website, Bundy explained the letter as follows, "What this is saying is that Cliven Bundy is taking control of things . . . If we don't retain it, then we've lost everything that we've done in the last two months. We're not gonna give up."   He added: "This is not Ammon's message. This is my message … We've made a decision to retain it … The feds are going to get out of there."   Bundy once again reiterated his stance that "the federal government doesn't have any jurisdiction or authority."   http://www.theguardian.com/us-news/2016/feb/01/oregon-armed-militia-standoff-cliven-ammon-bundy-malheur-national-wildlife-refuge?CMP=share_btn_tw (last visited February 13, 2016).

/////

/////

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 22**

# Cliven Bundy defies son Ammon in call for Oregon militia to stand their ground

After Ammon Bundy called on final occupiers to leave refuge, his father sent a letter to government officials declaring armed militia would not back down



📷 'What this is saying is that Cliven Bundy is taking control of things,' he said of the Oregon standoff in an interview from his ranch in Bunkerville, Nevada. Photograph: Sam Levin for the Guardian

In a video posted to Youtube titled, "Cliven Bundy speaks after Kanab funeral for LaVoy Finicum," published on February 6, 2016, by a local Utah newspaper, Bundy stated:

> It don't matter who we elect to the President of the United States, it don't matter who we elect for Congress, it don't matter who we elect for our Judges or the appointed Judges, the legal part don't work and political part don't work, and do you know why?  It's because the bureaucrat has got so fat and so healthy, that he is the one that prospers, he is the one that has life liberty and the pursuit of happiness, we are feeding him, and when you get to this point, I've

**Gov't's Memo in Support of Its Motion for PT Detention**                     **Page 23**

been to this point for twenty years.  I said no, I'm not going to sign contracts with you and I'm not going to pay you anymore, but I said twenty years ago, if ten ranchers would follow me, we would have had this thing beat a long time ago.  Today we still don't have it beat. . . . You [ranchers] you have terms and conditions you have to follow, and if you don't follow them, you know what happens?  You [ranchers] end up in a federal court and where in federal court did anyone ever win?  Where in a federal court did a rancher, a resource user, ever win in a Federal court.  You can't win at that Federal court, and it's their court."

https://www.youtube.com/watch?v=BHvCLZTrRGc (last visited February 13, 2016).

On February 10, 2016, Bundy Ranch Facebook page posted the following

status update:



When other Facebook users commented on the post, Bundy Ranch

continually reiterated its call to "head to Burns now!" and advised others to "meet

Cliven at the resource center, go now."  That same night, Bundy flew

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 24**

unaccompanied by his bodyguards to Portland, Oregon, where he was taken into federal custody at the airport.

While Bundy was traveling, another subject who had days earlier traveled from MNWR to Mesquite, Nevada, posted a status update to his Facebook page, stating, "Need contacts in PORTLAND to PM me ASAP!!!!!  [subject name] Safety is why I need contacts!!! I need some Warfighters if at all possible."

A subject who was questioned following his/her arrest in connection with his/her activities at MNWR told law enforcement officers that MNWR occupiers had made their way to Bundy Ranch and were staying there.  According to this person, an individual armed with an AR-15 was providing security for MNWR occupiers who were staying at Bundy Ranch.

## II.    ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both.  *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance.  *Id.*

**Gov't's Memo in Support of Its Motion for PT Detention**                              **Page 25**

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight.  *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("[T]he government may proceed in a detention hearing by proffer or hearsay.")

### A. The Offenses Charged Are Based on Bundy's On-Going Defiance of Federal Court Orders and Include Crimes of Violence

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or

**Gov't's Memo in Support of Its Motion for PT Detention                    Page 26**

property of another may be used in the course of committing the offense."  See 18
U.S.C. § 3156(a)(4)(A).  Here, five of the Counts contained in the Criminal
Complaint against Bundy are crimes of violence:  assault on a federal officer with a
firearm and deadly weapon; extortion by force and violence; Section 924(c) counts as
to each; and conspiracy to commit same.

Bundy's charges are grounded not only in violence and his lawless acts, but
also in his continued refusal to abide by federal court orders and other laws.
Bundy continues to be in violation of no less than four federal Court Orders and
each day enjoy the proceeds of his criminal activity, generating income through
grazing over a thousand head of cattle on federal lands for free and selling these
cattle for thousands of dollars each as he deems necessary.

Every day that Bundy is loose on Bundy Ranch is a day that he is in violation
of the law.  He continues to run his cattle in violation of federal law.  He continues
to flout the authority of federal law enforcement officers and threaten violence if
they try to enforce the law.

Bundy's rhetoric and his conduct relating to these charges makes clear that
he has not changed his mind about the BLM or the federal government.  As
demonstrated above, Bundy has declared a personal war against the BLM and the
federal government and there has been no evidence adduced during this massive
investigation to suggest that he has changed his mind about any of that.

In the past, he has used gunmen to man checkpoints and conduct security
patrols to prevent his arrest.  His threats of force and past use of force have, to date,

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 27**

prevented law enforcement officers from carrying out the court orders to remove Bundy's cattle from the public lands and kept them from patrolling and enforcing the laws and regulations pertaining to the large swath of public lands known in the Gold Butte area.

If Bundy were allowed to return to Bundy Ranch, the continued absence of a law enforcement presence in the Gold Butte area directly threatens the safety of others who wish to enjoy or use the same land that Bundy now has free reign over.

If released, Bundy would pose a significant risk of non-appearance, allowing him to bunker down at his ranch, fortify it with armed guards and thereby requiring federal officers to face the dangerous task of apprehending him.

Thus, there are no conditions or combination of conditions that any federal court could impose to protect the community from his lawless activity, whether that community is comprised of the citizens using the public lands or federal law enforcement officers and civilian employees attempting to manage the resources and enforce the laws. All are subject to Bundy's threats of violence.

### B.   Substantial Evidence Exists Establishing Bundy's Guilt

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation. Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests,

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 28**

conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature.  The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including (by some accounts) a .50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed over 40 search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

In addition to his numerous statements captured on social media, Bundy is captured on video directing his followers to go get his cattle on April 12.  Numerous witnesses describe his involvement in the conspiracy and the ongoing activities at Bundy Ranch both during and after the assault.  The evidence overwhelmingly establishes that Bundy was the leader, organizer and main beneficiary of the

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 29**

conspiracy to impede and assault the federal officers conducting impoundment operations on April 12.

### C.   Bundy's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

For two decades, Bundy has grazed his cattle on federal lands without complying with BLM regulations or paying any grazing fees or other penalties, despite four federal court orders directing him to cure these violations.  When Bundy was presented with the impending court-authorized impoundment of his cattle, he fomented and recruited his own army who expressed a willingness to raise weapons against federal law enforcement officers.

Bundy's rhetoric and his conduct relating to these charges makes clear that he has not changed his mind about the BLM or the federal government.  As demonstrated above, Bundy has declared a personal war against the BLM and the federal government and there has been no evidence adduced during this massive investigation to suggest that he has changed his mind about any of that.

Further, there simply is no indication in any of the evidence that an Order for less restrictive conditions from this Court will get Bundy to do what three previous Courts could not: follow federal law.  He does not recognize federal law and has said so repeatedly.  He does not follow federal law or federal court orders and has demonstrated that repeatedly.  There is no assurance that Bundy will in the least adhere to pretrial restrictions contained in yet another court order, which restrictions will no doubt include that he comply with and follow all federal laws

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 30**

which would include federal court orders that require him to remove his cattle from public lands.

### D.    Bundy Poses A Significant Danger to the Community

Bundy's conduct in April, 2014, risked hundreds of people's lives – he incited and directed approximately four hundred people to travel to the BLM impoundment site to face off with federal law enforcement officers.  But for the courageous restraint of these officers, this violent assault would likely have met with violent and deadly ends.

Bundy continues to put federal law enforcement officers, civilian employees, and community members at risk with his conspiracy to impede BLM in performing their duties around the country.  Bundy was willing to put these people at risk in April 2014 when faced with the impoundment of cattle.  He continued to do so with his patrols of the Gold Butte region and with his involvement in the MNWR takeover, ostensibly over lands rights issues.  That Bundy now faces a lengthy incarceration if convicted of the charges can only bode more dangerous conduct if he is released.

### E.    Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and Bundy's Future Appearance

A presumption applies that Bundy shall be detained and Bundy cannot overcome that presumption.  The charges, the evidence, Bundy's history and the danger posed establish that there are no conditions or combination of conditions that can address these risks.  As already discussed, any terms of release would have

**Gov't's Memo in Support of Its Motion for PT Detention**              **Page 31**

to include Bundy's adherence to all laws.  He has demonstrated and stated that he will not follow federal court orders.

Even the most stringent of conditions are insufficient to assure the safety of the community or Bundy's appearance, given that ultimately, they must rely on Bundy's good faith compliance.  *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict conditions," "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance").   In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute.  The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts.  Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated." *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that Bundy's crimes in this case are rooted in his defiance of federal court orders directed specifically to him, and that his commitment to flouting federal authority has been maintained in word and deed through the present.

**Gov't's Memo in Support of Its Motion for PT Detention**                    **Page 32**

# CONCLUSION

For the reasons stated herein, Bundy is a danger to the community and poses a risk of non-appearance.  Bundy cannot overcome the presumption that he should be detained and no conditions or combination of conditions will reasonably assure the safety of others or his appearance at future proceedings.  Accordingly, the Government respectfully requests that the Court order Bundy detained pending trial.

DATED this 16th day of February 2016.

Respectfully Submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*s/Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR.
Assistant United States Attorney

DANIEL G. BOGDEN
United States Attorney
District of Nevada

*s/Steven W. Myhre*
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys

**Gov't's Memo in Support of Its Motion for PT Detention**          **Page 33**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the **GOVERNMENT'S MEMORANDUM IN SUPPORT**

**OF ITS MOTION FOR PRETRIAL DETENTION** was emailed to Defendant Cliven

Bundy's attorney Noel Grefenson on February 16, 2016, at ngrefenson@aol.com.


*s/Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR.
ASSISTANT U.S. ATTORNEY

**CERTIFICATE OF SERVICE**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

No. 3:16-mj-00014

Plaintiff,

**ORDER APPOINTING COUNSEL**

v.

CLIVEN D. BUNDY,

Defendant.

IT IS ORDERED that counsel from the Criminal Justice Act Panel is hereby appointed to

act as counsel for Cliven D. Bundy, pursuant to the provisions of 18 U.S.C. § 3006A(c).

Specifically, the Criminal Justice Act Panel has designated Noel Grefenson, whose business

address is 1415 Liberty Street SE, Salem, Oregon, 97302.

Dated this 12th day of February, 2016.

The Honorable John V. Acosta
United States Magistrate Judge

Presented by:

Lisa Hay
Federal Public Defender

**Page 1**    **ORDER APPOINTING COUNSEL**

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants: Steven W. Myhre (mamie.ott@usdoj.gov, steven.myhre@usdoj.gov),
Charles F. Gorder, Jr (charles.gorder@usdoj.gov, lori.mcbryde@usdoj.gov), Noel Grefenson
(ngrefenson@aol.com)
--Non Case Participants: U.S. Marshal Service (pdx.operations@usdoj.gov), U.S. Pretrial
Services (cmecf@orpt.uscourts.gov)
--No Notice Sent:

Message-Id:5400816@ord.uscourts.gov
Subject:Activity in Case 3:16-mj-00014 USA v. Bundy Detention Hearing
Content-Type: text/html
```

## U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 2/16/2016 at 3:55 PM PST and filed on 2/16/2016

| | |
|---|---|
| **Case Name:** | USA v. Bundy |
| **Case Number:** | 3:16–mj–00014 |
| **Filer:** | |
| **Document Number:** | 7(No document attached) |

**Docket Text:**
 **Minutes of Proceedings: Detention Hearing before Magistrate Judge Janice M. Stewart as to Cliven D. Bundy(USM #79563–065). Order DETAINED: Flight/Danger. Counsel Present for Plaintiff: Steven Myhre, Charles Gorder. Counsel Present for Defendant: Noel Grefenson. (Court Reporter Nancy Walker) (jlr)**


**3:16–mj–00014–1 Notice has been electronically mailed to:**

Charles F. Gorder , Jr   charles.gorder@usdoj.gov, Lori.McBryde@usdoj.gov

Noel Grefenson   ngrefenson@aol.com

Steven W. Myhre   steven.myhre@usdoj.gov, mamie.ott@usdoj.gov

**3:16–mj–00014–1 Notice will <u>not</u> be electronically mailed to:**

ORP DET ORD (1/15/16)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

v.

*CLIVEN D. BUNDY*

Case No. _3:16-mg-00014_

ORDER OF DETENTION AFTER HEARING (18
USC § 3142(i))

☒ On motion of the Government involving an alleged:

  ☒ risk to the safety of any other person or the community for cases involving crimes described in 18 USC § 3142(f)(1)
  ☒ serious risk defendant will flee;
  ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,

☐ Upon consideration by the court *sua sponte* involving a:

  ☐ serious risk defendant will flee;
  ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,

Having considered the nature and circumstances of the offense charged, the weight of evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person and to the community that would be posed by the defendant's release, the court finds that:

☒ The offense charged creates a rebuttable presumption in 18 USC § 3142(e) that no combination of conditions will reasonably assure the safety of the community.

☒ No condition or combination of conditions will reasonably assure the appearance of defendant as required due to:

  ☐ Foreign citizenship and/or illegal alien    ☐ In custody/serving sentence    ☐ Substance use/abuse
  ☐ ICE Detainer                                ☐ Outstanding warrant(s)         ☐ Unknown family/employment/community ties
  ☐ Deportation(s)                              ☐ Prior failure(s) to appear     ☐ Unstable/no residence available
  ☐ Multiple or false identifiers               ☐ Mental health issues           ☐ Information unverified/unverifiable
  ☐ Aliases
  ☐ Prior criminal history, ☐ including drug/drug related offense, ☐ including alcohol/alcohol related offense
  ☐ Prior supervision failure(s), ☐ Including illicit drug use, ☐ including alcohol abuse
  ☒ Other: _Previous failures to follow federal court orders_

☒ No condition or combination of conditions will reasonably assure the safety of other persons and the community due to:

  ☒ Nature of offense                           ☐ Prior supervision failures
  ☐ Arrest behavior                             ☐ Substance use/abuse
  ☐ Possession of weapon(s)                     ☐ Mental health issues
  ☐ Violent behavior                            ☐ Alleged offense involves child pornography on the internet
  ☐ Prior criminal history, ☐including drug/drug related offense,  ☐ including alcohol/alcohol related offense
  ☐ Prior supervision failure(s), ☐ Including illicit drug use,    ☐ including alcohol abuse
  ☒ Other: _Public statements & threats; armed bodyguards_

☐ Other (writ/serving federal or state sentence): _____

☒ Defendant has not rebutted by sufficient evidence to the contrary the presumption provided in 18 USC § 3142(e).

☐ The defendant is detained without prejudice to further review by the court at a later date.

**THEREFORE, IT IS ORDERED** that:

  1.  Defendant is detained prior to trial;
  2.  Defendant is committed to the custody of the Attorney General for confinement in a corrections facility separated, as far as practicable, from persons awaiting or serving sentences or being held in custody pending appeal;
  3.  Defendant shall be afforded a reasonable opportunity for private consultation with his counsel;
  4.  The superintendent of the corrections facility in which defendant is confined shall make the defendant available to the United States Marshal for the purpose of appearance in connection with any court proceeding.

DATED: _Feb 16_, 2016

_Janice M Stewart_
United States Magistrate Judge Janice M. Stewart

1 - DETENTION ORDER

BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney
Charles.Gorder@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR   97204-2902
Telephone:   (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:16-MJ-00014** |
| v. | **MOTION FOR CANCELLATION OF PRELIMINARY HEARING AND FOR ISSUANCE OF ORDER OF COMMITMENT TO THE DISTRICT OF NEVADA** |
| **CLIVEN D. BUNDY,** | |
| Defendant. | |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and through Charles F. Gorder, Jr., Assistant United States Attorney, moves the Court for cancellation of the preliminary hearing scheduled in this matter and for an order of commitment to the District of Nevada.

At the initial appearance in this matter, defendant Cliven D. Bundy waived an identity hearing and requested a preliminary hearing.   The Court scheduled that preliminary hearing for Friday, February 19, 2016, at 1:30 p.m.   On Wednesday, February 17, 2016, the federal grand jury in the District of Nevada returned an indictment against defendant Cliven D. Bundy.   The indictment charges the defendant and others with numerous federal offenses which were the

subject of the Nevada complaint previously presented to this Court.   A copy of the indictment is

attached.   As such, there is no further need for the preliminary examination.   Fed. R. Crim.

P. 5.1(a)(2).

The government therefore requests that the Court cancel the preliminary hearing and issue

an order of commitment directing the United States Marshals to transport the defendant to the

District of Nevada.   Noel Grefenson, attorney for the defendant, has no objection to this request.

The government will submit forthwith the usual form of Commitment Order.

Dated this 18th day of February 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney


*s/ Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR., OSB #91287
Assistant United States Attorney

**Motion for Cancellation of Preliminary Hearing and for Issuance of Order of            Page 2
Commitment to the District of Nevada**

DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

FILED ___ RECEIVED
ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

FEB 17 2016

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) **CRIMINAL INDICTMENT** |
| Plaintiff, | ) |
| | ) 2:16-CR-__46__ |
| v. | ) |
| | ) **VIOLATIONS:** |
| CLIVEN D. BUNDY, | ) |
| RYAN C. BUNDY, | ) 18 U.S.C. § 371 – Conspiracy to Commit |
| AMMON E. BUNDY, | ) an Offense Against the United States; |
| RYAN W. PAYNE, and | ) |
| PETER T. SANTILLI, Jr., | ) 18 U.S.C. § 372 – Conspiracy to Impede |
| | ) and Injure a Federal Officer; |
| Defendants. | ) |
| | ) 18 U.S.C. § 111(a)(1) and (b) – Assault on |
| | ) a Federal Officer; |
| | ) |
| | ) 18 U.S.C. § 115(a)(1)(B) – Threatening a |
| | ) Federal Law Enforcement Officer; |
| | ) |
| | ) 18 U.S.C. § 924(c) – Use and Carry of a |
| | ) Firearm in Relation to a Crime of |
| | ) Violence; |
| | ) |
| | ) 18 U.S.C. § 1503 – Obstruction of the |
| | ) Due Administration of Justice; |
| | ) |
| | ) 18 U.S.C. § 1951 – Interference with |
| | ) Interstate Commerce by Extortion; |
| | ) |
| | ) 18 U.S.C. § 1952 – Interstate Travel in |
| | ) Aid of Extortion; |
| | ) |
| | ) 18 U.S.C. § 2 – Aiding and Abetting |
| | ) |
| | ) |

The Grand Jury charges that at all times relevant to this Indictment:

I.

SUMMARY

1.     This Indictment resulted from a massive armed assault against federal law enforcement officers that occurred in and around Bunkerville, Nevada, on April 12, 2014.  The defendants planned, organized, and led the assault in order to extort the officers into abandoning approximately 400 head of cattle that were in their lawful care and custody. In addition to conspiring among themselves to plan and execute these crimes, the defendants recruited, organized, and led hundreds of others in using armed force against law enforcement officers in order to achieve their criminal objectives.

2.     One of the goals of the conspiracy was to thwart the seizure and removal of defendant Cliven BUNDY's ("BUNDY") cattle from federal public lands. BUNDY had trespassed on the public lands for over 20 years, refusing to obtain the legally-required permits or pay the required fees to keep and graze his cattle on the land.

3.     Since 1998, BUNDY was under federal Court Order to remove his trespass cattle, an Order BUNDY refused to recognize or follow.  In 2013, a federal court issued two more Orders for removal, each declaring that, in keeping with the law, the United States was authorized to seize and remove the cattle from the land in the event BUNDY refused to do so.  BUNDY refused.

4.     The removal operation began on April 5, 2014.  While it was ongoing, BUNDY and his co-conspirators used deceit and deception to recruit others to help

2

them to force BLM to stop operations, flooding the internet with false and deceitful images and statements to the effect that law enforcement officers were abusing **BUNDY** and stealing his cattle.  Deliberately lying, they pleaded for others to travel to Nevada to "stop the abuse" by "making a show of force against [the officers]" in order "to get them to back down" and "return the cattle."  By the morning of April 12, hundreds of people, many armed with assault rifles and other firearms, had traveled to Bunkerville, becoming **BUNDY**'s "Followers," conspiring with, and aiding and abetting him and his co-conspirators to execute a plan to recover **BUNDY**'s cattle by force.

5.      On the morning of April 12, **BUNDY** organized his Followers and gave them the Order to get the cattle, directing a crowd of hundreds to travel more than five miles to the site where the cattle were corralled.  One group of Followers kept law enforcement officers occupied at the main entrance of the site by threatening to enter there, while another group – ultimately consisting of more than 200 Followers led by defendant Ammon **BUNDY** ("A. BUNDY") – assaulted the site from below, converging on its most vulnerable point: a narrow entrance located in a wash that ran under highway bridges.  Seeing the assault unfold, the officers responded to the wash to prevent entry.

6.      The 200 Followers in the wash included a significant number brandishing or raising their assault rifles in front of the officers.  Some of these gunmen took tactically superior positions on high ground, while others moved in and out of the crowd, masking their movements behind other unarmed Followers. The most immediate threat to the officers came from the bridges where gunmen

3

1    took sniper positions behind concrete barriers, their assault rifles aimed directly at

2    the officers below.

3          7.    Having seized the tactical advantage, **A. BUNDY** and his 200

4    Followers pressed forward to and against the wash entrance, demanding that the

5    officers leave and abandon the cattle, threatening to enter by force if they did not do

6    so. Outnumbered by more than 4:1, unwilling to risk harm to children and other

7    unarmed bystanders who had accompanied the Followers, and wishing to avoid the

8    firefight that was sure to follow if they engaged the snipers on the bridge who posed

9    such an obvious threat to their lives, the officers had no choice and were forced to

10   leave and abandon the cattle to **BUNDY** and his co-conspirators, who promptly

11   released and returned the cattle to **BUNDY**.

12         8.    Thereafter, the conspirators organized armed security patrols and

13   checkpoints in and around **BUNDY**'s property to deter and prevent any future law

14   enforcement actions against **BUNDY** or his co-conspirators and to protect his cattle

15   from future removal actions, cattle he continued to hold, graze and keep on federal

16   public lands unlawfully and continues to do so as of the date of this Indictment.

17

18                                   II.

19                          **THE DEFENDANTS**

20         9.    Defendant Cliven D. **BUNDY** ("**BUNDY**") was a resident of

21   Bunkerville, Nevada, and the operator of a ranch referred to as "Bundy Ranch." His

22   ranching operations included grazing cattle unlawfully on federal public land.

23         10.   Defendant Ryan C. **BUNDY** ("**R. BUNDY**") was a resident of Utah and

24   one of **BUNDY**'s adult sons who affiliated himself with Bundy Ranch.

                                    4

11.     Defendant Ammon E. **BUNDY** ("**A. BUNDY**") was a resident of Arizona and one of **BUNDY**'s adult sons who affiliated himself with Bundy Ranch.

12.     Defendant Ryan W. **PAYNE** ("**PAYNE**") was a resident of Montana and affiliated with an organization that he called Operation Mutual Aid ("OMA"). OMA purported to be "a coalition of States Militias, Patriotic Civilians, Individual Freedom Fighters, and Media Relations personnel from Patriotic political activism groups, in conjunction with local law enforcement if and where applicable."

13.     Defendant Peter T. **SANTILLI** ("**SANTILLI**") was a resident of California, who purported to be an internet blog radio host and affiliated with a show that he broadcasted over the internet.

### III.

### TERMS AND DEFINITIONS

14.     "Federal public land" or "public land" was land owned by the United States and managed through various agencies of the United States, including, among others, the United States Department of Interior, Bureau of Land Management ("BLM") and National Park Service ("NPS").

15.     The BLM and NPS employed Rangers, Officers, and Special Agents to enforce federal laws and regulations on public land under their management.

16.     BLM and NPS Rangers, Officers, and Special Agents were "federal law enforcement officers" under Title 18, United States Code, Section 115, that is, they were officers, agents, and employees of the United States authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of federal criminal law.

5

17.   The Bunkerville Allotment ("the Allotment") was an area of federal public land near Bunkerville, Nevada, under the management of BLM. The United States has owned the land comprising the Allotment since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

18.   The Lake Mead National Recreational Area ("LMNRA") was an area of federal public land located near or adjacent to the Allotment, under the management of the NPS. The United States has owned the land comprising the LMNRA since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

## IV.

## BUNDY TRESPASSED CATTLE ON PUBLIC LAND AND REFUSED TO COMPLY WITH FOUR COURT ORDERS TO REMOVE THEM

19.   Federal law required a rancher to obtain a grazing permit from the BLM and to pay fees to the United States to graze cattle on the Bunkerville Allotment. Grazing cattle without a permit constituted a trespass on public land.

20.   From 1993 to the date of this Indictment, **BUNDY** knowingly refused to pay fees or obtain permits as he kept and grazed his cattle on the Allotment year-round, constituting a continuing trespass on public land.

21.   In 1998, and because of **BUNDY**'s continuing trespass, the United States District Court for the District of Nevada (hereinafter "District Court" or "Federal Court") Ordered **BUNDY** to remove his cattle permanently from the

6

Allotment. **BUNDY** deliberately ignored the Order and continued to trespass by keeping and grazing his cattle unlawfully on public land.

22.     In 1999, the District Court fined **BUNDY** for each day he refused to remove his cattle.  **BUNDY** refused to pay the fines and continued to trespass by keeping and grazing his cattle unlawfully on public land.

23.     By 2012, **BUNDY**'s herd had multiplied substantially and spread into the LMNRA where **BUNDY** kept and grazed them year-round, refusing to pay fees or obtain permits, constituting a continuing trespass on public land.

24.     In 2013, the District Court issued two Orders.  One ordered **BUNDY** to remove his trespass cattle permanently from the LMNRA and the other re-affirmed the 1998 and 1999 Orders that required him to remove his cattle permanently from the Allotment. Both Orders declared that, in keeping with the law, the United States was authorized to seize and remove **BUNDY**'s trespass cattle if he did not comply with the Court's Orders.  One of the Orders expressly stated that **BUNDY** was "not to interfere" with any removal.

25.     **BUNDY** ignored the Orders and continued to keep and graze his trespass cattle unlawfully on public land.

V.

**THE BLM PLANNED TO SEIZE AND REMOVE THE CATTLE
FROM THE PUBLIC LANDS PURSUANT TO COURT ORDERS**

26.     In keeping with the law and the 2013 federal Court Orders, the BLM planned to seize and remove **BUNDY**'s trespass cattle, following well-established

7

rules and regulations governing this procedure, referred to hereinafter collectively as "impound" or "impoundment."

27.     A preliminary survey revealed that the BLM would have to impound almost 1,000 head of trespass cattle scattered over hundreds of thousands of acres of arid and difficult terrain.  Given these circumstances, BLM estimated that it would take a month or more to complete the impoundment.

28.     It was part of the plan that BLM would establish a base of operations (hereinafter referred to as "the Impoundment Site") located on the public lands near Bunkerville, about 7 miles away from Bundy Ranch in an area commonly referred to as the Toquop wash.

29.     It was part of the plan that on February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round-up and gather the trespass cattle.  The contract required the contractor to bring people and equipment to Nevada to conduct impoundment operations.

30.     It was part of the plan that the civilian contractor and crew would gather and move the trespass cattle from public land into corrals at the Impoundment Site where they would be held until such time as they could be further transported.

31.     It was part of the plan that on March 20, 2014, BLM entered into a contract for the services of an auctioneer in Utah.  The contract required the trespass cattle to be trucked from the Impoundment Site in Nevada to the contract auctioneer in Utah, who would then sell them at public sale.

8

32.    It was part of the plan that BLM would use BLM and NPS Rangers, Officers, and Special Agents to provide security for impoundment operations, including securing the cattle at the Impoundment Site and protecting the civilian contractors and government employees engaged in impoundment operations.

33.    It was part of the plan that BLM designated the Special Agent-in-Charge of BLM's Nevada and Utah region (hereinafter the "SAC") to lead impoundment operations.

## VI.

## BUNDY THREATENED TO "DO WHATEVER IT TAKES" TO PREVENT THE IMPOUNDMENT OF HIS CATTLE

34.    On October 23, 2012, and in connection with legal proceedings culminating in the 2013 Court Orders, **BUNDY** threatened to interfere with any impoundment by stating that he "would do whatever it takes" to stop the impoundment. When asked whether that included soliciting support from others to help him, **BUNDY** responded: "Yes."

35.    On March 14, 2014, the BLM formally notified **BUNDY** that impoundment operations would take place.

36.    On March 15, 2014, **BUNDY** threatened to interfere by stating publically that he "[was] ready to do battle" with the BLM and he would "do whatever it takes" to protect "his property."

37.    On March 17, 2014, a BLM Special Agent notified R. **BUNDY** that the Special Agent was available to answer any questions about the impoundment operation.    R. **BUNDY** became angry and threatened to interfere, stating that he

9

and his family would "do whatever it takes" and he would "have several hundred" with him to prevent the BLM from removing the trespass cattle. When asked whether his use of "whatever it takes" included physical force or violence, R. BUNDY replied: "I will do whatever it takes; you interpret that the way you want."

38.    On March 24, 2014, **BUNDY** threatened to interfere, stating publically that he intended to "organize lots of groups" to "come from hundreds of miles away" and he was in a "range war" with BLM that could "last a long time."

39.    On March 25, 2014, **BUNDY** threatened to interfere, stating publically that: "BUNDY's ready . . . whenever [the federal government's] got the guts to try it . . tell them to come . . . I'll do whatever it takes."

40.    On March 28, 2014, **BUNDY** threatened to interfere, stating publically that: "all of those cowboys are going to be thieves who steal my cattle . . . [i]t's like they're staging for a war . . . I told them I'd do whatever it takes . . . I'll stick with that."

## VII.

### BUNDY CARRIED OUT HIS THREATS BY CONSPIRING TO LIE, THREATEN FORCE AND VIOLENCE, AND USE FORCE AND VIOLENCE

A.    **Object and Nature of the Conspiracy.**

41.    Beginning in at least March 2014, and continuing to the date of this Indictment, the defendants conspired, confederated, and agreed to commit numerous federal offenses, as charged below, in order to achieve the objects of the conspiracy.

10

42.   The scope, nature, and objects of the conspiratorial agreement were to threaten force and violence and use force and violence to: (1) impede, obstruct, and interfere with BLM's impoundment; (2) obtain **BUNDY**'s impounded cattle; (3) intimidate and prevent law enforcement officers from taking action against the conspirators; and (4) threaten, intimidate, and prevent by force law enforcement officers from taking future law enforcement actions against **BUNDY** and his co-conspirators and prevent by force, the BLM from exercising regulatory and law enforcement authority over federal public lands.

**B.   Manner and Means of the Conspiracy.**

43.   To achieve their objectives, the conspirators recruited, organized, and led a force of hundreds of people (hereinafter referred to as "Followers") to threaten and use force and violence to prevent the law enforcement officers from discharging their duties and to coerce their consent to abandon the cattle that were, pursuant to Court Order, lawfully in their care and custody and which they were duty-bound to protect.

44.   As a part of the manner and means of the conspiracy, the defendants, among other things:

a.   Used deceit and deception to knowingly recruit Followers, that is, to encourage, counsel, and incite others to travel to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal Court Orders and using force and violence against federal law enforcement officers while they were performing their duties.

11

b.     Used the internet and other facilities in interstate commerce to knowingly broadcast false, deceitful, and deceptive images and messages for the purpose of recruiting Followers.

c.     Used the internet and other facilities in interstate commerce to encourage, counsel, and incite Followers to bring guns to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal Court Orders, and using force and violence against federal law enforcement officers to prevent them from discharging their duties.

d.     Traveled in interstate commerce and used other facilities in interstate commerce to threaten force, violence, and economic harm to private contractors providing services to the BLM during impoundment operations.

e.     Threatened and used force and violence against BLM civilian employees engaged in impoundment operations for the purpose of obstructing the execution of federal Court Orders and interfering with impoundment operations.

f.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of assaulting federal law enforcement officers.

g.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of extorting federal law enforcement officers.

h.     Organized Followers into body guards, armed patrols, and security checkpoints for the purpose of using threats, force, violence, and intimidation to protect the conspirators, prevent law enforcement actions against

12

1   the conspirators, prevent the execution of federal Court Orders, and prevent law

2   enforcement officers from discharging their duties.

3   C.    Roles of the Conspirators.

4        45.    **BUNDY** was the leader, organizer, and chief beneficiary of the

5   conspiracy, possessing ultimate authority over the scope, manner, and means of

6   conspiratorial operations and receiving the economic benefits of the extortion.

7        46.    **A. BUNDY** and **R. BUNDY**, were leaders and organizers of the

8   conspiracy who, among other things: recruited Followers; interfered with

9   impoundment operations through threats and use of force and violence; interfered

10  with impoundment operations by attempting to extort BLM contractors; led an

11  armed assault against federal law enforcement officers; delivered extortionate

12  demands to law enforcement officers; and extorted federal law enforcement officers.

13       47.    **PAYNE** was a leader and organizer of the conspiracy who, among

14  other things: recruited Followers; organized armed Followers; communicated the

15  objectives of the conspiracy to armed Followers; led an armed assault on federal

16  officers; and organized protection for the conspirators and the criminal enterprise.

17       48.    **SANTILLI** was a leader and organizer of the conspiracy who, among

18  other things: recruited Followers using the internet and other facilities in interstate

19  commerce; led an assault on federal officers;  threatened federal law enforcement

20  officers; and participated in the extortion of federal law enforcement officers.

21

22

23

24

13

D.    **Overt Acts in Furtherance of the Conspiracy.**

49.    It was a part of the conspiracy and for the purpose of carrying out the objects of the conspiracy, the defendants performed, or caused to be performed, the following overt acts, among many others.

1.    **March 28 to April 11: The Conspirators Interfered with Impoundment Operations and Used Deceit and Deception to Recruit Followers.**

50.    On or about March 28, 2014, **BUNDY, R. BUNDY,** and others working with them, blocked a convoy of vehicles carrying horses and equipment intended for use in impoundment operations, confronting and threatening civilian contractors, endangering the safety of the personnel in the convoy, and interfering with impoundment operations.

51.    Shortly thereafter, and in an effort to recruit Followers, **BUNDY** caused the broadcast of a video of the confrontation with the contractors entitled "Range War," depicting images captured during the confrontation, combining them with false, deceitful and deceptive statements to the effect that the BLM was stealing **BUNDY'S** cattle.

52.    On or about April 2, 2014, **R. BUNDY** and others working with him, traveled from Nevada to Utah to threaten force, violence and economic harm to the contract auctioneer providing services to the BLM, by, among other things, entering upon the contractor's property for the purpose of interfering with business operations, threatening and intimidating customers and employees, interfering with business operations, and threatening to shut down the business if the contractor fulfilled his contractual obligations with BLM.

14

53.    On or about April 5, 2014, **BUNDY** threatened force and violence against federal law enforcement officers by publically stating, among other things: "I've done quite a bit so far to keep my cattle, but I guess it's not been enough . . . they took 75 of my cattle today . . . I have said I'd do what it takes to keep my cattle so I guess it is going to have to be more physical."

54.    On or about April 6, 2014, **R. BUNDY** and his brother, Dave, interfered with impoundment operations by positioning themselves to block a BLM convoy and refusing to leave the area when asked to do so.  Failing to leave after repeated requests, Dave Bundy was arrested by law enforcement officers.

55.    Shortly thereafter, the defendants caused images of the Dave Bundy arrest to be broadcasted over the internet, combining them with false, deceitful and deceptive statements to the effect that the BLM supposedly: employed snipers against Bundy family members; used excessive force during the arrest; and arrested Bundy for exercising his First Amendment rights.

56.    On or about April 7, 2014, **A. BUNDY** traveled from Arizona to the Bundy Ranch in Nevada.

57.    On or about April 7, 2014, **PAYNE** in Montana, contacted **BUNDY** in Nevada, by telephone.

58.    On or about April 7, 2014, **PAYNE** used the internet and other facilities in interstate commerce to recruit others to travel to the Bundy Ranch for the unlawful purpose of interfering with impoundment operations, stating falsely, among other things, that the Bundy Ranch was surrounded by BLM snipers, that the Bundy family was isolated, and that the BLM wanted **BUNDY** dead.

15

59. On or about April 7, 2014, **BUNDY** and others working with him established a site only minutes travel distance from the Bundy Ranch along Nevada State Route 170, a state road that also served as the main route between the Impoundment Site and the public land where impoundment operations were taking place. Strategically located between the Impoundment Site and various ingress and egress points to public land, the location of site served as both a natural vantage point from which to observe impoundment operations and a potential choke-point for disrupting BLM convoys. Conspicuous for, among other things, a stage and two tall flagpoles, one of which flew the Nevada State flag above the flag of the United States, this site (hereinafter referred to as "the Staging Site") served as a base of operations from which the conspirators made speeches, received and organized Followers as they arrived at Bundy Ranch, and gathered and organized Followers before initiating their assaults on federal law enforcement officers.

60. On or about April 8, 2014, **SANTILLI** in California, contacted **BUNDY** in Nevada, by telephone.

61. On or about April 8, 2014, **SANTILLI** and **BUNDY** broadcasted messages over the internet. Using deceit, deception, and threats to encourage and incite others to travel to Bundy Ranch for unlawful purposes, **BUNDY** told listeners, among other things, that: "they have my house surrounded . . . the federal government is stealing my property . . . [the BLM] are armed with assault rifles . . . they have snipers . . . I haven't called no militia but, hey, that look like where we are . . . there is a strong army out here . . . we are going to have to take our land back . . . somebody is going to have to back off . . . we the people will put our boots

16

down and walk over these people . . . they are up against a man who will do whatever it takes."

62.    In that same broadcast, **SANTILLI** used threats to encourage and incite listeners to travel to Bundy Ranch for unlawful purposes, telling listeners, among other things, that: "if this is not the issue right now where we stand and fight to the absolute death there is no other option; the federal government must get out of the State of Nevada . . . if they don't want it to be peaceful it is by their choice. . . I'm calling on all Americans anywhere in the vicinity of Clark County, Nevada . . . if you're in Nevada and can legally carry, get weapons out there, o.k. . . . we are going to stand and fight in Clark County, Nevada . . . they will leave or else."

63.    On or about April 8, 2014, **PAYNE** sent a message from Montana to Pennsylvania to another person who referred to himself as one of the leaders in OMA, stating, among other things, that it was "time to invite everyone to the first annual Patriots (sic) Picnic at the Bundy Ranch" and telling the OMA leader that the Bundys "still want help."

64.    On or about April 8, 2014, and for the purpose of recruiting Followers, **PAYNE** sent a message over the internet, stating that he had spoken with **BUNDY** and that "he knows we're coming and has opened his land up to everyone willing . . . OMA is moving . . . not going public with this until more are enroute."

65.    On or about April 8, 2014, **PAYNE** caused an email to be sent to OMA members stating: "we have made the decision to mobilize in Nevada, units are underway as I type this . . . the feds arrested some protestors today, and the words 'we need you now' were uttered . . . we have approximately 150 responding, but that

17

number is [gr]owing by the hour." The message provided directions and grid coordinates to Bundy Ranch.

66.   On or about and between April 8 and 9, 2014, **SANTILLI** traveled from California to Bundy Ranch in Nevada.

67.   On or about and between April 8 and 9, 2014, **PAYNE** traveled from Montana to Bundy Ranch in Nevada.

68.   On or about April 9, 2014, **PAYNE** and **SANTILLI** met with **BUNDY** and other conspirators at Bundy Ranch.

69.   On the morning of April 9, 2014, **SANTILLI** met with the SAC and stated that he was acting as a liaison between Bundy Followers and the BLM. Threatening the SAC, **SANTILLI** asked rhetorically: "What are you guys going to do if 10,000 people show up? . . . Are you prepared for this?" **SANTILLI** added: "I don't believe in firing a single bullet unless in absolute defense and it's legal and constitutional."

70.   On or about April 9, 2014, and for the purpose of encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, the conspirators caused a message to be broadcasted over the internet, stating: "The Bundy family has requested help from militia groups including Operation Mutual Aid, 3 Percenters club, freedom fighters, and other operations to come and stand with us and regain our rights and freedom."

71.   On April 9, 2014, and for the purpose of encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "the BLM knows if they are

18

1   outnumbered and outgunned . . . they will stand down . . . we want BLM to get out

2   of the state of Nevada . . . I fully expect the standoff will occur when thousands go to

3   repossess the rightfully owned property of the Bundys . . . we need strength in

4   numbers."

5       72.   On or about April 9, 2014, **R. BUNDY,** and others working with him,

6   traveled for a second time from Nevada to Utah to threaten force, violence and

7   economic loss to the contract auctioneer providing services to the BLM by, among

8   other things: intimidating customers; interfering with business operations; and

9   instilling fear and apprehension in customers and employees.

10       73.   On or about April 9, 2014, and for the purpose of encouraging and

11   inciting other to travel to Bundy Ranch for unlawful purposes, **SANTILLI**

12   broadcasted a message over the internet, stating, among other things: "now is the

13   time to show up for something like this . . . we need ten thousand people to come

14   here . . . I only have one fear is that people that don't respond to this call . . . it's

15   time to make a stand against tyranny . . . we need to let everyone know that BLM

16   has zero authority."

17

18       74.   On April 9, 2014, **SANTILLI** and **A. BUNDY** assaulted federal officers

19   by, among other things: intercepting and blocking a convoy of BLM vehicles

20   engaged in impoundment operations; colliding an ATV into a truck in the convoy in

21   an attempt to stall the truck; attempting to forcibly gain entrance to the stalled

22   truck; attempting to throw a rock at law enforcement officers protecting the convoy;

23   threatening physical harm to law enforcement officers while they were protecting

24   the truck and the civilian passengers inside; and causing physical contact with an

19

officer while the officer was engaged in  protecting the truck and the civilian passengers inside.

75.    On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for unlawful purposes, SANTILLI broadcasted a message over the internet, stating, among other things: "we were serious about stopping the convoy . . . [the BLM] were caught off guard and tried to push past us . . . they couldn't do it . . . we outnumbered them and they retreated . . . we know how they will come back after they retreat . . . my biggest fear is if we don't respond . . . they retreated and will come back with a bigger force . . . we need to disperse them with tens of thousands . . . we want BLM to always retreat because we will always outnumber them . . . we have all been waiting for that ultimate moment . . . there is so much at stake . . . we can win with numbers . . . I've got people coming from Michigan . . . militia members who are fully armed are here . . . it's good to watch the BLM with its tail between its legs . . . get out here . . . this is going to get exciting . . . ultimately get the feds to leave."

76.    On April 10, 2014, and for the purpose of encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, PAYNE caused an email to be sent to self-described "militia" members of OMA under the subject line "Bundy Objectives," as follows:

> Nevada Alert!  We are requesting help to distribute the following to any and all media, blog, patriot groups etc.
>
> 1.    Secure the Bundy family from government incursion which includes protection of all personnel responding in support of the Bundys ie. Protestors, extended family, and friends.

20

2.     To return the confiscated Clark County Nevada property currently blocked by federal personnel to it's (sic) rightful stewards, the people of Clark County, Nevada.

3.     To secure and return to Mr. Bundys (sic) ranch the mounting number of cattle which have been confiscated by BLM agents and private contractors.

These objectives are in cohesion with Cliven Bundy and the Bundy ranch . . . .

77.     On or about April 10, 2014, and for the purpose of encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, SANTILLI broadcasted a message over the internet, stating, among other things: "there is not enough militia here . . . we have thousands of very organized constitutional militia . . . they are trickling in . . . where we will fail is for us not to at least match the overwhelming force . . . we have about 50 members here now . . . where we will fail is for us not to not match the BLM force . . . we need a show of force . . . we did a recon and found that BLM have hundreds of vehicles . . .  BLM needs to vacate immediately . . . we need the numbers for the feds to leave . . . they will come back with a bigger force . . . we need tens of thousands of people so they retreat . . . come out here . . . we've all been waiting for the ultimate moment . . . we can win with numbers . . . get out here no matter where you are . . . militia members here are fully armed."

78.     On or about April 10, 2014, and for the purpose of encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, SANTILLI broadcasted a message over the internet, stating, among other things: "there is a court order, but the court is corrupt . . .  BLM believes they are acting

21

constitutionally . . . BLM is in violation of every God-given right of every human being . . . [BLM's] closure orders are 'shelter in place'. . . [BLM] aimed AR-15s at me [during confrontation on April 9] . . . Waco and Ruby Ridge was a show of force by government and violated sovereign rights . . . if we have 10,000 people, [the BLM] will have to get past us."

79.    On the morning of April 11, 2014, **SANTILLI** met with the SAC and stated, among other things: "we are going to have a face-to-face confrontation . . . we have thousands of people . . . we are going to come here and it is non-negotiable . . . if that comes about, we want to make sure that any [BLM officer] who wants to stand down will not be retaliated against . . . this is non-negotiable . . . if you make the decision to go face-to-face and someone gets hurt we are going to hold you responsible . . . tell D.C. that the justification for this is from a corrupt court . . . I'm relaying a message . . . if anyone is acting unconstitutionally they will be arrested . . . I came here to allow you to prevent a scenario where someone gets hurt."

80.    By on or about April 11, 2014, hundreds of Followers traveled to Nevada, many armed with assault rifles and other firearms.

81.    By on or about April 11, 2014, **PAYNE** and others working with him, received and organized the armed Followers, placing them into camps from which to mobilize and deploy them.

82.    By on or about April 11, 2014, **PAYNE**, and others working with him, organized the armed Followers into patrols and security checkpoints to provide security to the conspirators and their criminal enterprise.

22

2.     **April 12: The Conspirators Assaulted and Extorted Law Enforcement Officers.**

83.     It was further a part of the conspiracy that on April 12, 2014, the defendants organized, led, and executed a mass assault on federal law enforcement officers in order to obtain the seized cattle, as follows.

84.     By the morning of April 12, the BLM had seized approximately 400 head of cattle and had them corralled at the Impoundment Site, awaiting further shipment out of the state of Nevada.

85.     On the morning of April 12, **BUNDY** led a rally of hundreds of his Followers at the Staging Site where he told them that "God [is] going to be with us" and that it was time "to take our land back." He then commanded his Followers to get the cattle.

86.     **BUNDY** directed his Followers that "horse people" (Followers riding horses) would leave the Staging Site and travel a dirt road to the Toquop wash, the location of the Impoundment Site, a distance of about 3.5 miles. While that was happening, so commanded by **BUNDY**, the other Followers were to travel the highway by vehicle, a distance of about 5 miles, and "shut down the freeway" at the Impoundment Site. The Followers, so directed by **BUNDY**, were then to meet with the "horse people" in the Toquop wash.

87.     The Followers did as **BUNDY** ordered. The Followers, many of them armed with a variety of firearms, including assault rifles, hurriedly loaded themselves into cars and trucks and moved *en masse* to the Impoundment Site, jamming the roads and slowing traffic on northbound Interstate-15 ("I-15") to a

23

trickle, making it difficult for state and local law enforcement vehicles to respond. When the Followers arrived at the Impoundment Site, they jumped out of their vehicles and many of them moved quickly on foot to a position across from the main entrance.

88.   The few local law enforcement officers who were able to respond formed a human line in the I-15 median to block the Followers, many of whom carried and brandished assault rifles, from entering at the main entrance to the Impoundment Site.

89.   Around 11:30 a.m., **A. BUNDY** directed Followers to follow him from the area across from the main entrance to the Impoundment Site to an area a few hundred yards east and below the main entrance, in the Toquop wash under the northbound I-15 bridge.  There, **A. BUNDY** waited while more Followers, seeing the movement of the others to the wash, moved there to join him.  As the Followers gathered in the wash, **A. BUNDY** instructed them that they were to wait there until the Followers on horseback arrived, as his father had stated at the Staging Site.

90.   About 150 yards across from **A. BUNDY**'s position was a makeshift metal rail gate that traversed the wash between the pillars that supported the southbound I-15 bridge, serving to block any unauthorized entrance to the Impoundment Site from the wash.  The gate was manned only by two officers who immediately called for backup when they first noticed **A. BUNDY** move to the wash with his Followers.  As the number of Followers in the wash grew, more officers

24

1  responded to the gate, eventually forming a line that started about 15 to 20 yards

2  behind the gate and extended up the wash, perpendicular to the gate.

3    91.   By 11:50 a.m., over 400 of **BUNDY**'s Followers had converged upon the

4  Impoundment Site, many of the Followers openly brandishing assault rifles, others

5  bearing side arms, the combined group grossly outnumbering the approximately 50

6  officers that had moved to the wash to protect the gate.   More and more of the

7  Followers moved to the wash while still others began flooding onto the southbound

8  I-15 bridges and bridge skirts, their movement there facilitated by the Followers

9  having slowed traffic on I-15 to a mere trickle.

10    92.   Around 12:00 noon, the 40-or-so Followers on horseback arrived at the

11  wash and joined with **A. BUNDY**'s group.   Then, the combined force of about 270

12  Followers – a combination of armed and unarmed on foot and on horseback – moved

13  out from under the northbound I-15 bridge and toward the officers at the gate.   The

14  officers immediately began ordering the crowd to disperse. Using loudspeakers, they

15  told the Followers that they were in a closed area, in violation of a Court Order.

16  Still they came.   As the Followers moved closer to them, the officers observed

17  gunmen moving with them and began calling out their positions to each other and

18  to their dispatch center.   On the loudspeaker, officers told the Followers that they

19  had spotted the gunmen and ordered them all to leave.   The commands went

20  unheeded and the Followers continued toward the gate.

21    93.   When the Followers got to within 60 yards of the gate, they stopped –

22  then formed a human line that stretched across the bottom of the wash. There the

23  Followers waited.

24

94.    The officers continued to call out any gunmen they observed.  They called out gunmen with "long guns" and sidearms moving in and out among the unarmed Followers on foot, some of them taking high ground.  They called out gunmen with "long guns" moving on the bridges and then disappearing.  One of the officers called out that they soon would be outgunned. As more gunmen moved to the wash, the officers reported that there were "more guns than they could count."

95.    The officers continued to use loudspeakers to command the Followers to disperse.  Their commands were met with angry taunts, the Followers screaming at the officers, demanding that they release BUNDY's cattle.

96.    The officers at the gate were dangerously exposed.  They were in the open on low ground at the bottom of the wash, below highway bridges that towered more than 40 feet above them and surrounded on the sides by steep embankments of high ground.  The terrain acted like a funnel with them at the bottom and no natural cover or concealment to protect them from the gunmen on the high ground, their only protection being their body armor and the vehicles they happened to drive to the gate. At this point, approximately 40 Followers were either carrying or brandishing firearms in front of the officers in the wash while more than 20 of them carried or brandished firearms on the bridges.

97.    The officers at the gate could readily observe gunmen bobbing up and down from behind the concrete barriers that bordered the northbound I-15 bridge, indicating to the officers that the gunmen were acquiring, and determining the range to, their officer-targets.  They observed armed gunmen dressed in military-style tactical gear and wearing body armor, moving in and among the unarmed

26

1    Followers, using them as human shields to mask their movements while still others

2    took tactically superior over-watch positions on the sides of the wash.

3        98.    The Followers' close proximity to the officers, their array and

4    formation in the wash, their refusal to disperse upon command, their angry taunts,

5    their numbers carrying or brandishing firearms, the movements of the gunmen in

6    and among the unarmed while brandishing assault rifles and wearing body armor,

7    and the superior position of the gunmen on the bridge above, all caused the officers

8    to fear immediate bodily harm or death.

9        99.    Around 12:15 p.m. and after hearing that from his officers at the gate

10   that there now were "too many guns to count" in front of them, the SAC was forced

11   to decide to give in to **BUNDY**'s demands and release the cattle in order to prevent

12   death or injury. The SAC moved from the main entrance area, down the wash and

13   to the gate, his purpose being to find a way to create space between his officers and

14   the Followers so the officers could safely disengage and avoid any potential

15   bloodshed while he found a way to release the cattle.

16       100.   As the SAC approached the gate, he observed assault weapons pointed

17   at him and armed gunmen moving to higher ground, all causing the SAC to fear

18   immediate bodily harm or death.

19

20       101.   When the SAC arrived at the gate, **A. BUNDY** came out from the line

21   and moved to the gate. The line of Followers advanced with him, yelling,

22   screaming, and taunting the officers as they moved. The gunmen on the bridges

23   took sniper positions, some behind the concrete barriers on the bridges and others

24

                                        27

1  under the bridges, trucked in the crevice where the bridge skirt connects to the

2  highway.

3      102.    As A. BUNDY moved to the gate, his gunmen in the wash moved with

4  him, openly brandishing their rifles and taking over-watch positions on the high

5  ground within full view of the tactically disadvantaged officers, the snipers on the

6  bridges now aiming their assault rifles directly at the officers below.  Seeing the

7  combined force arrayed against them — an organized crowd of more than 400

8  Followers, more than 270 of the Followers in the wash directly in front of them,

9  more than 60 Followers among the crowd carrying or brandishing rifles or pistols,

10  40 Followers on horseback, snipers concealed on and under the bridges above them

11  with their rifles zeroed-in on the officers, gunmen intermingled with the crowd

12  using the unarmed people to shield their movement, gunmen in over-watch

13  positions on the high ground, all refusing to leave, all of them there to get the cattle

14  — the officers believed they were going to be shot and killed.  They were stymied —

15  prevented from shooting the gunmen who posed such an obvious threat to their

16  lives out of concern they would spark a firefight that would kill or injure unarmed

17  people.  Unable to surgically remove the deadly threats before them, outnumbered,

18  outgunned, and located in a dangerously exposed and tactically inferior position, the

19  officers knew they were easy targets.  They still held their ground.

20      103.    Arriving at the gate, A. BUNDY met with the SAC who explained to

21  A. BUNDY that he would work with him to release the cattle but that he first had

22  to move his Followers back from the gate so the officers could safely disengage.  A.

23  BUNDY refused and demanded that the officers leave first, stating, among other

28

1   things, "You need to leave . . . that's the terms . . . no, you need to leave . . . you are

2   on Nevada State property . . . the time is now . . . no, the time is now."

3       104.    To prevent the disaster that was sure to follow if the officers remained

4   longer, the SAC was forced to give in to **A. BUNDY**'s demands and ordered his

5   officers to leave, abandoning the post, the impoundment site, and the cattle to

6   **BUNDY**.

7       105.    Having made the decision to meet the conspirators' demands, the SAC

8   met with **R. BUNDY** near the main entrance to the Impoundment Site to negotiate

9   the departure of the law enforcement officers. While the armed Followers held their

10  position below at the gate, **R. BUNDY** demanded that the BLM officers pack their

11  equipment hastily and leave the Impoundment Site within two hours.

12      106.    Thereafter, **R. BUNDY** assumed a leadership role in ensuring that the

13  officers left the Impoundment Site quickly and then organized the Followers to

14  release the cattle.

15      107.    The law enforcement officers were thus forced to abandon the

16  Impoundment Site and the cattle to the conspirators and their Followers, who

17  promptly released and returned them to **BUNDY** and took down the fences

18  comprising the corrals.

19      **3.    Continuing Conspiracy – Post-Assault to Indictment: The
            Conspirators Organized Bodyguards, Patrols, and Checkpoints
20          to Prevent and Deter Future Law Enforcement Actions.**

21      108.    It was further a part of the conspiracy that following the April 12

22  assault and extortion, the defendants took such other actions as necessary to

23

24

                                    29

protect themselves and their ill-gotten gains and to further interfere with and prevent future federal law enforcement actions on the public lands.

109. From April 12 to at least the end of May 2014, the defendants established, organized, and maintained camps to provide housing and logistical support to armed gunmen who continued to travel to the Bundy Ranch.

110. From April 12 to at least the end of May 2014, the defendants established armed checkpoints and security patrols to prevent and deter law enforcement actions against the conspirators, including recovering the extorted cattle.

111. From April 12, 2014 through September 2014, the defendants made statements to the SAC, threatening similar assaultive conduct in the event the BLM attempted further law enforcement actions against **BUNDY** or his conspirators.

112. From April 12, 2014 through the date of this Indictment, the defendants made public statements threatening that they would continue to interfere with federal law enforcement actions against them or the cattle.

113. From April 12, 2014 through the date of this Indictment, the defendants continued to employ armed body guards to protect **BUNDY** and other conspirators from federal law enforcement actions.

114. From April 12, 2014, through the date of this Indictment, the conspirators continue to take such actions as necessary to hold, protect, and prevent the impoundment of the extorted cattle and such other trespass cattle that are subject to the 2013 Court Orders.

30

## COUNT ONE
Conspiracy to Commit an Offense Against the United States
(Title 18, United States Code, Section 371)

115.   Paragraphs 1 through 114 are incorporated herein in full.

116.   Beginning in at least March 2014 and continuing to on or about the date of this Indictment, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, did conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit:

a.   Assault on a Federal Officer, in violation of Title 18, United States Code, Section 111(a)(1) and (b);

b.   Threatening a Federal Law Enforcement Officer, in violation of Title 18, United States Code, Section 115(a)(1)(B);

c.   Use and Carry of a Firearm In Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c);

d.   Obstruction of the Due Administration of Justice, in violation of Title 18, United States Code, Section 1503;

e.   Interference with Interstate Commerce by Extortion, in violation of Title 18, United States Code, Section 1951; and

f.   Interstate Travel in Aid of Extortion, in violation of Title 18, United States Code, Section 1952.

31

117.   In furtherance of the conspiracy, the defendants committed, attempted to commit and caused to be committed, the overt acts described herein and all of those comprising the offenses charged in Counts Three through Sixteen.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Conspiracy to Impede or Injure a Federal Officer
(Title 18, United States Code, Section 372)

118.   Paragraphs 1 through 114 are incorporated herein in full.

119.   Beginning in at least March 2014 and continuing to on or about the date of this Indictment, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to prevent by force, intimidation, and threats of violence, federal law enforcement officers from discharging the duties of their office under the United States, and to induce by force, intimidation, and threats, federal law enforcement officers to leave the place where their duties were required to be performed, that is, enforcing and executing federal Court Orders to remove trespass cattle from federal public lands and enforcing federal laws and regulations on federal public lands in and around the Allotment.

All in violation of Title 18, United States Code, Section 372.

32

## COUNT THREE
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

120.    Paragraphs 1 through 114 are incorporated herein in full.

121.    On or about April 12, 2014, in the State and Federal District of

Nevada, and elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and

unknown to the Grand Jury, did knowingly use and carry firearms, which were

brandished, during and in relation to a crime of violence for which they may be

prosecuted in a court of the United States, that is, conspiracy to impede and injure

an officer, in violation of Title 18, United States Code, Section 372, as charged in

Count Two of this Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT FOUR
Assault on a Federal Officer
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

122.    Paragraphs 1 through 114 are incorporated herein in full.

123.    On or about April 9, 2014, in the State and Federal District of Nevada,

and elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

33

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did use a dangerous and deadly weapon and forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers and intend to forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers, while they were engaged in and on the account of the performance of their official duties, that is, escorting and providing security for personnel and equipment traveling in a BLM convoy during impoundment operations as described herein.

All in violation of Title 18, United States Code, Sections 111(a)(1) and (b), 1114, and 2.

### COUNT FIVE
Assault on a Federal Officer
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

124.   Paragraphs 1 through 114 are incorporated herein in full.

125.   On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did use a deadly and dangerous weapon and forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers while they were engaged in, and on the account of, the performance of their official duties, that is, guarding and protecting the

34

1    Impoundment Site at or near Bunkerville, Nevada, in furtherance of the execution

2    of federal Court Orders to remove cattle from the Allotment, as described herein.

3         All in violation of Title 18, United States Code, Sections 111(a)(1) and (b),

4    1114, and 2.

5                                    **COUNT SIX**
                    Use and Carry of a Firearm in Relation to a Crime of Violence
6                        (Title 18, United States Code, Sections 924(c) and 2)

7         126.   Paragraphs 1 through 114 are incorporated herein in full.

8         127.   On or about, April 12, 2014, in the State and Federal District of

9    Nevada, and elsewhere,

                                 **CLIVEN D. BUNDY,**
10                               **RYAN C. BUNDY,**
                                 **AMMON E. BUNDY,**
11                               **RYAN W. PAYNE, and**
                                 **PETER T. SANTILLI, Jr.,**
12

13   defendants herein, aided and abetted by each other, and by others known and

14   unknown to the Grand Jury, did knowingly use and carry a firearm, which was

15   brandished, during and in relation to a crime of violence for which they may be

16   prosecuted in a court of the United States, that is, assault on a federal officer in

17   violation of Title 18, United States Code, Section 111(a)(1) and (b), as charged in

18   Count Five of this Indictment.

19         All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

20                                   **COUNT SEVEN**
                         Threatening a Federal Law Enforcement Officer
21                   (Title 18, United States Code, Sections 115(a)(1)(B) and 2)

22        128.   Paragraphs 1 through 114 are incorporated herein in full.

23

24

                                          35

129.   On or about April 11, 2014, in the State and Federal District of Nevada, an elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did threaten to assault the SAC, a federal law enforcement officer, and such other federal law enforcement officers associated with impoundment operations, with the intent to impede, intimidate, and interfere with said law enforcement officers while engaged in the performance of their official duties and with the intent to retaliate against said law enforcement officers on account of the performance of their duties, in that **SANTILLI** confronted the SAC at the Impoundment Site, threatening with words and actions to the effect that thousands would confront the officers with the potential for violence, as described herein.

All in violation of Title 18, United States Code, Sections 115(a)(1)(B) and 2.

36

**COUNT EIGHT**
Threatening a Federal Law Enforcement Officer
(Title 18, United States Code, Sections 115(a)(1)(B) and 2)

130.   Paragraphs 1 through 114 are incorporated herein in full.

131.   On or about April 12, 2014, in the State and Federal District of Nevada, an elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did threaten to assault the SAC, a federal law enforcement officer, and such other federal law enforcement officers associated with impoundment operations, with the intent to impede, intimidate, and interfere with said law enforcement officers while they were engaged in the performance of their official duties and with the intent to retaliate against said law enforcement officers on account of the performance of their duties, that is, guarding and protecting the Impoundment Site in furtherance of the execution of federal Court Orders to remove cattle from the Allotment as described herein.

All in violation of Title 18, United States Code, Sections 115(a)(1)(B) and 2.

**COUNT NINE**
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

Paragraphs 1 through 114 are incorporated herein in full.

37

132.   On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the grand jury, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, threating a federal law enforcement officer, in violation of Title 18, United States Code, Section 115(a)(1)(B), as charged in Count Eight of this Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

### COUNT TEN
Obstruction of the Due Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

133.   Paragraphs 1 through 114 are incorporated herein in full.

134.   On or about April 6, 2014, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did corruptly, and by threats and force, and by threatening communications, influence, obstruct, and impede, and attempt to

38

influence, obstruct, and impede, the due administration of justice, in that the defendants threatened to impede the execution of federal Court Orders when R. BUNDY, and others working with him, attempted to impede and obstruct a BLM convoy at or near Nevada State Route 170 while the convoy was engaged in impoundment operations, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

## COUNT ELEVEN
Obstruction of the Due Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

135.   Paragraphs 1 through 114 are incorporated herein in full.

136.   On or about April 9, 2014, in the State and Federal District of Nevada and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did corruptly, and by threats and force, and by threatening communications, influence, obstruct, and impede, and attempt to influence, obstruct, and impede, the due administration of justice, in that the defendants threatened force and violence and used force and violence to impede and thwart the execution of federal Court Orders, in that A. BUNDY and SANTILLI did impede and obstruct, and attempt to impede and obstruct, a BLM convoy while it was engaged in impoundment operations near Nevada State Route 170, as described herein.

39

All in violation of Title 18, United States Code, Sections 1503 and 2.

## COUNT TWELVE
Obstruction of the Due Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

137.   Paragraphs 1 through 114 are incorporated herein in full.

138.   On or about April 12, 2014, in the State and Federal District of Nevada,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did corruptly, and by threats and force, and by threatening communications, influence, obstruct, and impede, and attempt to influence, obstruct, and impede, the due administration of justice, in that the defendants threatened force and violence and used force and violence to impede, obstruct and thwart the execution of federal Court Orders by assaulting and extorting federal officers at the Impoundment Site, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

## COUNT THIRTEEN
Interference with Interstate Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

139.   Paragraphs 1 through 114 are incorporated herein in full.

40

140.    On or about April 9, 2014, in the State and Federal District of Nevada, and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did obstruct, delay and affect commerce, and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that the defendants attempted to obtain impounded cattle in the care, custody, and possession of a contract auctioneer in Utah, with his or her consent having been induced by the wrongful use of force, violence, and fear, including fear of economic loss, as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FOURTEEN
Interference with Interstate Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

141.    Paragraphs 1 through 114 are incorporated herein in full.

142.    On or about April 12, 2014, in the Federal District of Nevada, and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,

defendants herein, aided and abetted by each other, and by others known and

41

unknown to the Grand Jury, did obstruct, delay and affect commerce, and attempt

to obstruct, delay and affect commerce, and the movement of articles and

commodities in such commerce, by extortion, as those terms are defined in Title 18,

United States Code, Section 1951, in that the defendants did obtain, and attempt to

obtain, approximately 400 head of cattle at or near Bunkerville, Nevada, from the

care, custody, and possession of the SAC and such other federal law enforcement

officers engaged in impoundment operations, with their consent having been

induced by the wrongful use of force, violence, and fear as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIFTEEN
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

143.   Paragraphs 1 through 114 are incorporated herein in full.

144.   On or about April 12, 2014, in the State and Federal District of Nevada

and elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and

unknown to the grand jury, did knowingly use and carry firearms, which were

brandished, during and in relation to a crime of violence for which they may be

prosecuted in a court of the United States, that is, interference with interstate

commerce by extortion, in violation of Title 18, United States Code, Section 1951, as

charged in Count Fourteen of this Indictment.

42

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT SIXTEEN
### Interstate Travel in Aid of Extortion
(Title 18, United States Code, Sections 1952 and 2)

145. Paragraphs 1 through 114 are incorporated herein in full.

146. On or about and between April 5 and April 12, 2014, in the Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, traveled in interstate commerce and willfully used a facility in interstate commerce, namely the internet or worldwide web, with the intent to commit a crime of violence to further an unlawful activity, that is, extortion in violation of Title 18, United States Code, Section 1951(a) and Nevada Revised Statute 205.320, and thereafter committed, and attempted to commit, the crime of violence to further such unlawful activity.

All in violation of Title 18, United States Code, Sections 1952(a)(2) and 2.

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### FORFEITURE ALLEGATION ONE
(Conspiracy to Commit an Offense Against the United States;
Conspiracy to Impede and Injure a Federal Officer; Use and Carry of a
Firearm in Relation to a Crime of Violence; Assault on a Federal
Officer; Threatening a Federal Law Enforcement Officer; Obstruction
of the Due Administration of Justice; Interference with Interstate
Commerce by Extortion; and Interstate Travel in Aid of Extortion)

1.   The allegations contained in Counts One through Sixteen of this Criminal Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 924(d)(1) with Title 28, United States Code, Section 2461(c).

2.   Upon conviction of any of the felony offenses charged in Counts One through Sixteen of this Criminal Indictment,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, shall forfeit to the United States of America, any firearm or ammunition involved in or used in any knowing violation of Title 18, United States Code, Section 924(c), or any violation of any other criminal law of the United States, Title 18, United States Code, Sections 371, 372, 111(a)(1), 115(a)(1), 1503, 1951, and 1952: any firearm or ammunition possessed by the above-named defendants on April 12, 2014, at Impoundment Site near Bunkerville, Nevada, including but not limited to the handgun possessed by RYAN C. BUNDY.

All pursuant to Title 18, United States Code, Section 924(d)(1) with Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 924(c), 371, 372, 111(a)(1), 115(a)(1), 1503, 1951, and 1952.

44

### FORFEITURE ALLEGATION TWO
(Conspiracy to Commit an Offense Against the United States;
Conspiracy to Impede and Injure a Federal Officer; Use and Carry of a
Firearm in Relation to a Crime of Violence; Assault on a Federal
Officer; Threatening a Federal Law Enforcement Officer; Obstruction
of the Due Administration of Justice; Interference with Interstate
Commerce by Extortion; and Interstate Travel in Aid of Extortion)

1.  The allegations contained in Counts One through Sixteen of this Criminal Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 924(d)(1), (2)(C), and (3)(A) with Title 28, United States Code, Section 2461(c).

2.  Upon conviction of any of the felony offenses charged in Counts One through Sixteen of this Criminal Indictment,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, shall forfeit to the United States of America, any firearm or ammunition intended to be used in any crime of violence, Title 18, United States Code, Sections 371, 372, 111(a)(1), 115(a)(1), 924(c), 1503, 1951, and 1952: any firearm or ammunition possessed by the above-named defendants on April 12, 2014, at Impoundment Site near Bunkerville, Nevada, including but not limited to the handgun possessed by RYAN C. BUNDY.

All pursuant to Title 18, United States Code, Section 924(d)(1), (2)(C), and (3)(A) with Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 371, 372, 111(a)(1), 115(a)(1), 924(c), 1503, 1951, and 1952.

45

## FORFEITURE ALLEGATION THREE
(Conspiracy to Commit an Offense Against the United States and
Threatening a Federal Law Enforcement Officer)

1.   The allegations contained in Counts One, Seven, and Eight of this Criminal Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c).

2.   Upon conviction of any of the felony offenses charged in Counts One, Seven, and Eight of this Criminal Indictment,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,**

defendants herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 115(a)(1), a specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7)(D), or Title 18, United States Code, Section 371, conspiracy to commit such offense, an in personam criminal forfeiture money judgment, including, but not limited to, at least $3,000,000 in United States Currency, including any and all cattle on the Bunkerville Allotment and Lake Mead National Recreational Area (property).

3.   If any property subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants-

46

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States of America, pursuant to Title 21, United States

Code, Section 853(p), to seek forfeiture of any properties of the defendants for the

property listed above and the in personam criminal forfeiture money judgment

including, but not limited to, at least $3,000,000 in United States Currency.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title

28, United States Code, Section 2461(c); Title 18, United States Code, Sections 371

and 115(a)(1); and Title 21, United States Code, Section 853(p).

### FORFEITURE ALLEGATION FOUR
(Conspiracy to Commit an Offense Against the United States and Obstruction of the
Due Administration of Justice)

1.   The allegations contained in Counts One and Ten through Twelve of this

Criminal Indictment are hereby realleged and incorporated herein by reference for

the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section

981(a)(1)(C) with Title 28, United States Code, Section 2461(c).

2.   Upon conviction of any of the felony offenses charged in Counts One and

Ten through Twelve of this Criminal Indictment,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,

47

RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,

defendants herein, shall forfeit to the United States of America, any property, real

or personal, which constitutes or is derived from proceeds traceable to violations of

Title 18, United States Code, Section 1503, a specified unlawful activity as defined

in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1)(B), or Title 18,

United States Code, Section 371, conspiracy to commit such offense, an in personam

criminal forfeiture money judgment, including, but not limited to, at least

$3,000,000 in United States Currency, including any and all cattle on the

Bunkerville Allotment and Lake Mead National Recreational Area (property).

3.   If any property subject to forfeiture pursuant to Title 18, United States

Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a

result of any act or omission of the defendants-

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be divided

           without difficulty;

it is the intent of the United States of America, pursuant to Title 21, United States

Code, Section 853(p), to seek forfeiture of any properties of the defendants for the

property listed above and the in personam criminal forfeiture money judgment

including, but not limited to, at least $3,000,000 in United States Currency.

48

1    All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title

2    28, United States Code, Section 2461(c); Title 18, United States Code, Sections 371

3    and 1503; and Title 21, United States Code, Section 853(p).

### FORFEITURE ALLEGATION FIVE

4

5    (Conspiracy to Commit an Offense Against the United States; Interference with
Interstate Commerce by Extortion; and Interstate Travel in Aid of Extortion)

6    1.  The allegations contained in Counts One, Thirteen, Fourteen, and Sixteen

7    of this Criminal Indictment are hereby realleged and incorporated herein by

8    reference for the purpose of alleging forfeiture pursuant to Title 18, United States

9    Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c).

10    2.  Upon conviction of any of the felony offenses charged in Counts One,

11    Thirteen, Fourteen, and Sixteen of this Criminal Indictment,

12

13    CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,

14    RYAN W. PAYNE, and
PETER T. SANTILLI, Jr.,

15

16    defendants herein, shall forfeit to the United States of America, any property, real

17    or personal, which constitutes or is derived from proceeds traceable to violations of

18    Title 18, United States Code, Sections 1951 and 1952 and Nevada Revised Statute

19    205.320, specified unlawful activities as defined in Title 18, United States Code,

20    Sections 1956(c)(7)(A) and 1961(1)(A) and (1)(B), or Title 18, United States Code,

21    Section 371, conspiracy to commit such offenses, an in personam criminal forfeiture

22    money judgment, including, but not limited to, at least $3,000,000 in United States

23

24

49

1   Currency, including any and all cattle on the Bunkerville Allotment and Lake Mead

2   National Recreational Area (property).

3          3.   If any property subject to forfeiture pursuant to Title 18, United States

4   Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a

5   result of any act or omission of the defendants-

6          a.      cannot be located upon the exercise of due diligence;

7          b.      has been transferred or sold to, or deposited with, a third party;

8          c.      has been placed beyond the jurisdiction of the court;

9          d.      has been substantially diminished in value; or

10         e.      has been commingled with other property which cannot be divided

11                 without difficulty;

12

13   it is the intent of the United States of America, pursuant to Title 21, United States

14   Code, Section 853(p), to seek forfeiture of any properties of the defendants for the

15   property listed above and the in personam criminal forfeiture money judgment

16   including, but not limited to, at least $3,000,000 in United States Currency.

17         All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title

18   28, United States Code, Section 2461(c); Title 18, United States Code, Sections 371,

19

20

21

22

23

24

50

1951, and 1952; Nevada Revised Statute 205.320; and Title 21, United States Code, Section 853(p).

DATED:  this 17th day of February, 2016.

A TRUE BILL:

/S/
FOREPERSON OF THE GRAND JURY

DANIEL G. BOGDEN
United States Attorney

STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys

Attorneys for the United States.

51

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants: Charles F. Gorder, Jr (charles.gorder@usdoj.gov,
lori.mcbryde@usdoj.gov), Noel Grefenson (ngrefenson@aol.com), Steven W. Myhre
(mamie.ott@usdoj.gov, steven.myhre@usdoj.gov)
--Non Case Participants: U.S. Marshal Service (pdx.operations@usdoj.gov), U.S. Pretrial
Services (cmecf@orpt.uscourts.gov)
--No Notice Sent:

Message-Id:5403497@ord.uscourts.gov
Subject:Activity in Case 3:16-mj-00014 USA v. Bundy Order on Motion for Order
Content-Type: text/html
```

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 2/18/2016 at 11:52 AM PST and filed on 2/18/2016

| | |
|---|---|
| **Case Name:** | USA v. Bundy |
| **Case Number:** | 3:16–mj–00014 |
| **Filer:** | |
| **Document Number:** | 10(No document attached) |

**Docket Text:**
 **ORDER by Magistrate Judge Janice M. Stewart Granting [9] Government Motion To Cancel Preliminary Hearing And For Issuance of Order of Commitment To The District of Nevada as to Cliven D. Bundy (1) (jlr)**

**3:16–mj–00014–1 Notice has been electronically mailed to:**

Charles F. Gorder , Jr   charles.gorder@usdoj.gov, Lori.McBryde@usdoj.gov

Noel Grefenson    ngrefenson@aol.com

Steven W. Myhre   steven.myhre@usdoj.gov, mamie.ott@usdoj.gov

**3:16–mj–00014–1 Notice will not be electronically mailed to:**

AO 94 (Rev. 01/09) Commitment to Another District

# UNITED STATES DISTRICT COURT
### for the
### District of Oregon

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-MJ-00014 |
| | ) | |
| Cliven D. Bundy | ) | Charging District's |
| *Defendant* | ) | Case No.: 2:16-CR-00046 |

### COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____ District of  Nevada-Las Vegas .

The defendant may need an interpreter for this language: _____ .

The defendant:   ☐ will retain an attorney.

☑ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of court for this district must transmit any bail and documents to the charging district.

Date: February 18, 2016

_____
*Judge's signature*

HON. JANICE M. STEWART, U.S. MAGISTRATE JUDGE
*Printed name and title*