# EXHIBIT 1

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**AD HOC HEARING COMMITTEE**

In the Matter of

**LARRY KLAYMAN, ESQUIRE**
2020 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006

                Respondent,

**Member of the Bar of the District of**
**Columbia Court of Appeals**
**Bar Number: 334581**
**Date of Admission: December 22, 1980**

**Bar Docket No. 2008-**
**D048**

---

**RESPONDENT LARRY KLAYMAN'S POST-HEARING BRIEF AND PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Larry Klayman, Esq**.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Attorney for Himself, Pro Se*

# TABLE OF CONTENTS

I.      **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     **STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      A.      **Sandra Cobas**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      B.      **Louise Benson**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

      C.      **Peter Paul**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

III.    **THIS HEARING COMMITTEE SHOULD DISMISS ALL COUNTS IN THE
        AMENDED SPECIFICATION OF CHARGES BECAUSE BAR COUNSEL HAS
        FAILED TO MEET ITS BURDEN OF PROVING ITS CASE BY CLEAR AND
        CONVINCING EVIDENCE, RESPONDENT DID NOT REPRESENT COBAS,
        BENSON, OR PAUL IN THE SAME OR SUBTANTIALLY RELATED MATTER
        AS HIS PRIOR CLIENT, AND RESPONDENT DID NOT INTERFERE WITH
        THE ADMINISTRATION OF JUSTICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

      A.      **Bar Counsel Failed To Prove Its Case By the Required Standard of Clear
                and Convincing Evidence**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

      B.      **Respondent Did Not Violate D.C. Rule 1.9 In the Cobas, Benson, or Paul
                Matters Because He Did Not Represent Any of Them In the Same Or A
                Substantially Related Matter To His Prior Client and This Alleged Violation
                Should Be Dismissed Based on the Plain Language of Rule 1.9 and Its
                Comments Alone**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

            1.      Respondent Did Not Change Sides By Representing Sandra Cobas and
                        There Was No Substantial Risk That Any Confidential Information Could
                        Benefit Cobas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

            2.      Respondent Did Not Change Sides By Representing Louise Benson and
                        There Was No Substantial Risk That Any Confidential Information Could
                        Benefit Benson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

            3.      Respondent Did Not Change Sides By Representing Peter Paul and There
                        Was No Substantial Risk That Any Confidential Information Could
                        Benefit Paul. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

      C.      **Respondent Did Not Violate D.C. Rule 8.4(d) In the Paul Matter Because He
                Did Not Engage In Conduct That Seriously Interfered With the
                Administration of Justice and This Alleged Violation Should Be Dismissed
                Based on the Plain Language of Rule 8.4(d) and Its Comments Alone**. . . . . . .   25

IV.   **IN THE UNLIKELY EVENT THAT THIS HEARING COMMITTEE FINDS BY CLEAR AND CONVINCING EVIDENCE A TECHNICAL VIOLATION OF EITHER D.C. RULE 1.9 OR D.C. RULE 8.4(d), THE FACTS OF THESE CASES DO NOT WARRANT ANY DISCIPLINARY ACTION AT MOST MORE SERIOUS THAN AN INFORMAL ADMONITION BECAUSE NO DISHONESTY OR MISREPRESENTATION OCCURRED, RESPONDENT DID NOT GAIN ANY FINANCIAL BENEFIT, AND THERE ARE SERIOUS, MITIGATING FACTORS THAT MUST BE CONSIDERED**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.   **The Facts of These Cases Do Not Warrant Anything At Most More Than An Informal Admonition Because Respondent Did Not Act Dishonestly And Did Not Gain Any Financial Benefit**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     B.   **This Honorable Committee Must Consider the Serious, Mitigating Factors and The Law of Equity When Determining An Appropriate Remedy, In the Unlikely Event This Committee Does Not Dismiss the Case In Its Entirety**. . . 34

          1.   **The Doctrine of Laches**: The Passing of Almost Ten Years Since the Alleged Violations Occurred Has Significantly Harmed Respondent In Defending This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

          2.   **The Doctrine of Necessity**: Respondent Had No Other Recourse Without Violating D.C. Rule 1.3 and Indeed Hired Another Lawyer to Represent Benson and Cobas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

          3.   **Selective Prosecution**: Prejudice by Bar Counsel As a Result of Misconduct by Complainant, Thomas Fitton, as Respondent is Singled Out. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

          4.   **Due Process Violations**: Respondent Was Not Timely and Adequately Notified of Any Charges or Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . 40

          5.   **A Form of *Res Judicata***: A Federal Court Judge Already Resolved The Issues Related to the Paul Matter and Therefore Any Subsequent Attempt by Bar Counsel to Discipline Respondent is Barred. . . . . . . . . . . . . . . . . . . 41

V.   **RESPONDENT'S ADDITIONAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW NOT ALREADY ADMITTED OR DISPUTED**. . . . . . . . 44

     A.   **Respondent's Proposed Findings of Fact**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

          1.   Direct Examination of Thomas Fitton by Bar Counsel. . . . . . . . . . . . . . . . 44

          2.   Cross Examination of Thomas Fitton by Larry Klayman. . . . . . . . . . . . . . 45

          3.   Direct Examination of Paul Orfanedes by Larry Klayman. . . . . . . . . . . . . 46

4.     Direct Examination of Larry Klayman by Larry Klayman. . . . . . . . . . . . .  46

5.     Cross Examination of Larry Klayman by Bar Counsel. . . . . . . . . . . . . . .  51

6.     Direct Examination of Expert Witness Professor Ronald Rotunda by Larry
Klayman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

7.     Cross Examination of Expert Witness Professor Ronald Rotunda by Bar
Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

8.     Direct Examination of the Honorable Royce C. Lamberth by Larry
Klayman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

9.     Cross Examination of the Honorable Royce C. Lamberth by Bar Counsel. .  55

10.    Direct Examination of Dan Dugan by Bar Counsel. . . . . . . . . . . . . . . . . .  55

11.    Cross Examination of Dan Dugan by Larry Klayman. . . . . . . . . . . . . . . .  55

12.    Aggregating and Mitigating Circumstances. . . . . . . . . . . . . . . . . . . . . . . .  56

13.    Affidavit and Admitted Evidence of Peter Paul Supplied by the Honorable
Royce C. Lamberth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

**B.**    **Respondent's Proposed Conclusions of Law**. . . . . . . . . . . . . . . . . . . . . . . . . . .  58

**VI.**   **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

# TABLE OF AUTHORITIES

## **Cases**

*American Univ. Park Citizens Ass'n v. Burka,*
    400 A.2d 737 (D.C. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Atkins v. United States,*
    556 F.2d 1028 (Ct.Cl.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Beins v. District of Columbia Bd. of Zoning Adjustment,*
    572 A.2d 122 (D.C. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35, 59

*Brown v. District of Columbia Board of Zoning Adjustment,*
    486 A.2d 37 (D.C. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Caldwell-Gadson v. Thompson Multimedia,*
    SA 2000 U.S. Dist. LEXIS 16087 (S.D. Ind. 2000). . . . . . . . . . . . . . . . . . . . . . . . 18

*Committee for Washington's Riverfront Parks v. Thompson,*
    451 A.2d 1177 (D.C. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Health Care & Ret. Corp. of Am., Inc. v. Bradley,*
    961 So.2d 1071 (Fla. Dis. Ct. App. 4th Dist. 2007). . . . . . . . . . . . . . . . . . . . . . . 22, 34

*Kelson v. State Bar,*
    17 Cal.3d 1 (Cal. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Amendments to the Rules Regulating the Fla. Bar,*
    933 So.2d 417 (Fla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 59

*In re Anderson,*
    778 A.2d 330 (D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Allen,*
    27 A.3d 1178 (D.C. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Beaman,*
    4660 Martin Luther King, Jr. Avenue SW, Washington, D.C. March 30, 2001. . . . . . . . .27, 28

*In re Cater,*
    887 A.2d 1 (D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Cope,*
    455 A.2d 1357 (D.C. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Evans,*
    No. M-126-82 (D.C. Dec. 18, 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*In re Gonzales,*
    7921 Jones Branch Drive, McLean, Virginia. June 11, 2001. . . . . . . . . . . . . . . . . . . . . .27, 28

*In re Harmon,*
    M-79-81 (D.C. Dec. 14, 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*In re Klayman,*
    Bar Docket No. 2008-D048. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*In re Lunsford,*
    Bar No. 88096 January 31, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29, 30

*In re Machado,*
    Law Office of Alan Toppelberg, 1444 N Street NW, Washington, D.C. May 2, 2001. . . . .27, 28

*In re Matney,*
    740 P.2d 598 (Kan. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*In re Ponds,*
    888 A.2d 234 (D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35, 59

*In re Rivera,*
    1322 18th Street NW, Washington, D.C. January 29, 2001. . . . . . . . . . . . . . . . . . . . . .  28

*In re Romansky,*
    Bar Docket No. 2013-D078. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*In the Matter of Ruffalo, Jr.,*
    390 U.S. 544 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*In re Scully,*
    3027 O Street NW, Washington, D.C. April 26, 2001. . . . . . . . . . . . . . . . . . . . . . . . . .28, 29

*In re Snyder,*
    Bar Docket No. 2010-D238. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*In re Sofaer,*
    728 A.2d 625 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*In re Tenenbaum,*
    918 A.2d 1109 (Del. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35, 59

*In re Williams,*

464 A.2d 115 (D.C. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*In re Williams,*
513 A.2d 793 (D.C. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Morgan v. North Coast Cable Co.,*
63 Ohio St.3d 156 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 59

*Paul v. Judicial Watch, et al.,*
Case No. 1:07:cv-00279 (D.D.C. Feb. 5, 2007). . . . . . . . . . . . . . . . . . . . . . . . . .   41

*Short v. District of Columbia Dep't of Emp't Servs.,*
723 A.2d 845 (D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*United States v. Greenwood,*
796 F.2d 49 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

*United States v. Will,*
449 U.S. 200 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Wayte v. United States,*
470 U.S. 598 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39, 59

**Rules**

District of Columbia Court of Appeals Board on Professional Responsibility Board Rule 11.6 . .   14

District of Columbia Court of Appeals Board on Professional Responsibility Board Rule 11.11. . .   1

District of Columbia Rule of Professional Conduct 1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.3(a) cmt. 1. . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.3(a) cmt. 8. . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.3(a) cmt. 9. . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.9 cmt. 1. . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.9 cmt. 2. . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 1.9 cmt. 3. . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 8.4(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

District of Columbia Rule of Professional Conduct 8.4(d) cmt. 2. . . . . . . . . . . . . . . . . . . . . . . .   25

District of Columbia Rule of Professional Conduct 8.4(d) cmt. 3. . . . . . . . . . . . . . . . . . . . . .   26

Indiana Rule of Professional Conduct 1.9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

Indiana Rule of Professional Conduct 1.9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

15 U.S.C. § 1125 (Section 43(a) of the Lanham Act). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22, 23

18 Va. Code 2-2250. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

**The Constitution**

U.S. CONST. art. III, § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

**Other Sources**

Debra T. Landis, Annotation, Attorneys at Law: Delay in Prosecution of Disciplinary. . . . . . . . . .   35

District of Columbia Bar Ethics Opinion 272. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16, 59

Proceeding as Defense or Mitigating Circumstance,
    93 A.L.R.3d 1057 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

St. Thomas Aquinas, Summa Theologica, Part II, 2nd part, ques. 120, art. 1
    (Fathers of the English Dominican Province Trans., 3d ed. 1942). . . . . . . . . . . . . . . . . . . .   34

I.      **INTRODUCTION**.[1, 2]

Respondent, Larry Klayman, ("Respondent"), hereby respectfully submits this "Post-Hearing Brief And Proposed Findings of Fact and Conclusions of Law" to the Honorable Hearing Committee ("Committee"), which will render moot its " . . . *preliminary, non-binding determination* . . ." that Bar Counsel proved *by clear and convincing evidence* the alleged violations of Rules 1.9 and 8.4(d) of the District of Columbia Rules of Professional Conduct (" D.C. Rules" or "D.C. Rule") during the hearing heard before the Committee on January 26, 27, and 28 of 2016. *See District of Columbia Court of Appeals Board on Professional Responsibility Board Rule ("BPR Rules" or "BPR Rule") 11.11 (emphasis added).[3]

Thus, in making the determination that Respondent did not violate D.C. Rules 1.9 or 8.4(d), this Committee must consider that (1) Bar Counsel failed to prove its case **by clear and convincing evidence**, (2) Respondent did not represent Sandra Cobas ("Cobas"), Louise Benson ("Benson"), or Peter Paul ("Paul") in the same or substantially related matter as his prior client, Judicial Watch, Inc. ("Judicial Watch") because he never changed sides and there was no risk of the disclosure of any confidential information, and (3) Respondent did not interfere in any way

---

[1]      Respondent apologizes for any confusion he may have caused with his initial filing of March 18, 2016. Respondent's father unexpectedly died two weeks ago and as the oldest of six siblings, he has been traveling back and forth to Philadelphia, Pennsylvania to administer to his late father's affairs.

[2]      As a preliminary matter, and in order to fully comply with the Honorable Chair's Order of March 24, 2016, Respondent admits the following Proposed Findings of Fact: 1, 3-6, 8-17, 19-27, 29, 31-33, 36-38, 40, 42-44, 49, 51. Respondent disputes the following Proposed Findings of Fact: 2, 7, 18, 28, 30, 34-35, 39, 41, 45, 46-48, 50. The disputes are incorporated herein by numbered reference, and, for the Court's ease, are highlighted in yellow. Each corresponds to Bar Counsel's Proposed Findings of Fact. Respondent's Proposed Findings of Fact begin with the number 52, as Bar Counsel's end at number 51. Respondent disputes the only two Proposed Conclusions of Law that Bar Counsel submitted. The disputed record for the two Proposed Conclusions of Law is incorporated in the body of this Post-Hearing Brief. Therefore, Respondent's Proposed Conclusions of Law begin with the number 1. Respondent's additional Proposed Findings of Fact and Conclusions of Law are incorporated at the end of this Post-Hearing Brief, immediately preceding the Conclusion.

[3]      Respondent has filed a Motion to Dismiss, which remains pending and should respectfully be considered, ruled upon, and granted by this Committee.

with the administration of justice because he has cooperated with Bar Counsel, among other compelling reasons, throughout this proceeding.

However, in the unlikely event that this honorable Committee rules that there may have been a technical violation of D.C. Rules 1.9 or 8.4(d) – even after deliberating on the expert testimony of premiere ethics expert Ronald Rotunda, Respondent's own sworn testimony, and the testimony of the lawyer, Dan Dugan ("Dugan"), who agreed with and signed his name to pleadings concurrent with Respondent (as well as other compelling evidence) – the only plausible disciplinary action necessary is an informal admonition, as Respondent did not act dishonestly, he did not use confidential information to further his subsequent clients, he did not gain any financial benefit from his representation of Cobas, Benson or Paul, and serious, mitigating factors must be considered in light of Respondent's significant disadvantage to defend himself. Indeed, Bar Counsel has issued informal admonitions for far more serious alleged violations by attorney-members of the District of Columbia Bar, including pleading guilty to committing felonies and lying to courts, clients, and tribunals, as elucidated fully below. Respondent's alleged conduct did not come close to the allegations raised against these attorneys and Bar Counsel does not allege so.

## II.     STATEMENT OF FACTS.

Respondent has continuously been a member in good standing of the District of Columbia Bar and The Florida Bar. *See* Plaintiff's Exhibit 2, 3, 26 ("Pl.'s Ex."). He was admitted on December 22, 1980 in the District of Columbia and was assigned Bar Number 334581. Respondent is also the founder and former Chairman and General Counsel of Judicial Watch, a not-for-profit educational organization that seeks to promote ethics, government transparency and fight judicial and government corruption. Trial Tr., Jan. 27, 2016 at 324:14-15; *see* Respondent's Proposed Findings of Fact ("RPFOF") at ¶ 84, 88; *see also* Stipulation of Facts ("SOF") at ¶ 2. Respondent served as Chairman and General Counsel since Judicial Watch's inception in July of

1994 and remained in that capacity until September of 2003, when he voluntarily left Judicial

Watch, pursuant to the terms of his severance agreement, to run for the U.S. Senate in Florida. *Id.*

at 329:8-13; RPFOF at ¶ 89.

While campaigning in Florida for his U.S. Senate run, Respondent discovered that the

current President of Judicial Watch, Tom Fitton ("Fitton"), along with other directors and officers,

all of whom Respondent hired and cultivated, had fraudulently misrepresented to donors that

Judicial Watch was actively pursuing the purchase of a building with donor funds. RPFOF at ¶ 52,

84; SOF at ¶ 15. Respondent also discovered that Judicial Watch squandered and misappropriated

donor funds, failed to aggressively pursue cases that Respondent had left to the organization, and

vindictively fired and harassed most of the executive staff that Respondent had hired. RPFOF at ¶

99. As the founder of Judicial Watch, Respondent could not simply stand by and watch the

organization he founded and its employees fall victim to the unethical and illegal abuses of

Judicial Watch's directors and officers, particularly the actions and inactions of Fitton.

In light of the egregious misconduct within the organization, Respondent found it

necessary, and indeed ethically mandated, to represent three individuals in their respective legal

actions against Judicial Watch because (1) the possible risk of confidential information being

exposed did not exist, (2) he did not represent any of the three in the same or substantially related

matter as his prior representation of Judicial Watch, and (3) he was not put on actual judicial

notice of any potential conflict until Judge Royce C. Lamberth issued his opinion – underscoring

and highlighting the ambiguity and lack of case law on point. Trial Tr., Jan. 28, 2016 at 658:12-

15; RPFOF at ¶ 148. On July 18, 2008, eight years ago, Respondent ceased representing the three

individuals in any capacity after Judge Lamberth issued his opinion disqualifying Respondent

from the Paul matter. RPFOF at ¶ 112. Importantly, Judge Lamberth voluntarily testified on Respondent's behalf on January 28, 2016 without being served with a subpoena.[4]

On January 23, 2008, Fitton, a non-lawyer and the current President of Judicial Watch who Respondent hired and trained, filed a Bar Complaint against Respondent (Bar Docket No. 2008-D048), alleging a breach of ethical duties in representing Cobas, Benson and Paul. Notably, Fitton's complaint was filed tactically and coercively, after years of contention and litigation between Respondent, Judicial Watch, and its officers, particularly Fitton. Trial Tr., Jan. 27, 2016 at 331:5-9. **Bar Counsel's Proposed Finding of Fact ("BCPFOF") 50.** *__Disputed__*.[5] After Respondent left Judicial Watch, Fitton even sent correspondence to the reputable news organizations CNN and C-SPAN demanding that Respondent could not comment on the a case that Respondent started that ended in front of the U.S. Supreme Court, in clear violation of the fair comment provision in the severance agreement between the parties. *See* Pl.'s Ex. 18. Indeed, the adversarial relationship between Respondent and his former group was undoubtedly a driving force for Judicial Watch to strong-arm Bar Counsel to bring a Petition for Instituting Disciplinary

---

[4]	Any assistance on the part of Respondent to help these individuals who had been wronged by Judicial Watch was done in good faith for ethical purposes in addition to rectifying the wrongs caused by the egregious misconduct by Judicial Watch. Respondent acted in good faith by representing them. Indeed, as the founder and former Chairman of Judicial Watch, Respondent reasonably believed that an ethical duty required him to help these persons for the wrongs committed against them and to protect himself from any potential liability that could arise from Judicial Watch's neglectful, unethical and improper representation and treatment of these individuals, including any allegations of malpractice against Respondent himself. RPFOF at ¶ 61. Put simply, in each case, Respondent was justified, and indeed obligated, to provide adequate legal representation to Cobas, Benson, and Paul not only to protect the rights of these individuals, but also to protect himself from malpractice liability. (Even assuming that Respondent had some ulterior motive in representing these individuals against Judicial Watch, Bar Counsel's argument of rule violations would still not be meritorious because Respondent did not represent them in the same or substantially related matter and there was no risk of confidential information being disclosed to the subsequent clients). Respondent's representation provided assistance through the legal process when these individuals would otherwise be left with no recourse, as each lacked the funds to support their lawsuits. RPFOF at ¶¶ 100, 126, 150, 151.

[5]	**BCPFOF 50**: Bar Counsel incorrectly submits: "Representing Cobas, Benson and Paul in their battles against Judicial Watch also fit with Respondent's pattern of contention and litigation against his former client since his September 2003 separation . . ."

Proceedings. Judicial Watch provided Bar Counsel with voluminous boxes of highly prejudicial documents related to Respondent's contested divorce and custody proceeding and other personal matters as a coercive tactic to prejudice Bar Counsel. RPFOF at ¶ 67. Respondent's ex-wife made false allegations against him and he was cut off from seeing his children. RPFOF at ¶¶ 90, 91. It is indisputably apparent that Judicial Watch, by motivating Bar Counsel to file these charges, is attempting to belatedly use the Bar Complaint for tactical and retaliatory purposes to gain an advantage in ongoing litigation between Respondent and Judicial Watch.[6,7]

Notably, Respondent has not been suspended for one day in his almost forty year legal career, despite frequently combating government inequities and authoritative, unethical individuals and entities that have sought to retaliate against him. Trial Tr., Jan. 27, 2016 at 319:2-5; SOF at ¶ 36. Respondent complied with the D.C. Rules when he upheld his duties and obligations to his clients, even to his own detriment. Respondent helped these three individuals without receiving any financial gain and indeed he shelled out money from his own pocket because he was interested in zealously and diligently representing his clients by protecting their interests. Importantly, Bar Counsel concedes that Respondent did not act dishonestly to it or any

---

[6]     Despite the almost six-year delay from when the original Bar Complaint by Fitton was filed, on October 1, 2013 Bar Counsel petitioned the Board on Professional Responsibility to institute a formal disciplinary proceeding against Respondent for violations of D.C. Rules 1.9 and 8.4(d), even though the Stipulation of Facts determines that there is no allegation that Respondent used any confidential information in representing Paul, Benson, or Cobas. SOF at ¶ 39; RPFOF at ¶ 102. The severely delayed petition relates to Respondent's legal representation of Cobas, Benson, and Paul, a former employee, a donor, and a whistleblower, respectively, to protect and assist them from the unethical conduct of Judicial Watch, and its officials and its directors. During this lengthy delay, memories fade and documents become harder to find. Evidence is lost. RPFOF at ¶ 152.
[7]     Judicial Watch pushed to have this proceeding "proceed" only after Respondent had obtained a jury verdict and judgment against it before the U.S. District Court for the Southern District of Florida, finding that Judicial Watch had maliciously defamed him. The verdict awarded compensatory and punitive damages. SOF at ¶ 35; RPFOF at ¶¶ 62, 63; *see* Pl.'s Ex. 22, 23.

tribunal and that these matters do not involve the risk of confidential information being used to an advantage. SOF at ¶ 39, 40.

A.     Sandra Cobas.

Sandra Cobas was the former Director of Judicial Watch's Miami Regional Office until she was forced to resign in 2003 after she was maliciously and willfully sexually harassed by Judicial Watch officers and directors. Trial Tr., Jan. 27, 2016 at 345:5-10; SOF at ¶ 4; *see* Pl.'s Ex. 13-18. Cobas discussed the harassment with Respondent and Respondent subsequently spoke to his directors that the time, seeking to have them rectify the problem. RPFOF at ¶ 125. On August 25, 2005, *eight years prior* to Bar Counsel petitioning the Board on Professional Responsibility to institute a disciplinary proceeding against Respondent, and almost eleven years ago from today, Cobas filed a lawsuit against Judicial Watch and its officers, *pro se*, because of their sexually harassing conduct. The lawsuit was dismissed on July 31, 2006. ***After the record had been fully established, no confidences were or could have been violated, and because of the materially different representation involved***, Respondent entered an appearance and filed a notice of appeal on behalf of Cobas to provide her with some recourse as she was not able to retain any other counsel due to lack of funds. During the representation of Cobas, Respondent did not act dishonestly, did not misrepresent facts, and did not seek any funds from Cobas. He worked for Cobas entirely *pro bono*. Trial Tr., Jan. 27, 2016 at 349:1-2; RPFOF at ¶ 95. Respondent never changed sides on this issue; he always was supporting Cobas. Judicial Watch never took any action against Cobas. RPFOF at ¶ 64.

BCPFOF 2. ***Disputed***.[8] Importantly, since Judicial Watch's inception, during and throughout Respondent's tenure, Judicial Watch hired outside counsel – that is, outside *lawyers* –

---

[8]     **BCPFOF 2**: Bar Counsel incorrectly submits: "From July 29, 1994, until September 19, 2003, Respondent, who **co-founded** Judicial Watch, served as its Chairman and General Counsel. As General Counsel, Respondent served as the organization's lead attorney and observed all legal matters

for their specialties to represent Judicial Watch. For example, Judicial Watch hired David Barmak ("Barmak") for his expertise on labor law – including overseeing any potential issues with employment disputes or employee complaints – corporate law, and litigation. Trial Tr., Jan. 26, 2016, at 100:1-3; 242:12-15; RPFOF at ¶ 76. Judicial Watch also hired Alan Dye of Webster, Chamberlain and Bean, for expertise in tax and non-profit law; *id*. at 97:1-4; 97:20-22; 98:11-12; Earl Coplievitz for non-profit registrations; *id*. at 113:19-22; 114:1-6; 114:5-6; Mike Dowd, for the criminal defense of Peter Paul in New York; *id*. at 191:2-5; Trial Tr., Jan. 27, 2016, at 369:19-22; and Mark Fitzgibbons, President and General Counsel of American Target Advertising, for ethics expertise in fundraising. RPFOF at ¶ 85. **BCPFOF 7. *Disputed***.[9] Indeed, Respondent was not involved in the day-to-day activities of Judicial Watch during and throughout the time Cobas complained of sexual harassment. Trial Tr., Jan. 26, 2016, at 18:9-13; RPFOF at ¶ 53, 78.

Judicial Watch's employment of Barmak is highly relevant when applied to the facts of the Cobas case. Specifically, during the time that Judicial Watch employees in the Miami office sexually harassed Cobas, Respondent (on behalf of Cobas) spoke to his hired counsel for labor and employee disputes, Barmak, regarding the Cobas issue. Indeed, Barmak was the labor law lawyer that Judicial Watch hired *for these purposes*. Trial Tr., Jan. 26, 2016 at 100:1-3; 250:10-18; 250:19-22; RPFOF at ¶ 76. As such, Respondent's subsequent representation of Cobas was not substantially related to his prior representation of Judicial Watch, as General Counsel, because he

---

associated with or affecting Judicial Watch. JX ¶ 2. Respondent provided legal advice to Judicial Watch as the chief litigation strategist and in-house counsel, including for internal business matters, personnel matters, and fundraising . . ." *As a technical matter, Respondent's and Bar Counsel's Joint Stipulation of Facts contradicts Bar Counsel's Proposed Finding of Fact No. 2. Respondent was not the co-founder of Judicial Watch, as submitted here. See* Stipulation of Facts at ¶ 2 ("From or about July 29, 1994 . . . Respondent, who **founded** Judicial Watch . . ."). Respondent's additional disputes are elucidated after "**2. *Disputed***."

[9]   **BCPFOF 7**: Bar Counsel incorrectly submits in its footnote: "Although Respondent and Judicial Watch were negotiating Respondent's separation from the organization at that time, Respondent remained involved with the day to day operations of the organization. Tr. 227-229 (Fitton)."

assigned employment disputes to other attorneys, and particularly in this case, a specific

attorney.[10]  Importantly, Judicial Watch and Fitton did not file a motion to disqualify Respondent

in the Cobas case. RPFOF at ¶ 54.

### B.      Louise Benson.

Louise Benson was a volunteer and supporter of Judicial Watch while Respondent was

Chairman. Trial Tr., Jan. 27, 2016 at 350:12-20. During his tenure at the organization, Respondent

developed a close relationship with Benson, who essentially became a second mother to him.

RPFOF at ¶ 80, 104; *see* Pl.'s Ex. 25. In 2002, Benson pledged $50,000 to purchase the rights to

ceremoniously name an office after her in a permanent building that was to be Judicial Watch's

headquarters. Trial Tr., Jan. 26, 2016 at 148:1-5. Fitton, not Respondent, initially wrote the letter

to solicit funds from Benson. RPFOF at ¶ 55. Benson donated $15,000 of the $50,000 in order to

assist Judicial Watch in purchasing its headquarters building. RPFOF at ¶ 56. However, after

Respondent voluntarily left the organization in the Fall of 2003, Judicial Watch, its directors, and

officers, unlawfully converted Benson's donation and defrauded her of her purchase of the naming

rights of the would-be building. Trial Tr., Jan. 26, 2016, at 27:8-11. Before Benson filed suit, she

contacted Judicial Watch various times and did not get a return call from Gregory Mills, a Judicial

Watch employee. Upon further phone calls, Mills finally responded by saying that the building

purchase and naming was proceeding. RPFOF at ¶¶ 105, 106; Pl.'s Ex. 21. She hired Dugan to

represent her in this action. *Id*; RPFOF at ¶ 130. As with Cobas, in an effort to protect Benson

from the unethical misconduct by Judicial Watch, and to have the money that was misappropriated

---

[10]      More importantly, even if the Cobas complaint of harassment was within the general scope of
Respondent's duties as General Counsel of Judicial Watch, representing her for the purposes of an
appeal of a dismissal of a lower court case – when the record had already been clearly established – is
in no way substantially related to his prior representation of Judicial Watch. Trial Tr., Jan. 27, 2016, at
504:18-22; 505:1-9; RPFOF at ¶ 101. In this regard, case law and the comments to D.C. Rule 1.9
illustrate the principle that the type of relationship Respondent had with Judicial Watch does not
preclude representation of a subsequent person. No violation of D.C. Rule 1.9 occurred during
Respondent's limited representation of Cobas when he gratuitously helped her on her appeal.

returned to her, Respondent – *because his representation of her was not substantially related to his prior representation of Judicial Watch* – represented Benson in a lawsuit filed on January 25, 2007, almost four years after Respondent departed from his prior organization, and six years before Bar Counsel filed its petition against Respondent. As with Cobas, Respondent represented Benson *pro bono*. RPFOF at ¶ 95. Respondent never represented Judicial Watch in a Benson fraud suit against it. RPFOF at ¶ 66.

Grasping at straws, Bar Counsel hangs it hat on Respondent having sent a letter to Benson soliciting a donation for the purchase of naming rights of a headquarters building. This fact alone, however, has *nothing to do with his role as General Counsel* of Judicial Watch. As such, there was no matter that could have even arguably been substantially related, as a solicitation letter in and of itself obviously does not form an attorney-client relationship with the prior client *in that particular matter*, such that the subsequent representation of the letter receiver, here Benson, would be precluded. For example, lawyers and non-lawyers involved in not-for-profit organizations send hundreds of thousands of solicitation letters for various projects. Many of those hundreds of thousands of letters actually help the not-for-profit receive financial contributions directly because of those letters from lawyers and non-lawyers alike. Bar Counsel would have this Committee believe that each of these lawyers and non-lawyers establishes an attorney-client relationship *on the basis of those solicitation letters* with their not-for-profit organization. Indeed, Bar Counsel would *have to* hang its hat on that misconception because it is the only way that a violation of D.C. Rule 1.9 could theoretically occur in the case of Benson. **BFPFOF 18.** **_Disputed_**.[11] Indeed, during the time of the initial solicitation for the purchase of the building,

---

[11]     **BCPFOF 18**: Bar Counsel incorrectly submits: "As General Counsel for Judicial Watch, Respondent was directly involved with legal issues concerning approval of the fundraising activities, negotiations with the landlord and Judicial Watch's real estate team, and approving plans associated with purchasing the building. Tr. 61-62, 66-67 (Fitton). Judicial Watch relied upon Respondent to exercise his legal skills to protect its interests in connection with the project. Tr. 66-67 (Fitton)."

Judicial Watch worked with an outside fundraising consultant who had experience in raising money for buildings. Trial Tr., Jan. 26, 2016 at 61:4-10.

Specifically, and to demonstrate this in a practical manner, various not-for-profit organizations are founded by and run by non-lawyers. Naturally, many of these founders, presidents, and officers – who are non-lawyers – send out solicitation letters to potential donors. These founders, presidents, and officers are not soliciting money by virtue of their membership of a State Bar, or their lack of a membership of a State Bar. Concretely, since Respondent's departure from Judicial Watch, Fitton has taken the place of Respondent and now signs his name to all solicitation letters. *See* Pl.'s Ex. 8. Yet, fundamentally, Fitton is not soliciting funds because he is a lawyer representing Judicial Watch. In fact, Fitton (who never attended law school) is not a lawyer at all; much like many other solicitors of not-for-profit organizations. Therefore, because Respondent solicited funds from Benson and others does not mean that – in his capacity as a lawyer – he was soliciting funds as the legal representative and General Counsel of Judicial Watch. Instead, he solicited funds as its head, just as Fitton currently solicits funds as Judicial Watch's head, and does so without legally representing the organization.  As such, Respondent never changed sides with regard to his representation of Judicial Watch and subsequently Benson because he never acted in a legal capacity with regards to the solicitation of Benson during his employment at Judicial Watch. RPFOF at ¶¶ 138, 139, 140, 141.

**BCPFOF 28, 30. *Disputed*.**[12] Importantly, not only did Respondent not represent Benson in a substantially related matter as his prior representation of Judicial Watch, but he also entered in appearance by the advice of his attorney, Dugan. Trial Tr., Jan. 27, 2016 at 409:6-17; *see* Bar

---

[12]     **BCPFOF 28**: Bar Counsel incorrectly submits: "Respondent did not ask Mr. Dugan whether he could ethically enter his appearance on behalf of Ms. Benson and Mr. Dugan did not give Respondent any advice as to whether he could do so. Tr. 686 (Dugan)." **BCPFOF 30**: Bar Counsel submits: "On July 7, 2007, Respondent filed an opposition to the disqualification motion . . . Respondent conceived of all of the arguments in the opposition to Judicial Watch's motion to disqualify; his counsel did not advice that he had no conflict . . ."

Counsel's Exhibit ("B.C.'s Ex.") 30. **BCPFOF 39.** ***Disputed.***[13] Dugan filed the initial complaint

against Judicial Watch for Benson and Dugan and – at his direction – his office, prepared the

Opposition to the Motion to Disqualify, after Judicial Watch filed a Motion to Disqualify

Respondent. Dugan informed Respondent that no conflict existed, which is precisely why he came

to Respondent's defense in the Opposition to the Motion to Disqualify. Indeed, Dugan testified

unequivocally that he would not have prepared and signed the Opposition if he felt that ethics and

the law did not support it. Trial Tr., Jan. 27, 2016 at 358:14-16; RPFOF at ¶¶ 150, 153, 154, 155,

159, 160. Dugan has been a member of good standing of the District of Columbia Bar for forty

years. Trial Tr., Jan. 28, 2016 at 669:3-13; RPFOF at ¶ 151. Respondent relied on advice of

counsel. For these and many other reasons, no violation of D.C. Rule 1.9 occurred even during

Respondent's limited representation of Benson.[14]

    **C.**    **Peter Paul.**

    Peter Paul sought guidance from Judicial Watch after he discovered that the Federal

Bureau of Investigation and the Crime Task Force of the Criminal Division of the U.S.

Department of Justice were investigating him for alleged violations of securities and bank fraud.

Trial Tr., Jan. 26, 2016 at 189:16-21; RPFOF at ¶ 72, 109. Paul originally corresponded with

Fitton and Christohper Farrell of Judicial Watch. RPFOF at ¶ 57. But, an entirely separate law

firm specializing in criminal defense carried out Paul's representation. RPFOF at ¶¶ 58, 59, 72, 73.

---

[13]    **BCPFOF 39**: Bar Counsel incorrectly submits: " . . . Respondent conceived of all of the arguments set forth in the opposition and did not rely upon the advice of counsel . . . Respondent drafted and filed the opposition himself."

[14]    Moreover, Respondent has no obligation of loyalty towards Judicial Watch on this matter of financial fraud. RPFOF at ¶ 135. Respondent has no obligation to be silent and thereby help the fraud of Judicial Watch, and indeed under the BPR Rules, Respondent could not remain silent to further an ongoing fraud. *See* D.C. Rule 1.6(d). Bar Counsel never disputed that Judicial Watch raised funds for a building that it has never built or purchase for over a decade. Bar Counsel never disputed Respondent's claim that Judicial Watch engaged in fraud. Bar Counsel (frankly, in a misleading way) says in its Bar Complaint that Judicial Watch did not construct the building immediately, and does not explain that over a decade has passed and there is still no building and no accounting of the funds. RPFOF at ¶¶ 71, 82.

The representation of Paul was not carried out by Respondent or Judicial Watch nor was

Respondent privy to any privileged information as it related to Paul. Paul also sought Judicial

Watch's guidance as a whistleblower against alleged criminal activities by Bill and Hillary

Clinton. RPFOF at ¶ 108. Regarding the civil suit filed by Judicial Watch on Paul's behalf against

Bill and Hillary Clinton, Respondent cannot be accused of changing sides because in order to

change sides, he would have had to represent Bill or Hillary Clinton *against* Paul. This never

occurred; his subsequent representation of Paul did not involve the same transaction or legal

dispute – indeed the legal dispute was regarding fraud and restitution against Bill and Hillary

Clinton and *not* a breach of Judicial Watch's duty to continue to seek outside legal assistance for

Paul – and confidential communications could not possibly have been disclosed because Paul's

story was already in the public domain and Respondent did not disclose information to "the other

side" which, in this case, was Bill and Hillary Clinton. RPFOF at ¶ 114. **BCPFOF 34. *Disputed*.**[15]

In addition, another attorney, Ernie Norris, filed the civil case in California. RPFOF at ¶ 60, 73.

Importantly, Respondent did not even seek to enter *pro hac vice* into that litigation.

Bar Counsel mistakenly relies on two representation agreements, signed by both

Respondent and Fitton, a non-lawyer, to make its claim that Respondent violated D.C. Rules 1.9

and 8.4(d). But, like the Benson case, it was attorney Dugan who originally filed suit against

Judicial Watch for alleged breach of contract and other related torts on behalf of Paul, *not*

Respondent. RPFOF at ¶ 74. Respondent only entered an appearance after Dugan bowed out

because of lack of payment and Respondent also relied on Dugan's advice as counsel. RPFOF at

¶¶ 117. In addition, other lawyers not employed by Judicial Watch did the heavy legal lifting for

Paul. RPFOF at ¶¶ 59, 75, 110, 127, 128. Respondent solely sought to enforce the agreement that

---

[15]    **BCPFOF 34**: Bar Counsel incorrectly submits: "In 2003, Judicial Watch Filed a lawsuit on behalf of Mr. Paul, styled Paul v. Clinton, in the Los Angeles (California) Superior Court, and hired criminal defense counsel to defend Mr. Paul in connection with the criminal matter . . . Respondent was primarily responsible for the civil litigation in California . . ."

he and Fitton had signed on behalf of Paul. A review of D.C. Rule 1.9, comment 1 explains that the lawyer should not seek to rescind a contract he drafted. Respondent sought to uphold the contract, not rescind it. Bar Counsel does not claim that Respondent ever sought to rescind a contract that he partook in for Judicial Watch. He always sought to uphold any contract, even when Judicial Watch was engaged in financial fraud in connection with its fundraising. RPFOF at ¶¶ 168, 169, 170, 171, 172, 173.[16] Indeed, after Judicial Watch pulled out from representing Paul, it continued to fundraise off his name. RPFOF at ¶ 129.

Importantly, Bar Counsel stipulates that at least one of the reasons Respondent stepped in to represent these three individuals was because he felt that Judicial Watch abandoned them. Trial Tr., Jan. 26, 2016, at 159:2-8; RPFOF at ¶ 69. Bar Counsel also admits and thus concedes that Respondent may have truly wanted to help these three individuals. Trial Tr., Jan. 26, 2016, at 159:16-18; RPFOF at ¶ 70.

**III.   THIS HEARING COMMITTEE SHOULD DISMISS ALL COUNTS IN THE AMENDED SPECIFICATION OF CHARGES BECAUSE BAR COUNSEL HAS FAILED TO MEET ITS BURDEN OF PROVING ITS CASE BY CLEAR AND CONVINCING EVIDENCE, RESPONDENT DID NOT REPRESENT COBAS, BENSON, OR PAUL IN THE SAME OR SUBTANTIALLY RELATED MATTER AS HIS PRIOR CLIENT, AND RESPONDENT DID NOT INTERFERE WITH THE ADMINISTRATION OF JUSTICE.[17]**

---

[16]     In addition, Respondent has cooperated with Bar Counsel throughout this proceeding, has never missed a hearing or other date and, after Judge Lamberth issued his opinion, Respondent immediately stopped representation of Paul. Therefore, no violation of D.C. Rules 1.9 or 8.4(d) occurred during Respondent's limited representation of Paul.

[17]     Preliminarily, D.C. Rule 1.3 states, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law." Further, D.C. Rule 1.3(a) provides guidance on this issue and the ethical duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor." D.C. Rule 1.3(a), cmt. 1. "Neglect of client matters is a serious violation of the obligation of diligence." *Id*. at cmt. 8. "Unless the relationship is terminated . . . a lawyer should carry through to conclusion all matters undertaken for a client." *Id*. at cmt. 9. As expert Professor Rotunda explains in his letter dated June 2, 2014, " . . . it is reasonable and understandable that Mr. Klayman believed that [he] had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients." Pl.'s Ex. 5; *see also* Pl.'s Ex. 4 for the resume of Professor Rotunda.

**A.**   **Bar Counsel Failed To Prove Its Case By the Heightened Standard of Clear and Convincing Evidence.**

Bar Counsel bears the heavy burden of establishing that Respondent violated the D.C. Rules 1.9 and 8.4(d) by clear and convincing evidence. *See In re Anderson*, 778 A.2d 330, 335 (D.C. 2001); *see also* BPR Rule 11.6 ("Bar Counsel shall have the burden of proving violations of disciplinary rules by clear and convincing evidence."). "This more stringent standard expresses a preference for the attorney's interests by allocating more of the risk of error to Bar Counsel, who bears the burden of proof." *In re Allen*, 27 A.3d 1178, 1184 (D.C. 2011). Establishing a violation of the D.C. Rules by clear and convincing evidence is no easy task. It is not enough to tip the scale in favor of an alleged violation. Indeed, it is more than a preponderance of the evidence. It is "evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Cater*, 887 A.2d 1, 24 (D.C. 2005).

Bar Counsel failed to meet its high, stringent burden because it simply did not have the evidence to support its allegations. For example, when pressed by Chair Jack Metzler regarding confidential information, Bar Counsel concedes, "We don't have any proof. We haven't put forward any proof that he has . . .[used confidential information]." Trial Tr., Jan. 27, 2016 at 388:4-5; RPFOF at ¶ 116, 120. Not only does Bar Counsel's critical admission fall below the required clear and convincing evidence standard, but it also falls below the preponderance of the evidence standard, as, with regard to confidentiality, "[they] don't have any proof." Trial Tr., Jan. 27, 2016 at 388:4-5.[18]

---

[18]   This proceeding is *quasi*-criminal; Bar Counsel intends to try to discipline Respondent by hindering his ability to practice law. This undercuts Respondent's integrity, dignity, and respect in the legal communities in which he practices; the same integrity and respect that Respondent has fought for almost forty years to maintain through his own watchdog organizations that seek out *quasi*-criminal behavior of government officials.  If there is a doubt in this honorable Committee's mind, and it believes that Bar Counsel has failed to prove its case by the requisite standard, then it must, in the interest of justice, dismiss all counts against Respondent.

**B.** **Respondent Did Not Violate D.C. Rule 1.9 In the Cobas, Benson, or Paul Matters Because He Did Not Represent Any of Them In the Same Or A Substantially Related Matter To His Prior Client and This Alleged Violation Should Be Dismissed Based on the Plain Language of Rule 1.9 and Its Comments Alone.**

D.C. Rule 1.9 states, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." D.C. Rule 1.9. "The scope of a 'matter' for purposes of [D.C.] [R]ule [1.9] may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree." D.C. Rule 1.9, cmt. 2.

In *Committee for Washington's Riverfront Parks*, the Court quoted the description of "matter" by the ABA Committee:

> . . . work as a government employee in drafting, enforcing or interpreting government or agency procedures, regulations, or laws, or in briefing abstract principles of law, does not disqualify the lawyer under DR 9-101(b) from subsequent private employment involving the same regulations, procedures, or points of law.

*Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177, 1188 (D.C. 1982).

The legal definition of "the same or a substantially related" is two-fold; one of the two elements must be proven **by clear and convincing evidence** in order for a violation to be found. For the purposes of this rule, matters are the same or substantially related if "they involve the same transaction or legal dispute *or* if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." D.C. Rule 1.9, cmt. 3 (emphasis added). The main purpose of this rule – if not the only purpose – is to preserve confidentialities. Even the D.C. Bar, in Ethics Opinion 272 titled, "Conflicts of Interest: Hot Potato," recognizes as much. The D.C. Bar states:

Under this rule [1.9], a lawyer may sue or otherwise take positions antagonistic to a former client, without disclosure and without the former client's consent, if the new representation is not substantially related to the matter in which the lawyer had represented the former client. **The purpose of this rule is to assure the preservation of attorney-client confidences gained in the prior representation**. . .

D.C. Bar Ethics Opinion 272 (emphasis added). Furthermore, "[i[nformation that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying . . . in the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation . . ." D.C. Rule 1.9, cmt. 3.

Here, Bar Counsel and Respondent *stipulate* that no confidential factual information was used to an advantage[19], and any alleged "confidences" are not before this Committee. RPFOF at ¶¶ 113, 115; SOF at ¶¶ 39. Hence, Bar Counsel **must prove** by clear and convincing evidence that Respondent's representation of Cobas, Benson, and Paul involved the same transaction or legal dispute as the prior representation. Regarding the same transaction or legal dispute:

[A] lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem **of that type** even though the subsequent representation involves a position adverse to the prior client . . . [t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a **changing of sides** in the matter in question.

D.C. Rule 1.9, cmt. 2 (emphasis added)[20]; *see Brown v. District of Columbia Board of Zoning Adjustment*, 486 A.2d 37, 42 (D.C. 1984). As a matter of principle and diligence, even though Bar

---

[19]     **Chairman Metzler**: Mr. Smith, are you willing to stipulate to whether Mr. Klayman used any confidential information in the course of his representation?
**Mr. Smith**: *We don't have any proof. We haven't put forward any proof that he has*.
**Chairman Metzler**: Okay, so it sounds like you're saying you do not intend to argue that he did use confidential information?
**Mr. Smith**: I do not intent to argue that he used confidential information in this matter. Trial Tr., Jan. 27, 2016 at 387:22; 388:1-5; 388:14-19 (emphasis added).
[20]     Comment 2 also explains, "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type *even though the subsequent representation involves a position adverse to the prior client.*" (Emphasis added).

Counsel stipulates that no confidential information was disclosed, Respondent also has shown how he did not – and could not – violate any confidences from his previous representation of Judicial Watch to Cobas, Benson or Paul.

> 1.    Respondent Did Not Change Sides By Representing Sandra Cobas and There Was No Substantial Risk that Any Confidential Information Could Benefit Cobas.

**Comment 2 of D.C. Rule 1.9 and relevant case law are clear**: even if a lawyer handles a type of problem for a former client that a subsequent client is suing the prior client for, this does not preclude the representation of the subsequent client if it is a wholly distinct problem of that type. *See* D.C. Rule 1.9, cmt. 2. Assuming that Respondent represented Judicial Watch in the harassment issues that she discussed with him  – which he did not – he still would not be precluded from representing Cobas because: 1) Cobas sued Judicial Watch *pro se* for intentional infliction of emotional distress, defamation, and false light, which are "[] wholly distinct problem[s] of that type . . ." *Id*.; 2) Respondent entered an appearance after the initial complaint was dismissed and therefore could not (even if he wanted to, which he did not) relay any confidential information to Cobas regarding Judicial Watch; and 3) Respondent never changed sides in his representation of Cobas because Judicial Watch never litigated with Cobas. As Professor Rotunda testified under oath: "[f]irst of all, he never was asked by Judicial Watch to represent Judicial Watch in a sex harassment claim where the other party, the adverse party was Ms. Cobas." Trial Tr., Jan. 27, 2016 at 502:7-10; RPFOF at ¶¶ 133, 134, 137.

Bar Counsel strives mightily but fails to make the argument that there is a changing of sides because of Cobas's discussion with Respondent regarding the sexual harassment while he was General Counsel of Judicial Watch. But the only change of sides that could have occurred even using Bar Counsel's faulty argument would be if Judicial Watch had sued Cobas for defamation *first*, then Respondent sued Judicial Watch for defamation (or false light or intentional

infliction of emotional distress). This is the changing of sides that D.C. Rule 1.9 comment 2 seeks to protect. This type of change did not occur here. Furthermore, outside legal counsel Barmak was especially hired for these types of matters as an employment and labor lawyer *for Judicial Watch* and Respondent brought Cobas's allegations to his attention before he departed from Judicial Watch.

In *Caldwell*, a plaintiff sued the defendants for alleged copyright infringement. The plaintiff was represented by her husband, the former attorney one of the defendant corporations. *Caldwell-Gadson v. Thompson Multimedia*, SA 2000 U.S. Dist. LEXIS 16087 (S.D. Ind. 2000). The defendant corporation moved to disqualify plaintiff's attorney alleging violations of the Indiana Rules of Professional Conduct ("Indiana Rule") 1.9 and other conduct rules. (Indiana Rule 1.9(a) is virtually identical to D.C. Rule 1.9). The disqualification was denied because the defendant corporation failed to show that the attorney had represented defendant in attempting to get the copyright to plaintiff's book and as such, even though the attorney represented the prior client in the type of problem he then represented his subsequent client, because they were distinct issues, there was no violation of Indiana Rule 1.9(a). *Id*. at 6.[21]

Indeed, the husband legally represented the corporate defendants in intellectual property actions, including copyright actions, *during the time he was married to his wife*. Logically, he spoke to his wife in the evening or in bed about his job. He then stepped in to represent his wife

---

[21]    There, the attorney was not disqualified, despite having even acted in a more serious way than Respondent is alleged to have acted. An attorney legally represented corporate defendants in obtaining the copyright rights of his wife's property in an "Inventors Awards Book." The wife then sued the corporate defendants, first *pro se* – as she is an attorney herself – and then is represented by her husband, the person who represented the corporate defendants in almost exactly the same transaction as the subsequent representation of his wife. But, the court saw no problem with his representation of his wife: " . . . though Mr. Gadson was employed as Senior Patent Attorney by TCE and presumably represented it on many intellectual property matters, there is no evidence other than Mr. Carter's unsupported conclusory statements that Mr. Gadson represented the Corporate Defendants in obtaining for Plaintiff any rights belong to them in material contained in the "Investors Awards Book." *Id*. at 5-6.

18

against the very company he was negotiating for technically *against* his wife. Although even this is not the switching of sides D.C. Rule 1.9 seeks to protect, it is far more curious than Respondent's situation with respect to Cobas.[22]

In addition, Respondent did not – and could not – violate any confidences by representing Cobas. "Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying." D.C. Rule 1.9, cmt. 3. Respondent represented Cobas after her case was dismissed in the lower court and the record was complete. The case was in the public domain. As ethics expert Professor Rotunda testified under oath: " . . . you cannot violate a confidentiality. It's irrelevant here. It's completely irrelevant here, because not only does the Bar not allege it, but [also] there is the simple fact that he was handling the appeal. There is nothing confidential about that." Trial Tr., Jan. 27, 2016 at 503:10-15; RPFOF at ¶ 134. As such, there is no rule violation in the Cobas matter and this count should be dismissed in its entirety.

        2.     Respondent Did Not Change Sides By Representing Louise Benson and There Was No Substantial Risk That Any Confidential Information Could Benefit Benson.

**Comment 3 of D.C. Rule 1.9 and relevant case law are clear**: hypothetically, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations. *See* D.C. Rule 1.9, cmt. 3. This would be analogous to Respondent's situation if he actually did legally and specifically represent Judicial Watch for

---

[22]      The Court did not disqualify the attorney because, even though he presumably spoke to his wife about his work generally, the matters were not sufficiently substantially related, just as Respondent's representation of Cobas was not substantially related to his prior, general representation of Judicial Watch. As ethics expert Professor Rotunda testified under oath, "[s]o, if Mr. Klayman had developed sex harassment rules for Judicial Watch, then Cobas sued Judicial Watch, and he was one of the lawyers working on behalf of Judicial Watch to defend the lawsuit, he could not then switch sides . . ." Trial Tr., Jan. 27, 2016 at 504:18-25; 505:1-2; RPFOF at ¶ 137. But even this hypothetical situation did not occur here.

the purpose of the solicitation of monies from Benson to secure the purchase of the building –
which he clearly did not because, as discussed above, anyone can solicit monies for a not-for-
profit organization without legally representing it, such as Fitton currently does for Judicial Watch
– and then represented subsequently Benson seeking to *block* the purchase of a building. *See* D.C.
Rule 1.9, cmt. 1 ("[A] lawyer could not properly seek to rescind on behalf of a new client a
contract drafted on behalf of the former client."); RPFOF at ¶ 139. Indeed, even if Respondent did
legally represent Judicial Watch in the solicitation of monies from Benson, there is still no
substantially related relationship and no changing of sides between Respondent and Benson
because he did not seek to rescind or attack his work product; only to enforce it. **BCPFOF 46.**
***Disputed***.[23] As Professor Rotunda testified to under oath: "[h]e's not attacking the donation. He's
trying to enforce it. And he then sues, with Ms. Benson, Judicial Watch for breach of contract,
unjust enrichment and fraud . . . [i]n this particular count there never was a situation where Ms.
Benson sued Judicial Watch and respondent is helping Judicial Watch defend that lawsuit." Trial
Tr., Jan. 27, 2016 at 506:14-17; 509:8-11; RPFOF at ¶ 140.

The hypothetical lawyer mentioned in Comment 3 would not be precluded, however, on
the grounds of a substantial relationship or changing sides, from defending a tenant of the
completed shopping center in resisting eviction for nonpayment of rent. Indeed, information that
has been disclosed to the public or to other parties adverse to the former client ordinarily will not
be disqualifying. *See* D.C. Rule 1.9, cmt. 3; *see also In re Amendments to the Rules Regulating the
Fla. Bar*, 933 So.2d 417, 445 (Fla. 2006).

Here, Respondent, with respect to the Benson matter, is in a similar position of the
hypothetical attorney who is not precluded from representing a person resisting eviction for

---

[23]     **BCPFOF 46**: Bar Counsel incorrectly submits: "He [Rotunda] also emphasized that Judge
Lamberth did not refer Respondent to the Bar – apparently disregarding the fact that Respondent had
informed the Judge himself that he already had been referred by Mr. Fitton."

nonpayment of rent. Put even more analogously, Respondent would be the hypothetical lawyer above if the hypothetical lawyer represented the landlord of a tenant who failed to pay rent. Representing the landlord of a building in which he secured environmental permits against the prior client which obtained the environmental permits (even this is a stretch because, as discussed, Respondent did not represent Judicial Watch in his legal capacity for the solicitation of Benson's funds, unlike the hypothetical lawyer who did indeed represent the client in securing the permits), as long as the client was a former one and no confidential information was disclosed (how could there be since the securing of environmental permits and failure to pay rent are not at all related, just as sending out a fundraising letter for a not-for-profit in a non legal capacity and seeking to receive the solicitation money back when the purpose of the monies was never consummated), it would be permitted under D.C. Rule 1.9.[24]

---

[24]     The mere existence of a former representation is simply not enough to compel this honorable Committee to find a violation of D.C. Rule 1.9 as the factual information from the prior representation must materially advance the subsequent client's position in the matter. In *Morgan v. North Coast Cable Co.*, the appellants filed a motion to disqualify counsel, alleging that a conflict of interest existed between the counsel's personal financial interests and the interests of the client. The court held that in order for an attorney to be disqualified or disciplined, he or she must have received some information from the former client that could be used to prejudice the former client in the current matter. *Morgan v. North Coast Cable Co.*, 63 Ohio St.3d 156, 160 (1992).

Here, Respondent obtained no confidential information from Judicial Watch regarding the sending of a solicitation letter that could prejudice Judicial Watch against Benson. RPFOF at ¶ 145. The only knowledge Respondent had regarding the solicitation is that Judicial Watch had not purchased the building, which was the basis of the donation. As Professor Rotunda testified under oath: "[h]e's not attacking the donation. He's trying to enforce it . . . [h]e never attacked the work product. He never was involved in the other side of the suit of Benson versus Judicial Watch." Trial Tr., Jan. 27, 2016 at 506:14-15; 509:17-19. Furthermore, assuming *arguendo* Respondent received confidential information from Judicial Watch regarding solicitations when representing the organization, Bar Counsel has not shown that such information would prejudice Judicial Watch and advance Benson. *See* D.C. Rule 1.9, cmt. 3. Bar Counsel admits as much: "**Chairman Metzler**: Mr. Smith, are you willing to stipulate to whether Mr. Klayman used any confidential information in the course of his representation? **Mr. Smith**: *We don't have any proof. We haven't put forward any proof that he has* . . ." Trial Tr., Jan. 27, 2016 at 387:22; 388:1-5. As such, there is no rule violation in the Benson matter and this count should be dismissed in its entirety.

3.      Respondent Did Not Change Sides By Representing Peter Paul and There Was No Substantial Risk that Any Confidential Information Could Benefit Paul.

**Comment 3 of D.C. Rule 1.9 and relevant case law are clear**: "Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying . . . in the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation . . ." D.C. Rule 1.9, cmt. 3.

First, at the time of Paul's initial correspondence with Judicial Watch, he was a public figure as he sought, to further his public interest activities, recognition from the public domain and was in fact in the public domain. Trial Tr., Jan. 27, 2016 at 386:8-12; RPFOF at ¶ 114. Therefore, much of the information that Paul sought help from Judicial Watch for was already "disclosed to the public." D.C. Rule 1.9, cmt. 3. Second, just as in the Cobas case, Dan Dugan initially filed the complaint against Judicial Watch to enforce the contract Respondent and Fitton signed for Paul and also helped with the Opposition to Judicial Watch's Motion to Disqualify. Dugan testified that he did not believe it was frivolous. RPFOF at ¶ 158. The suit alleged breach of contract, breach of fiduciary duty, violations of the standards of professional conduct, unjust enrichment, violation of Section 43(a) of the Lanham Act, and appropriation of name and likeness. It was not until March 8, 2008 – over a year after Dugan filed the original complaint – did Respondent enter an appearance on behalf of Paul, and only after Dugan withdrew because Paul could not pay him.[25]

---

[25]      In *Health Care & Ret. Corp. of Am., Inc.*, an attorney that had represented a corporation, Manor Care, in nursing home negligence actions went to work for a law firm for another person in her action, which claimed negligence in the care of a resident who suffered from pressure ulcers. *Health Care & Ret. Corp. of Am., Inc. v. Bradley*, 961 So.2d 1071 (Fla. Dis. Ct. App. 4th Dist. 2007). Specifically, the attorney worked in negligence litigation regarding ulcers for Manor Care in Boca Raton, Florida. He billed in excess of 2,100 hours to Manor Care in at least sixty cases. "Many of the cases **involved the same type of negligence as in this case**, concerning pressure ulcers and falls." *Id.* at 1072 (emphasis added). During the same month that he represented Manor Care, he then went to work for a separate law firm and became involved in litigation *against* Manor Care for negligence regarding pressure ulcers; *precisely* the same type of litigation the attorney represented Manor Care for. *Id.* The court held that the subsequent case was a wholly distinct problem of that type, as each case

With regard to Paul, Respondent's representation of him was that of a wholly distinct problem from that which he represented Judicial Watch. Respondent never attacked the work that he had previously created for Paul. Respondent and Fitton signed an agreement agreeing that Judicial Watch would take the necessary steps, including bringing on outside counsel for criminal matters, to assist Paul in his alleged securities and bank fraud. Trial Tr., Jan. 26, 2016 at 189:16-21; 189:22; 190:1-2; Trial Tr., Jan. 27, 2016 at 470:10-13; RPFOF at ¶¶ 72, 73 ("Mr. Dowd was hired to represent Paul in his criminal defense case."). This representation is wholly different from filing a complaint against an entity that promised to provide you with outside counsel and legal assistance regarding alleged securities and *bank fraud* for breach of contract, breach of fiduciary duty, violations of the standards of professional conduct, unjust enrichment, violation of Section 43(a) of the Lanham Act, and appropriation of name and likeness. As if this blatant fact is not enough to convince this honorable Committee that Respondent did not violate D.C. Rule 1.9 because the matters at issue were not even remotely related, even assuming that Respondent was the sole person at Judicial Watch who drafted the representation agreements, confirmed and thus signed by Fitton, he still would not have represented Paul in a substantially related matter as Judicial Watch because he never attacked his work product.

> **BCPFOF 47.** ***Disputed.***[26] **Professor Rotunda**: In general, you have no loyalty to a former client . . . You could sue him, but you cannot use relevant confidences adverse to the former client. That's not part of this case [Paul], or I'd leave that out. Then there is one aspect, a small aspect of loyalty that you do have to the former client. You can't seek to undo the work product, your work produce that you drafted on behalf of the former client. That's why they say you can' rescind on behalf of the new client the work product you drafted. And the negative pregnant – it's as clear as you can. You can on behalf of the new client enforce the contract

---

turns on its own facts, and the "work in the [subsequent] case did not involve attacking work that the attorney had previously performed." *Id.* at 1073-74.

[26]    **BCPFOF 47**: Bar Counsel incorrectly submits: "Although Professor Rotunda professed familiarity with In re Sofaer, 728 A.2d 625 (D.C. 1999) . . . he ignored the D.C. Court of Appeals' expansive definition of a "matter" in that case . . ."

you drafted even though it involves your old client, as long as you're not switching sides in that same lawsuit.

**Chairman Metzler**: Okay, so if I understand you correctly, so long as the lawsuit wasn't started while the attorney was representing the first party, and so long as the lawsuit involves I guess an alleged breach or to enforce the terms of the contract rather than to undo the contract, it's okay under Rule. 1.9, in your view, for an attorney to negotiate the contract on the first party's behalf, and then sue on that same contract on the second party's behalf?

**Professor Rotunda**: Yeah.

**Chairman Metzler**: Okay. You can't undo the contract, but it looks like he then sued to enforce it. That's what comment one seems to say. That's because if you were undoing it, if the lawyer were seeking to undo the transaction, that would be the same matter, but if it is seeking to enforce the contract, that is a different matter?

**Professor Rotunda**: I wouldn't say undo the transaction; undo the contract. That's what we're talking about.

Trial Tr., Jan. 27, 2016 at 527:17-22; 528:1-22; 528:1-12; RPFOF at ¶ 142. Respondent did not seek to rescind the contracts; he sought to enforce them. And, when Judicial Watch failed to follow the agreement, Dugan filed suit against it on behalf of Paul in order to force Judicial Watch to comply with the agreement. When Respondent made his appearance after Dugan resigned because of lack of payment, he did so without being paid and sought only to enforce an agreement that he and Fitton had signed; not to attack it by attempting to rescind it. As Professor Rotunda testified under oath: "He never attacked the work product. He never seeks to rescind the retainer agreement. When there is a dispute between Paul and Judicial Watch, he's never on the opposite site [sic] of that suit. He's always seeking to enforce the retainer agreement, implement the retainer agreement, never attack his work product . . ." *Id*. at pg. 512:11-19.

Importantly, "[i]n the Peter Paul case, there is no allegation by the judge, or by the DC Bar, that the respondent violated any confidences." Trial Tr., Jan. 27, 2016 at 517:17-19; RPFOF at ¶ 102; SOF at ¶ 39. Still, there is nothing that Respondent could have gained from his prior representation of Judicial Watch that could have materially advanced the subsequent representation of Peter Paul. Again, Paul was a public figure and his lawsuit was publicized nationally and internationally. Importantly, even Fitton, after Respondent left Judicial Watch, sent

out fraudulent, indiscriminate solicitation letters to Americans seeking donations on Paul's behalf. RPFOF at ¶ 129. Fitton did so after Judicial Watch had jettisoned Paul as a client. As such, there is no rule violation in the Paul matter and this count should be dismissed in its entirety.

C.   **Respondent Did Not Violate D.C. Rule 8.4(d) In the Paul Matter Because He Did Not Engage In Conduct That Seriously Interfered With the Administration of Justice and This Alleged Violation Should Be Dismissed Based on the Plain Language of Rule 8.4(d) and Its Comments Alone.**

D.C. Rule 8.4(d) provides, "[i]t is professional misconduct for a lawyer to . . . [e]ngage in conduct that seriously interferes with the administration of justice[.]" Not only did Respondent not in any way seriously interfere with the administration of justice, but also the Amended Specification of Charges submitted by Bar Counsel fails to allege so. Trial Tr., Jan. 27, 2016, at 519:9-11; 571:18-22; 572:7-8; RPFOF at ¶ 132. Indeed, the large majority of these cases where Bar Counsel seeks to have a lawyer disciplined for violating D.C. Rule 8.4(d) involve a lawyer's failure to cooperate with Bar Counsel, *see* D.C. Rule 8.4(d), cmt. 2. These examples simply do not exist here.

A lawyer's failure to respond to Bar Counsel's inquiries or subpoenas may constitute a violation of this rule, *see In re Cope*, 455 A.2d 1357 (D.C. 1983), as may the failure to abide by agreements made with Bar Counsel. *See In re Harmon*, M-79-81 (D.C. Dec. 14, 1981).

Respondent has never failed to appear in hearings or defied court orders, which are other common forms of conduct, deemed to be prejudicial to the administration of justice in violation of D.C. Rule 8.4(d). *See In re Evans*, No. M-126-82 (D.C. Dec. 18, 1982). Respondent and Bar Counsel have a conciliatory relationship and have been working together throughout these proceedings. In addition, Respondent has not failed to comply with any agreements made with Bar Counsel.

Professor Ronald Rotunda's expert testimony illustrates that Respondent did not – and could not – have violated D.C. Bar Rule 8.4(d):

> **Professor Rotunda**: I think the allegation of a violation of 8.4(d) is laughable . . . The judge ordered him to leave and he left. I don't' know how there was any serious intervention with the system of justice. The judge knew that the case against Judicial Watch would be dropped, and the judge said that doesn't matter. I have no idea how the judge disqualifies you and then you leave, that there is a serious intervention with the administration of justice. I thought that was laughable.

Trial Tr., Jan. 27, 2016 at pg. 519:10-22; RPFOF at ¶ 144. As his testimony elucidates, when ordered to remove himself from the Paul case, Respondent immediately complied with the Judge's Order.[27] Importantly, up to the point of Judge Lamberth's Order disqualifying Respondent from the Paul matter, no court or tribunal ever said orally or in writing that Respondent had any conflict of interest. RPFOF at ¶ 111.

## IV.   IN THE UNLIKELY EVENT THAT THIS HEARING COMMITTEE FINDS BY CLEAR AND CONVINCING EVIDENCE A TECHNICAL VIOLATION OF EITHER D.C. RULE 1.9 OR D.C. RULE 8.4(d), THE FACTS OF THESE CASES DO NOT WARRANT ANY DISCIPLINARY ACTION AT MOST MORE SERIOUS THAN AN INFORMAL ADMONITION BECAUSE NO DISHONESTY OR MISREPRESENTATION OCCURRED, RESPONDENT DID NOT GAIN ANY FINANCIAL BENEFIT, AND THERE ARE SERIOUS, MITIGATING FACTORS THAT MUST BE CONSIDERED.

### A.   The Facts of These Cases Do Not Warrant Anything At Most More Than An Informal Admonition Because Respondent Did Not Act Dishonestly And Did Not Gain Any Financial Benefit.

Respondent and Bar Counsel stipulated to three critical facts with respect to the Cobas, Benson and Paul matters: (1) "Respondent has not been disciplined in his 36 plus years of

---

[27]   Even the comments to D.C. Rule 8.4(d) demonstrate that in no way did Respondent seriously interfere with the administration of justice. In order for him to potentially be found guilty for violating Rule 8.4(d), Respondent would have had to: (1) fail to respond to Bar Counsel's inquiries or subpoenas; (2) fail to abide by agreements made with Bar Counsel; (3) fail to appear in court for a scheduled hearing; (4) fail to obey court orders; (5) fail to turn over the assets of a conservatorship to the court or to the successor conservator; (6) fail to keep Bar Counsel aware of any address change, after being warned to do so; or (7) tendering a check known to be worthless in settlement of a claim against the lawyer or against the lawyer's client.  While this list is not exhaustive, D.C. Rule 8.4(d) seeks ultimately to discipline attorneys who are "offensive, abusive, or harassing . . ." and whose conduct manifests bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status. D.C. Rule 8.4(d), cmt. 3. Not only has Respondent not engaged in this type of behavior, but also Bar Counsel fails to allege so, and therefore its case has not been proved by clear and convincing evidence.

membership in the District of Columbia Bar. He is a member of good standing, continuously, before this [b]ar, since his admittance on December 22, 1980[;]" (2) "There is no allegation in the Specification of Charges or the Amended Specification of Charges that Respondent used any confidential information in representing Paul, Benson, or Cobas[;]" and (3) "The Specification of Charges [and Amended Specification of Charges] d[o] not allege Respondent engaged in dishonesty . . ." SOF at ¶¶ 36, 39, 40.

Importantly, there are several District of Columbia cases where Bar Counsel has informally admonished attorneys who acted much more seriously in allegedly violating the D.C. Rules than Respondent is alleged to have acted. Recall John L. Beaman of *In re John L. Beaman*, 4660 Martin Luther King, Jr. Avenue SW, Washington, D.C. March 30, 2001, who was given an informal admonition for practicing law while administratively suspended. Then, **less than a month later**, the same John L. Beaman was given another informal admonition, not a public censure or suspension, in connection with three separate disciplinary complaints involving criminal matters. Mr. Beaman allegedly failed to represent two separate clients competently, failed to serve two clients with skill and care commensurate with that afforded to clients by other lawyers in similar matters, failed to represent two clients diligently, failed to keep two clients reasonably informed about the status of their cases, failed to provide one client written notice of the rate or basis of his fee, and failed to surrender three clients' papers or other property after the representations ended.

In *In re Edward Gonzales*, 7921 Jones Branch Drive, McLean, Virginia. June 11, 2001, Bar Counsel and the Board issued Gonzales only an informal admonition for revealing a client's secrets, which Bar Counsel stipulates is not even on the table for Respondent. SOF at ¶ 39. In *In re John L. Machado*, Law Office of Alan Toppelberg, 1444 N Street NW, Washington, D.C. May 2, 2001, Bar Counsel and the Board issued Machado only an informal admonition for failing, in

connection with a criminal matter, to represent a client competently, to serve the client with skill and care commensurate with that afforded to clients by other lawyers in similar matters, to represent the client diligently, to act with reasonable promptness, to keep the client reasonably informed about the status of his case, to explain the matter to the extent reasonably necessary to permit the client to make informed decisions, or to surrender papers to a client after the representation ended; intentionally failing to seek the client's legal objectives; and engaging in conduct that seriously interfered with the administration of justice.

Beaman, Gonzales, and Machado allegedly committed serious violations. Mr. Beaman appears to be a repeat offender, yet still was only given an informal admonition after he essentially failed to represent his clients at all and then apparently stole their property after his representation ended. Gonzalez revealed a client's secrets, which, as any ethical lawyer knows, is a violation not only of the Bar Rules but also of the basic human laws of integrity and decency; yet he too was only informally admonished. Then Machado not only failed to give property back to his clients after his representation ended, but also *intentionally* failed to seek the client's legal objectives. His discipline too, not surprisingly, was an informal admonition.[28]

There are also cases of *intentional misrepresentation* by lawyers to court's and clients. Despite their lack of honesty or candor, these individuals also received informal admonitions. In *In re Richard A. Scully*, 3027 O Street NW, Washington, D.C. April 26, 2001, Bar Counsel issued Scully an informal admonition for engaging in deceptive or misleading conduct and conduct that

---

[28]  Even stronger case law demonstrates that the highest sanction necessary for Respondent, if any is to be imposed, in the interest of justice – and relevant District of Columbia case law – would be an informal admonition. In *In re Severina B. Rivera*, 1322 18th Street NW, Washington, D.C. January 29, 2001, Bar Counsel issued an informal admonition for failing, in connection with a criminal matter, to represent a client competently, to serve the client with skill and care commensurate with that afforded to clients by other lawyers in similar matters, to represent the client diligently, to act with reasonable promptness, or to surrender papers to the client after the representation ended; intentionally failing to seek the client's legal objectives and prejudicing the client's case during the course of the representation; and engaging in conduct that seriously interfered with the administration of justice.

seriously interfered with the administration of justice in connection with an immigration matter. Similarly, in *In re Steven B. Snyder*, Bar Docket No. 2010-D238, Bar Counsel issued Snyder an informal admonition. While serving as an Assistant U.S. Attorney for the District of Columbia and representing the United States in the prosecution of two individuals, Snyder made a false statement of fact to a tribunal or failed to correct a false statement of material fact previously made to the tribunal. Both Scully and Snyder received informal admonitions for essentially lying to courts of law. Respondent and Bar Counsel have stipulated that Respondents' conduct did not involve dishonesty. RPFOF at ¶ 40. Thus, at most an informal admonition would be more than necessary to punish Respondent for his alleged misconduct.

In addition to Bar Counsel issuing informal admonitions for attorneys who lie to the courts and their clients, **Bar Counsel also issues informal admonitions for attorneys who plead guilty to committing felonies.** In *In re Michael A. Romansky*, Bar Docket No. 2013-D078, Romansky entered a plea of guilty in the Circuit Court of Arlington County, Virginia to one count of Possession of a Controlled Substance, in violation of 18 Va. Code 2-2250, a felony, on February 23, 2006. Only after he completed his probation did the Circuit Court vacate its previous finding of guilty and ordered that the charge in the indictment be dismissed. Romansky never reported his guilty plea to the D.C. Bar or the Board of Professional Responsibility. Bar Counsel only became aware of the guilty plea from an independent source. Yet, Bar Counsel issued Romansky an informal admonition, even after he intentionally withheld his crime from Bar Counsel.

In *In re John K. Lunsford*, Bar No. 88096 January 31, 2006, Bar Counsel issued Lunsford an informal admonition for engaging in a conflict of interest **and disclosing client secrets**. Lunsford, the former General Counsel to an entity, provided legal advice to individuals who were on the other side of a transaction as to which he had previously represented the entity, and represented one of the individuals in pursuit of his claims against the entity in its subsequent

29

bankruptcy matter. Specifically, Lunsford served as a hospital's General Counsel, its President, and Chief Executive Officer. He began work as General Counsel of four entities in May 1993. From January until November 1998, Lunsford also served as Acting Administrator of the hospital.[29]

Mr. Lunsford, according to Bar Counsel, committed at least two violations of D.C. Rule 1.9 and D.C. Rule 1.6 (confidentiality of information). Bar Counsel stated in no uncertain terms that Lunsford "revealed secrets of your [Lunsford's] former corporate clients, in violation of Rule 1.6, and that you [Lunsford] did not have the informed consent of your clients to do so[,]" yet received nothing more than an informal admonition. The compelling, unequivocal irony here is that Bar Counsel stipulates that Respondent did not violate any confidences, yet is seeking a

---

[29] In 1999, the hospital experienced financial difficulties and a petition for involuntary bankruptcy was filed by one of the hospital's creditors. On September 9, 1999, the hospital was notified by the District of Columbia Department of Health of the city's intent to revoke the hospital's license to operate. During this time, the hospital – by and through Lunsford – entered into negotiations with the Department of Health in order to preserve the hospital's license. On September 28, 1999, Lunsford resigned yet remained as General Counsel for two of the four entities, including the hospital and nursing center. After Lunsford's involuntary termination of General Counsel with the two entities, he provided legal and strategic advice and assistance to persons interested in purchasing the hospital. On January 29, 2000, Lunsford provided the purchasers with written comments on a draft agreement the person who terminated Lunsford had submitted to the purchasers. Lunsford also provided the purchasers with strategic advice on the conduct of negotiations with the person who terminated him. Further, on February 23, 2000, Lunsford provided the purchasers with written comments, giving legal advice on the terms of the agreement. The legal advice given in these communications was based at least in part on information obtained by Lunsford through his previous role as General Counsel to the four entities.

Then, on April 8, 2002, Lunsford entered an appearance on behalf of one of the purchasers in the hospital bankruptcy acquisition, the same hospital that Lunsford was representing as General Counsel in attempting to stop the bankruptcy acquisitions. Subsequently, Lunsford filed a proof of claim on behalf of the purchasers. The claim included one for funds the purchaser provided to the hospital in connection with the failed attempt to purchase the hospital during the time you were handling negotiations on behalf of the hospital. Bar Counsel claimed, "It cannot be disputed that this was the same transaction as to which you provided legal representation to the hospital and nursing center during your employment as General Counsel and CEO for those entities." http://www.dcbar.org/discipline/informal_admonition/Lunsford_J.pdf.  Bar Counsel continued, " . . . we find that you again violated Rule 1.9 when you represented Dr. Rajagopal [purchaser] in both the hospital bankruptcy and the personal bankruptcy of Dr. Shin [the person who terminated Lunsford]." *Id*.

sanction more serious than an informal admonition.

*In re Sofaer*, a case that Bar Counsel relies on, is easily distinguishable from Respondent's case, both factually and legally.  On December 21, 1988, Libyan terrorists blew up Pan American Flight 103 over Lockerbie, Scotland, killing everyone on board and 11 people in the town. *In re Sofaer*, 728 A.2d 625, 630 (D.C. Cir. 1999). The United States investigated the identification of the terrorists responsible and the families of the victims sued Pan American for damages arising from the bombing. *Id*. At the time of the United States' investigation into the bombing, Sofaer was the Legal Advisor in the U.S. Department of State. During his tenure, Sofaer provided legal advice to the Secretary of State and to other officials in the State Department and the U.S. government. *Id*. at 630-31. Sofaer met with high-level, interagency lawyers to consider legal issues related to the possible use of force against Libya in retaliation for its sponsorship of these terrorist acts. *Id*. at 631. The United States took retaliatory action against Libya when it confirmed that Libya had sponsored a previous terrorist attack 2 years earlier. Sofaer provided legal advice to administration officials regarding the necessity for the use of force against Libya, the proportionality of the proposed response, and the applicability of the War Powers Resolution to the proposed retaliation. *Id*. at 631. In his legal capacity as Legal Advisor for the U.S. Department of State, Sofaer learned details of communications intercepts linking the prior bombing to the bombing of the Pan American flight. He learned of other possible acts of terrorism that Libya was planning. He also learned about potential Libyan targets that the United States was considering bombing because of their ties to terrorism. *Id*. In this regard, Sofaer even published an article concerning Libya's terrorist activities.[30]

---

[30]   Immediately following the fatal bombing of Pan American Flight 103, en route from London to New York, Sofaer received the U.S. Department of State's daily written briefing report about sensitive or important matters. *Id*. Sofaer testified that these briefings included information about the progress of the Pan American investigation and that he had access to classified communications and cables relating to the progress of the investigation and diplomatic efforts concerning the bombing. *Id*.

In 1989, the families of the victims of the flight filed wrongful death lawsuits against Pan American and in the fall of 1989, Pan American served the U.S. Department of State subpoenas, seeking documents related to its case. An attorney in the U.S. Department of State drafted the responses to the subpoenas and transferred it to Sofaer, the Legal Advisor, because "Respondent had instituted a policy that all documents from his office going to an Assistant Secretary or higher official in the State Department had to be reviewed by him, and this memorandum fit into . . . that category. Respondent enforced this policy because he wanted to be aware of and involved in advice given by his office to high-level officials in the State Department." *Id*. at 633.

In June 1990, U.S. officials confirmed that Libya was behind the Pan American Flight bombing. Also in June 1990, Respondent left the U.S. Department of State and sought employment with a private law firm. Despite the questionable period of when Sofaer left the U.S. State Department and when it was officially confirmed that the Libyans bombed the Pan American Flight, Respondent testified that he learned of the evidence in November 1991. *Id*. In 1992, however, Sofaer agreed to represent Libya "in connection with legal proceedings in the United States arising from the Pam Am 103 bombing." *Id*. at 635. He was prepared to assist "in resolving by consensual negotiations all pending and potential civil and criminal litigations and other legal proceedings related to the Pam Am 103 bombing."[31] *Id*. 636.

The facts of *Sofaer*, and in particular Sofaer's involvement with his prior client, the U.S.

---

at 632.

[31]     After receiving $250,000 in a Swiss Bank Account and receiving less than a blessing from the U.S. government, Respondent finally terminated his representation of Libya when "the public perception of HH&R's [Respondent's law firm] undertaking and the reaction of government authorities were so negative that HH&R concluded that it could not effectively carry out the representation [of Libya]." *Id*. at 640.  At first, Bar Counsel and Respondent agreed to a diversion agreement that was rejected by the Board Chair. *Id*. at 641. Respondent rejected an informal admonition offered by Bar Counsel, so Bar Counsel petitioned the matter and brought it to a hearing. *Id*. The District of Columbia Court of Appeals upheld Bar Counsel's recommendation of an informal admonition.

Department of State, are wholly inapposite to the facts of this case and indeed Sofaer's actions are far more serious than those alleged of Respondent, yet still he was informally admonished. First, Sofaer benefitted financially from improper representation. Here, Respondent did not earn even one dime from his representations. RPFOF at ¶ 95.

In addition, Sofaer's serious behavior has little to do with his representing a country that was found to have funded and been seriously involved in terrorism. Rather, the seriousness of his conduct stems from his intimate involvement with the classified information he received as Legal Advisor to the U.S. Department of State. Sofaer had access to security briefings regarding terrorism, Libya, and in particular, the terrorism link between Libya and the subsequent bombing of the Pan American Flight. Indeed, he was Legal Advisor when the U.S. Department of State bombed Tripoli, because of the serious and then confirmed ties to terrorism and the Pan American Flight. "Moreover, respondent's actions take on added significance when viewed in the context of his participation, as one of a small number of senior State briefings which periodically included information about the progress of the criminal investigation and related diplomatic relations." *Id.* at 627. Importantly, a bomb exploded in Berlin, Germany, killing several United States military personnel. **The U.S. government learned that is bombing was connected to the Libyan government and took retaliatory action against Libya. Sofaer knew this. He also learned details of the communication intercepts linking the Germany bombing to Libya. He was also informed of other possible acts of terrorism that Libya was planning before his departure as Legal Advisor of the U.S. Department of State, four years later.** *Id.* at 631. Respondent then represented Libya "in connection with on-going civil and criminal disputes and litigation relating to the destruction of Pan Am 103." *Id.* at 635.

What Sofaer did by representing Libya would be similar to Respondent's actions if and only if Respondent and Judicial Watch had taken actions *against* Cobas, Benson or Paul, as the

U.S. Department of State, with Sofaer as its Legal Advisor, took action *against* Libya when it bombed its capital. The fundamental difference between Sofaer's actions and Respondent's actions goes to the heart of what Professor and ethics expert Ronald Rotunda called "attacking the lawyer's own work" of the prior client. This is also consistent with the ruling in *Health Care & Ret. Corp. of Am., Inc.*, which held that even if the two representations involve the same type of transaction, there concerning ulcers and falls, it is considered a wholly distinct problem of that type if the work in the subsequent case did not involve attacking work that the attorney had previously performed. *Health Care & Ret. Corp. of Am., Inc.*, 961 So.2d 1071 at 1073-74. Sofaer attacked his own work by giving the U.S. Department of State *specific legal advice about terrorism and Libya* (work) on whether or not to blow up a city and then subsequently representing those who he blew up (attacked the work). Respondent did not. This has been discussed at length above, but simply put, Respondent's role as General Counsel did not involve drafting, maintaining, or giving legal advice regarding work place hostility and sexual harassment (Cobas), he did not solicit donations from potential donors as his role as General Counsel, nor did he draft in-house, fundraising, legal documents regarding solicitations at Judicial Watch (Benson), and he did not attempt to rescind the contracts he and Fitton signed on behalf of a whistleblower (Paul); he only attempted to enforce them.

    **B.**    **This Honorable Committee Must Consider the Serious, Mitigating Factors and The Law of Equity When Determining An Appropriate Remedy, In the Unlikely Event This Committee Does Not Dismiss the Case In Its Entirety.**

"In these and like cases it is bad to follow the law, and it is good to set aside the letter of the law and to *follow the dictates of justice and the common good*." St. Thomas Aquinas, Summa Theologica, Part II, 2nd part, ques. 120, art. 1 (Fathers of the English Dominican Province Trans., 3d ed. 1942) (emphasis added).

1.    **The Doctrine of Laches**: The Passing of Almost Ten Years Since the Alleged Violations Occurred Has Significantly Harmed Respondent In Defending This Case.

Equity is a fundamental principle of American jurisprudence. Indeed, the U.S. Constitution recognizes this precept in Article III, Section II: "The judicial power shall extend to all cases, in law **and equity**, arising under this Constitution . . ." U.S. Const. art. III, § 2 (emphasis added). The equitable doctrine of laches is no exception. Laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. Of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *See American Univ. Park Citizens Ass'n v. Burka*, 400 A.2d 737, 740 (D.C. 1979).

Importantly, a number of jurisdictions have determined that the defense of laches applies in attorney disciplinary cases. *See, e.g.*, *In re Tenenbaum*, 918 A.2d 1109, 1114 (Del. 2007) (adopting the laches defense in attorney disciplinary cases); *In re Ponds*, 888 A.2d 234, 240-44 (D.C. 2005) (discussing delay as a mitigating factor in setting the appropriate sanction); *In re Matney*, 740 P.2d 598, 605 (Kan. 1987) (applying laches in an attorney disciplinary case); *In re McCarty*, 75 A.3d 589, 594 n.3 (Vt. 2013) (applying laches but finding no prejudice); *See generally*, Debra T. Landis, Annotation, Attorneys at Law: Delay in Prosecution of Disciplinary Proceeding as Defense or Mitigating Circumstance, 93 A.L.R.3d 1057 (1979).

In *In re Ponds*, the disciplinary board overviewed an attorney's misconduct in continuing to represent a defendant in a criminal matter even after the defendant tried to withdraw a guilty plea based on allegations that the attorney had coerced him into pleading guilty. *In re Ponds*, 888 A.2d 234 (D.C. 2005). The court held, "treating the lapse of time as a possible mitigating factor is

35

a particularly suitable approach if the attorney has ethically practiced law during the period of delay. *Id*. at 241.

Here, the conduct alleged by Bar Counsel occurred approximately ten years ago, as Respondent represented Cobas in 2006, Benson in 2007, and Paul in 2007. Bar Counsel's delay is not only inexcusable but the current prosecution seems driven by Judicial Watch's influence and force for coercive, tactical purposes, especially in light of the ongoing litigation between Respondent and Judicial Watch in other legal disputes. Specifically, several lawsuits have been filed against Judicial Watch, the most recent awarding Respondent compensatory and punitive damages in excess of $181,000, as a result of the unethical, malicious, defamatory, and fraudulent conduct by Judicial Watch against Respondent personally and professionally. RPFOF at ¶¶ 63; SOF at ¶ 35; *see* Pl.'s Ex. 22, 23.

The unreasonable and clearly malfeasant delay in bringing these charges before this Committee has detrimentally prejudiced Respondent, particularly since recollection and memories fade over the course of a decade. Even Dugan, a key material witness, admitted during his examination that memory faded because of the passage of time.[32] Trial Tr., Jan. 28, 2016, at 678:13-16. As Respondent testified, he could have called Gregory Mills, Rick Ventura and others as witnesses had this proceeding not been brought to fruition eight years after Fitton filed the original Bar Complaint. Trial Tr., Jan. 27, 2016 at 427:4-7; 430:10-12; RPFOF at ¶¶ 122, 123, 124.

Respondent has also been a member of good standing for his entire four-decade career as a lawyer. Trial Tr., Jan. 27, 2016, at 319:2-5. He has never been disciplined by the Board or any

---

[32]     ("Q: Do you recall any of the discussion you would have had with Mr. Klayman at that time? A: I really can't remember after all the – that passage of time."); *Id*. at 688:1-7; RPFOF at ¶ 153, 157 ("Q: Now, I know you don't recall – you testified you don't recall our discussions with regard to my entry of appearance, correct? A: Correct. Q: It's been eight and a half years. That's a long time; would you agree? A: I would agree.")

other tribunal because of misrepresentation or dishonesty.[33] The only mark on Respondent's record is from The Florida Bar that issued an agreed upon censure because Respondent was unable to make a payment on a *mutually agreed upon* time schedule. RPFOF at ¶ 161. Importantly, as set forth in the public censure judgment, the lawyer, Mark Solomon, who succeeded Plaintiff in the representation of the former client, who was and is prepared to testify or submit an affidavit, admitted to Respondent that he did not owe the client any refund and that he did not expect Respondent to make a payment. Trial Tr., Jan. 28, 2016 at 707:18-22; RPFOF at ¶ 163.[34]

In *In re Williams*, Bar Counsel brought disciplinary charges against Williams in 1979 and 1980. *In re Williams*, 513 A.2d 793 (D.C. 1986). Three years later, the Court of Appeals for the District of Columbia remanded the case back to the Board because it concluded that Williams had not been afforded due process protections. *In re Williams*, 464 A.2d 115 (D.C. 1983). Eighteen months later, Bar Counsel refiled identical allegations of misconduct. *Williams*, 514, A.2d at 794-95. When Williams argued that the eighteen-month delay warranted dismissal of the charges, the Board accepted his argument and **dismissed the disciplinary proceedings**. *Id.* at 795.

The *Williams* cases are particularly relevant here for three reasons: First, the alleged violations by Williams are far more serious than the allegations against Respondent; second, a mere eighteen months was considered substantial enough a delay to warrant dismissal; and third,

---

[33]     Part of Bar Counsel's Bar Complaint involved litigation in Florida. Fitton and Judicial Watch claim that that litigation involved a conflict. But the Florida judge did not make any such finding. The Florida Bar Counsel raised no such issue. As Professor Rotunda also testified: If Fitton thought that there was a conflict, one would think that he would have filed a complaint in Florida. The Florida tribunal is the most natural tribunal to decide this issue. It knows, much better than D.C. Bar Counsel, what Florida law means.

[34]      This notwithstanding, Respondent intended to pay the agreed upon amount but a severe recession hit the economy and Respondent also had a near fatal car accident which prevented timely payment. The agreed upon reprimand – to simply put the matter behind Respondent during a difficult period – did not involve any dishonesty or other ethical violation; rather, it was a matter of not having the money to timely pay an agreed-upon settlement.

the dismissal of a serious alleged violation against Williams proves that a lapse of time is an

affirmative defense, and not merely a mitigating factor. These factors must be taken into account.

>    2.    **The Doctrine of Necessity**: Respondent Had No Other Recourse Without
>           Allegedly Violating D.C. Rule 1.3 and Indeed He Hired Another Lawyer to
>           Represent Benson and Cobas.

Respondent's actions should also be understood and considered in light of the doctrine of

necessity. Even judges can decide cases if they are otherwise disqualified if there is no other judge

available to decide the case. The U.S. Court of Claims applied the rule of necessity and held that

its judges could hear the case involving their own salaries. *Atkins v. United States*, 556 F.2d 1028

(Ct.Cl.1997). Recall also *United States v. Will*, where the court there explained: "[t]he Rule of

Necessity had its genesis at least five-and-a-half century ago. Its earliest recorded invocation was

in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he

was a party when there was no provision for appointment of another judge." *United States v. Will*,

449, U.S. 200, 213. (1980).

**BCPFOF 48. *Disputed*.**[35] As Professor and ethics expert Ronald Rotunda correctly

testified under oath:

> Faced with the dilemma of either representing Cobra [sic], Paul, and Benson, or
> allowing them to lose their legal rights, Mr. Klayman sided with the rights of the
> clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them.
> Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the
> lawsuits because it knew [it] would escape liability for the wrongs that they [sic]
> had caused . . . the trial judge did *not* refer this case to the disciplinary authorities
> for further discipline.  It appears reasonable to believe that the trial judge imposed
> all the discipline (in the form of a disqualification) that he believed should be
> imposed. The situation involving these particular clients provided a unique set of
> circumstances, one that the D.C. Rules [] do not expressly take into account. Given
> this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct
> the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule

---

[35]    **BCPFOF 48**: Bar Counsel incorrectly submits: "Attempting to address Respondent's claim
that Cobas, Benson and Paul needed his services, due to lack of funds to pay for other counsel,
Professor Rotunda suggested an analogy to doctrines permitting judges to decide cases in spite of
conflicts, where no one else is available to do so . . . He acknowledged that there was no precedent for
using that doctrine in relation to lawyers."

1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

Pl.'s Ex. 5. Cobas, Benson, and Paul were all left without recourse and Respondent was the only person who could step up to the plate for them. Trial Tr., Jan. 27, 2016 at 378:12-22; 454:15-19; 461:21-22; 462:1-3.

      3.    **Selective Prosecution**: Prejudice by Bar Counsel As a Result of Misconduct by Complainant, Thomas Fitton, as Respondent is Singled Out.

In order to prevail on a selective prosecution claim, Respondent need only show that enforcement against him "had a discriminatory effect and . . . was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Even "[a] 'nonfrivolous showing' of both elements of the claim is sufficient to support a hearing and related discovery on selective prosecution. *United States v. Greenwood*, 796 F.2d 49, 52 (1986).

That these disciplinary actions were taken so long after the alleged conduct in question demonstrates an abnormality if not gross abuse in this disciplinary proceeding. It is clear that something had caused this action to be taken up by Bar Counsel so long after the fact. Indeed, Judicial Watch provided Bar Counsel with boxes full of irrelevant and highly prejudicial information regarding Respondent's past divorces, custody proceedings regarding his children, and other personal struggles Respondent has dealt with since his departure from Judicial Watch. These salacious and prejudicial documents were not produced to Respondent until he discovered that Bar Counsel had them in its possession. Trial Tr., Jan. 26, 2016 at 132:3-22; Trial Tr., Jan. 27, 2016 at 331:18-22; 332:1-3; RPFOF at ¶ 67.[36]

---

[36]    In this regard, in a letter dated October 1, 2013 to Fitton from Bar Counsel, Bar Counsel writes, "[t]hank you for calling this matter to our attention and for your consideration." Since the original complaint was filed in the beginning of 2008, it is no coincidence that Fitton contacted Bar Counsel immediately after he and Judicial Watch were denied a motion to dismiss in a case that resulted in large compensatory and punitive damages awarded to Respondent. Indeed, Fitton's motion to dismiss was denied only twenty-five days prior.

A huge elephant in the room that Bar Counsel seeks to keep hidden is that on at least one occasion, Respondent asked Bar Counsel to investigate the conduct of Fitton and Judicial Watch directors for unethical violations. Trial Tr., Jan. 27, 2016 at 330:20-22; 331:1-4; RPFOF at ¶ 92. In a letter dated March 27, 2008 to Ms. Elizabeth A. Herman, Esq., Deputy Bar Counsel, Respondent writes:

> [i]ronically, Mr. Fitton may have performed a service to Cobas, Benson, and Paul and the public at large by filing his non-meritorious complaint, as Bar Counsel is respectfully requested to investigated how what is essentially, in practice, a public interest legal organization can ethically function with such a non-lawyer at the helm – who effectively calls "all the shots."

In the same letter, Respondent writes, "Mr. Fitton's complaint, who is a non-lawyer [sic], was conceived of, furthered and prepared by his counsel, Mr. Richard Driscoll and Mr. Paul Orfanedes, both members of the District of Columbia Bar . . . [b]oth have been the subject of recent bar complaints filed by me, when they disclosed court sealed, private information about my divorce and had it published in Legal Times in an attempt to falsely damage my reputation and harm my family."

Ironically, even after all this time, many, many years later, Bar Counsel still has not initiated an investigation into the alleged unethical practices of Fitton, Orfanedes, or Driscoll, even though it claims to "investigate[] all complaints and allegations of ethical misconduct and initiate appropriate resolutions . . ." *See* http://www.dcbar.org/attorney-discipline/office-of-bar-counsel/obcmission.cfm. RPFOF at ¶ 93; Pl.'s Ex. 20.[37]

    4.    **Due Process Violations**: Respondent Was Not Adequately Notified of Any Charges or Proceedings.

---

[37] **As Professor Rotunda testified, the case for selective prosecution herein is even stronger than with regard to former Solicitor General, Ted Olson, who clearly flipped sides in the Citizens United case, where he went from representing the government to representing Citizens United on the same exact matter. Bar Counsel took no action against him. Trial Tr., Jan. 27, 2016 at 516:5-22; 517:1-16.**

It is axiomatic that lawyers in disciplinary proceedings are entitled to procedural due process. In *Ruffalo*, the petitioner appealed his disbarment after records of his employment were mentioned at a late stage in his disciplinary proceeding without giving him the opportunity to respond. The U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.*, 390 U.S. 544, 550 (1968); *see also Kelson v. State Bar*, 17 Cal.3d 1, 6 (Cal. 1976) (holding that it was a violation of procedural due process for the State Bar to amend charges on the basis of testimony without giving Respondent notice of the change).

Respondent learned of the documents Judicial Watch provided Bar Counsel more than six years after Fitton filed the original Bar Complaint. The volumes of this prejudicial information sat before Bar Counsel (and was obviously reviewed) for *years*, and Respondent did not know they existed. If Bar Counsel provided copies of the volumes of prejudicial information to Respondent in a timely manner – that is, not six years later – Respondent could have argued with force against the finding of probable cause or moved much earlier to dismiss this proceeding. Respondent could have argued that the prejudicial and exculpatory information was commenced not only selectively but also for an improper, prejudicial purpose, which violated Respondent's due process rights.

     5.    **A Form of *Res Judicata*:** A Federal Court Judge Already Resolved The Issues Behind the Paul Matter and Therefore Any Subsequent Attempt by Bar Counsel to Discipline Respondent is Barred.

Simply put, res judicata precludes a party from relitigating an entire claim that has already reached a final judgment on the merits. *Short v. District of Columbia Dep't of Emp't Servs.*, 723 A.2d 845, 849 (D.C. 1998). Respondent should not be disciplined for the alleged misconduct because this alleged misconduct was already instituted and addressed by the U.S. District Court for the District of Columbia. The Honorable Royce C. Lamberth has already

resolved the issue. *See Paul v. Judicial Watch, et al.*, Case No. 1:07:cv-00279 (D.D.C. Feb. 5, 2007). In his Memorandum Opinion Order, Judge Lamberth specifically addressed the issue of D.C. Rule 1.9 in regard to Respondent's representation of Paul. Judge Lamberth, in his ruling, found that "a survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." Trial Tr., Jan. 28, 2016 at 658:15-17; B.C.'s Ex. 52.

Indeed, under the circumstances at the time, and the harm that would be caused to Paul, it was thus ambiguous whether D.C. Rule 1.9 required Respondent's disqualification under the circumstances. Even Respondent's co-counsel, Dugan, had advised and counseled Respondent that there was no conflict of interest and that Respondent did not violate D.C. Bar Rule 1.9 by representing Paul. **BCPFOF 41, 45.** ***Disputed.***[38] Judge Lamberth even took "note of Paul's argument that he will suffer prejudice if [Respondent] is disqualified." Judge Lamberth reiterated that "[t]he essence of the hardship that Paul asserts will result from disqualification of [Respondent] is an inability to obtain alternate counsel for lack of financial resources" and ultimately found that "[t]he Court is not unsympathetic to this concern." B.C.'s Ex. 52. Indeed, shortly after Respondent's disqualification, Paul was incarcerated for almost a decade. Trial Tr., Jan. 27, 2016 at 378:12-22; Pl.'s Ex. 1.

Judge Lamberth's testimony of January 28, 2016 is critical with regard to the disciplinary action, if any, recommended for Respondent. Over the course of his career, Judge Lamberth has referred many matters to Bar Counsel. Indeed, at times Judge Lamberth believed that he overwhelmed Bar Counsel with the numbers of matters he referred to them. Trial Tr., Jan. 28,

---

[38]    **BCPFOF 41**: Bar Counsel incorrectly submits: "On July 16, 2008, the District Court entered an order disqualifying Respondent as counsel for Mr. Paul accompanied by a 14-page Memorandum Opinion . . . The Court found "a clear violation of Rule 1.9 . . ." **BCPFOF 45**: Bar Counsel incorrectly submits: "In determining whether Respondent's Rule 1.9 violation required disqualification, the Court concluded Rule 1.9 itself "creates an irrebuttable presumption" that such a conflict taints the underlying trial."

2016 at 658:12-15; RPFOF at ¶ 147. But Judge Lamberth did not believe that Respondent's disqualification of Paul warranted a referral to Bar Counsel as there was a legitimate debate regarding the alleged misconduct and when he issued his opinion disqualifying Respondent, Judge Lamberth believed that that in and of itself was a notice of a public reprimand and his comments were sufficient to make sure that Respondent knew the Court's view. *Id.* at 659:4-7; RPFOF at ¶ 148, 149.[39]

Indeed, it was Judge Lamberth who sought to supplement the record of this case with an affidavit. **BCPFOF *35. Disputed***.[40] In the affidavit, Paul testifies under oath that Respondent did not provide or convey to him any confidential or privileged information that could have belonged to Judicial Watch and that Judicial Watch abandoned him. Paul Aff. at ¶ 8, 9; RPFOF at ¶¶ 168, 169, 170, 171, 172.  Importantly, Judge Lamberth testified, voluntarily, on behalf of Respondent without having been served with a subpoena. Judge Lamberth explained why Bar Counsel should not seek to impose any discipline. RPFOF at ¶ 147, 149.

Following Judge Lamberth's Order, Respondent immediately ceased all representation of the three individuals alleged to pose a conflict of interest and no harm was caused to Judicial Watch because of Respondent's limited representation of these individuals, as this was the first time he was put on judicial notice. RPFOF at ¶¶ 111, 112. Judge Lamberth, as made clear in his Order, recognized that the Rules of Professional Responsibility were not clear as to when disqualification was necessary under Rule 1.9 and thus took no further action. These facts alone should have obviated any need for a review by Bar Counsel. With regard to Benson and Cobas,

---

[39]     Bar Counsel argues that Judge Lamberth did not refer Respondent to Bar Counsel because Fitton had already done so. This argument is entirely inconsistent with the Judge's own sworn testimony. Trial Tr., Jan. 28, 2016 at 658:12-22; RPFOF at ¶ 149.

[40]     **BCPFOF 35**: Bar Counsel incorrectly submits: "In April 2005, Judicial Watch withdrew from representing Mr. Paul in Paul v. Clinton. Judicial Watch also withdrew from the criminal matter . . . Judicial Watch withdrew from the representation because Mr. Paul had fired the lawyers it had hired to represent him in the criminal matter and had attempted to extort Judicial Watch . . ."

there was never any judicial determination that Respondent may have violated D.C. Rule 1.9. No

court ever disqualified Respondent for his representation of Cobas or Benson.

**V.      RESPONDENT'S ADDITIONAL PROPOSED FINDINGS OF FACT AND
         CONCLUSIONS OF LAW NOT ALREADY ADMITTED OR DISPUTED.**

      **A.      Respondent's Proposed Findings of Fact.**

            **1.      Direct Examination of Thomas Fitton by Bar Counsel**

52.      *Respondent hired Fitton. Trial Tr., Jan. 26, 2016 at 37:4-5.*

53.      *At the time Respondent told Fitton about the Cobas problem, Respondent had taken
a step back from the organization and was not coming into the office as much. Id. at 44:20-22;
45:1.*

54.      *Fitton and Judicial Watch did not file a motion to disqualify Respondent on the
appeal for the Cobas case. Id. at 58:16-21.*

55.      *Fitton initially wrote the letter to solicit funds from Benson. Id. at 63:1-2.*

56.      *Benson sued because she wanted her money back after she gave $15,000 to
Judicial Watch for the purchase of the building. Id. at 72:4-6.*

57.      *Fitton and another Judicial watch Director, Christopher Farrell, initially
corresponded with Paul when Paul originally contacted Judicial Watch. Id. at 80:4-6.*

58.      *Judicial Watch hired a lawyer in New York to represent Paul in New York. There
was additional outside counsel that was brought in to legally represent Paul in the criminal
matters. Id. at 84:12-15.*

59.      *Judicial Watch lawyers, including Respondent, never entered an appearance for
Paul in the New York matter. Id. at 85:2-6.*

60.      *A team of lawyers represented Paul that did not work for Judicial Watch. Id. at
85:15-16.*

61.     *Paul was upset that Respondent had left Judicial Watch and accused Respondent of abandoning him. Id. at 87:5-8.*

62.     *Judicial Watch lost a defamation case brought by Respondent. Id. at 96:2-4.*

63.     *Damages, including punitive, were assessed against Judicial Watch in the amount of $181,000. Id. at 96:5-10.*

## 2.     Cross-Examination of Thomas Fitton by Larry Klayman

64.     *Judicial Watch never took any action against Cobas. Id. at 116:7-12.*

65.     *Judicial Watch most likely never took any action against Paul. Id. at 116:13-17.*

66.     *Judicial Watch never took any action against Benson. Id. at 118:5-8.*

67.     *Fitton provided Bar Counsel with documents related to Respondent's divorce proceeding and the custody battle with his children. Id. at 132:3-22.*

68.     *Donors for the building purchase had a plaque listing donors to the building fund on the office doors of the building that was to be purchased outright by Judicial Watch. Id. at 151:2-18.*

69.     ***Bar Counsel stipulates that at least one of the reasons Respondent stepped in to represent these people was because he felt that Judicial Watch abandoned them. Id. at 159:2-8.***

70.     ***Bar Counsel admits that Respondent may have truly wanted to help these three people. Id. at 159:16-18.***

71.     *Fitton signed a donation letter in 2005 seeking more donations for the purchase of a building. It quotes Fitton as the President of Judicial Watch and says to donors that Judicial Watch had raised $1.4 million for the building fund. At the time of the solicitation letter, no building was purchased. Id. at 169:6-19.*

72.     *Judicial Watch agreed to obtain for Paul a criminal defense lawyer with regard to securities fraud and the investigation by the U.S. Department of Justice. Id. at 189:16-21.*

73.     *The criminal defense lawyer for Paul was not Respondent on behalf of Judicial Watch. 189:22; 190:1-2. Mr. Michael Dowd was hired to represent Paul in his criminal defense case. Id. at 191:2-5. Gary Kreep entered an appearance for Paul in California, not Respondent. Id. at 194:3-17. A civil lawsuit was filed in California on behalf of Paul against Hillary Clinton and other Defendants over alleged illegal fundraising and this was filed by Ernie Norris, not Respondent. Id. at 191:13-19.*

74.     *Fitton was aware that Dan Dugan initially represented Paul in Washington, D.C. Id. at 199:14-18.*

75.     *Respondent's name was not on the complaint filed on behalf of Paul by Dan Dugan. Id. at 200:14-21.*

### 3.     Direct Examination of Paul Orfanedes by Larry Klayman

76.     *During the time that Orfanedes and Respondent were at Judicial Watch together, an outside lawyer named David Barmak was retained. Id. at 242:12-15.*

77.     *Orfanedes represents Judicial Watch and other clients through Judicial Watch. He has a dual loyalty to both Judicial Watch and his other clients. Id. at 255:4-13.*

78.     *Orfanedes is aware that Respondent spent much time in the Miami office. Id. at 258:22; 259:1-2.*

79.     *Orfanedes and Respondent tried many cases in Florida together and they won them all. Id. at 259:17-22; 260:1.*

80.     *Orfanedes knows that Benson and Respondent were close and that Benson flew across the country to help him babysit his children. Id. at 271:1-8.*

81.     *Respondent's name did not appear on the pleading for Benson. Id. at 273:6-8.*

82.     *The $1.4 million that Judicial Watch raised has still not been spent on a building. Id. at 274:20-22.*

### 4.      Direct Examination of Larry Klayman by Larry Klayman

83.     *Respondent took a position at the U.S. Department of Justice and was offered three sections of the Antitrust Division. Respondent chose Consumer Affairs, which represented the Federal Trade Commission, and the Consumer Produce Safety Commission. He later transferred to the AT&T trial section and was on the legal team that broke up AT&T. Respondent was never disciplined at the U.S. Department of Justice and indeed received good reviews. Trial Tr., Jan. 27, 2016 at 322: 2-14.*

84.     *Respondent has always done what he thought he should do ethically. Respondent decided that he wanted to start a public interest group because he had seen some judges favor domestic interests over foreign clients, and Respondent did not believe the judges acted properly. Id. at 323:5-22; 324:1-3.*

85.     *Respondent hired a number of lawyers at Judicial Watch. Id. at 327:15-16.*

86.     *Judicial Watch became bigger than the Heritage Foundation and the American Civil Liberties Union in terms of numbers of donors to Judicial Watch. Id. at 327:20-22.*

87.     *Judicial Watch had about $20 million in semi-liquid assets that Respondent left them upon his departure. Id. at 328:1-3.*

88.     *Respondent came up with Judicial Watch's slogan, "No one is above the law." Respondent wanted to be the "hamburger helper" of the Bar Counsel because he did not see the Bar having the capacity to enforce ethics with regard to government lawyers and officials, and he felt that there was an opening in that area. Id. at 329:1-7.*

89.     *When Respondent left Judicial Watch in September of 2003, it was to run for the U.S. Senate in Florida. Respondent's severance agreement makes specific reference that he was leaving to pursue other endeavors. Id. at 329:8-13. After Respondent left Judicial Watch, a press*

*release went wishing Respondent well on his departure and thanking him for his job at Judicial*

*Watch and for building Judicial Watch into a major organization. Id. at 332:18-22; 333:1-4.*

90.     *Respondent's ex wife made false allegations about him and Respondent was the*

*person who filed for divorce initially. There was never an allegation that Respondent committed*

*adultery. Id. at 329:16-20.*

91.     *Respondent was cut off from seeing his children and he was smeared falsely all*

*over the internet for tactical reasons by a divorce lawyer in Cleveland, Ohio. Judicial Watch*

*sought to use these types of false allegations against Respondent. Id. at 330:2-9.*

92.     *Respondent asked Bar Counsel to initiate an investigation into the Fitton and*

*Orfanedes because of the kind of conduct that demonstrated since Respondent's departure from*

*Judicial Watch. Id. at 330:20-22; 331:1-4.*

93.     *Respondent never received an answer from Bar Counsel to his Cross-Complaint*

*regarding the potentially unethical conduct of Fitton and Orfanedes. Id. at 331:14-17.*

█████████████████████████████████████████████████████████[41]

95.     *Respondent did not receive money for representing Cobas, Benson, or Paul. Id. at*

*337:15-17.*

96.     *Paul was angry at Judicial Watch because it had abandoned him and Respondent*

*became caught in between. Respondent was at risk of being sued for malpractice. Id. at 338:9-12.*

█████████████████████████████████████████████████████████[42]

98.     *Cobas resigned from Judicial Watch on September 8, 2003 and did not work for*

*Respondent during his U.S. Senate campaign while he was at Judicial Watch. Id. at 340:21-22;*

*341:1-3.*

---

[41]     Withdrawn from previously brief.
[42]     Withdrawn from previously brief.

99.     *After Respondent left Judicial Watch, Cobas was not the only person who was forced out. Mike Pendleton, the Director of the San Marino office was also forced out, and Russ Verney, who had been the right hand man of Ross Perot, was forced out. A former Federal Bureau of Investigation agent, John Vincent, was also effectively forced out. Id. at 346:1-8.*

100.    *Cobas represented herself pro se and then attorney Ray Reiser came in to represent her. She lost the case. It was only at that point that she asked Respondent to step in, because she did not have any funds to hire someone else and Respondent would only be coming in at the appeal level. Id. at 347:9-15.*

101.    *The record was already made in the Cobas case and there was nothing confidential in terms of anything that at that point was being put in front of the appellate court. Id. at 347:16-21.*

102.    *The Bar has not accused Respondent of using confidential information. That has never been a part of this case. Id. at 348:2-5.*

103.    *There was no harm done to Judicial Watch. Cobas lost her case and they did not suffer anything. Id. at 348:14-16.*

104.    *Benson is like a mother to Respondent who no longer has his mother. Id. at 351:7-10. Id. at 351:7-9.*

105.    *Benson swears under oath in an affidavit, "After Mr. Klayman separated from Judicial Watch, I tried to contact defendants for information about that status of my donation and naming rights. Defendants, and in particular their employee, Robert G. Mills, a/k/a/ Gregory Mills, initially refused to return my calls or respond to my correspondence. Id. at 352:16-22.*

106.    *Benson then swears, "Upon further direct inquiries, Mills and others advised me that the building purchase and naming were proceeding." Id. at 353:17-19.*

107.    *The shopping center that Benson owns has always put "her in the red" because she inherited it from her husband who regrettably committed suicide and she has been trying to support herself ever since. Benson felt strongly about Judicial Watch. She loved it and she loves Respondent. Id. at 361:1-8.*

108.    *Paul showed Judicial Watch the checks that were written to Hillary Clinton. He also showed Judicial Watch "thank-you" notes for helping fund her U.S. Senate campaign. Id. at 366:7-14.*

109.    *Paul told Judicial Watch that he was being investigated for securities fraud and that Judicial Watch would have outside counsel represent him because Respondent is not a criminal defense lawyer. Id. at 366:17-20.*

110.    *Paul had a Brazilian criminal defense lawyer for extradition matters and then an American criminal defense lawyer for Paul named Michael Dowd in New York City. Id. at 369:19-22.*

111.    *Up to the point of Judge Lamberth's Order disqualifying Respondent in the Paul matter, no court or tribunal had ever said orally or in writing, that Respondent had any conflict with Cobas, Benson or Paul. Id. at 381:1-4.*

112.    *Respondent took no action with regard to any of the three individuals after Judge Lamberth's ruling. Id. at 382:6-8.*

113.    *For Cobas and Paul, Respondent did not use confidential information when he stepped in to represent them. Id. at 385:10-15.*

114.    *In addition, for Paul, everything was out in the public domain and there was nothing confidential about it. Id. at 386:8-12.*

115.    *Bar Counsel has no proof, and has not put forward any proof, that Respondent used confidential information in the course of his representation of the three individuals. Id. at 387:13-22; 388:1-5.*

116.    *Bar Counsel does not intend to argue that Respondent used any confidential information. Id. at 388:17-19.*

117.    *In the Paul matter, Respondent acted under advice of his counsel, Dugan, when Dugan filed the opposition to Judicial Watch's motion to disqualify Respondent. Id. at 409:6-17.*

118.    *Respondent contacted the Bar and asked for and received an advisory opinion relating to ongoing client fraud several years ago when he worked for Busby, Rehm and Leonard. Id. at 410:19-22; 411:1-10.*

119.    *Respondent raised the issue of asking for an advisory opinion regarding the three individuals Respondent represented after his departure of Judicial Watch. Bar Counsel did not think it was prudent considering the case had already begun. Id. at 411:20-22; 412:1-2.*

120.    *There was no dishonesty involved in these matters, and that is important with regard to what the Hearing Committee decides to do, if anything. No confidential information is a part of the charges here and in any event, no confidential information was used. Id. at 416:14-21.*

121.    *Respondent had an ethical duty under D.C. Bar Rule 1.3 to zealously represent his clients. Id. at 420:1-5.*

### 5.    Cross-Examination of Larry Klayman by Bar Counsel

122.    *With respect to the Benson matter, Respondent would have called Gregory Mills as a witness if the Bar proceeding had not taken eight years. Id. at 427:4-7.*

123.    *With respect to the Benson matter, Respondent would have called Rick Ventura as a witness if the Bar proceeding had not taken eight years. Id. at 430:10-12.*

124.    *Respondent tried very hard to resolve things with Judicial Watch before he filed suit in order to enforce his severance agreement. Id. at 443:9-13.*

125.    *Respondent contacted Judicial Watch regarding the Cobas matter and it "showed her the door." Id. at 444:1-8.*

126.    *Respondent became involved in the Benson matter at the very end when she could not afford to pay for continued legal representation. Id. at 454:15-19.*

127.    *Respondent agreed with Judicial Watch that the criminal representation of Paul would be by criminal defense lawyers and not by Judicial Watch lawyers. Id. at 470:10-13.*

128.    *The second and final legal representation signed by Paul and Judicial Watch presumes that Judicial Watch would hire a criminal defense lawyer to represent Paul.*

129.    *After Judicial Watch withdrew from representing Paul in California, Judicial Watch [fraudulently] continued to fundraise off of Paul's name. Id. at 481:3-11.*

130.    *Respondent gave Benson and Paul Dugan's name as he is entitled to do under D.C. Rule 4.3. Respondent did not direct them to Dugan as he only recommended Dugan. Id. at 483:11-21.*

### 6.    Direct Examination of Expert Witness Professor Ronald Rotunda by Larry Klayman

131.    *Expert Witness Professor Ronald Rotunda was in the Harvard Law Review and clerked on the U.S. Court of Appeals for the Second Circuit. He co-authored a book on legal ethics, which is the most widely used casebook on legal ethics in the United States. He also co-authored a treatise on legal ethics, which has been cited in the U.S. Supreme Court. Id. at 497:1-22.*

132.    *In his expert opinion, Rotunda testifies that Bar Counsel's complaint does not allege facts that would violate D.C. Bar Rule 1.9. Id. at 502:1-6.*

133.    *In his expert opinion, Rotunda testifies that Respondent was not asked to represent Judicial Watch in a sex harassment claim where the other party was Cobas. There is also no allegation that he used or misused confidential information. Id. at 502:7-13.*

134.    *In his expert opinion, Rotunda testifies that it would be impossible to violate confidentiality in the Cobas case because not only does Bar Counsel not allege it, but also Respondent was only handling the appeal and there is nothing confidential about that. Id. at 503:10-15.*

135.    *In his expert opinion, Rotunda testifies that there is no obligation of loyalty to a former client. Id. at 503:16-19.*

136.    *In his expert opinion, Rotunda testifies that Respondent did not seek to rescind on behalf of a new client that which he drafted on behalf of the former client. Id. at 504:9-13.*

137.    *In his expert opinion, Rotunda testifies that if Respondent had developed sex harassment rules for Judicial Watch, then Cobas sued Judicial Watch and Respondent was one of the lawyers working on behalf of Judicial Watch, he could not then switch sides and represent Cobas subsequently. Rotunda testifies that this did not occur in the Cobas case and there is no shifting of sides. Id. at 504:18-22; 505:1-9.*

138.    *In his expert opinion, Rotunda testifies that the only allegation is that Respondent solicited a donation and "that's fine." It is not the opposite end of the transaction. Id. at 505:17-18.*

139.    *In his expert opinion, Rotunda testifies that Respondent did not attack the donation of Benson. Rather, he tried to enforce it. Id. at 506:14-16.*

140.    *In his expert opinion, Rotunda testifies that there was never a situation where Benson sued Judicial Watch and Respondent is defending or representing Judicial Watch. Id. at 509:8-11.*

141.    *In his expert opinion, Rotunda testifies that Respondent never attacked the work product in the Benson case. He was never involved in the other side of the suit of Benson v. Judicial Watch because it did not exist. Id. at 509:17-19.*

142.    *In his expert opinion, Rotunda testifies that Respondent never attacked his work product in representing Paul. Respondent always seeks to enforce the retainer agreement. He never switched sides. Id. at 512:14-22.*

143.    *In his expert opinion, Rotunda does not believe that Respondent violated either D.C. Bar Rule 1.9 or 8.4(d). Id. at 571:18-22; 572:7-8.*

144.    *In his expert opinion, Rotunda testifies the allegation of a violation of D.C. Bar Rule 8.4(d) is laughable. Id. at 519:9-11.*

### 7.    Cross-Examination of Expert Witness Professor Ronald Rotunda by Bar Counsel

145.    *In his expert opinion, Rotunda testifies that it is "absolutely" within the ethical rules of Rule 1.9 for a lawyer to: draft and research a solicitation, personally made a request of a donor to make that donation and then represent that donor against the company for which he helped draft that solicitation and sent that solicitation to a particular donor. Id. at 589:10-19.*

146.    *In his expert opinion, Rotunda testifies that nowhere in the Specification of Charges or Amended Specification of Charges does Bar Counsel allege that Respondent acted dishonestly. And dishonesty factors into whether a violation of D.C. Bar Rule 1.9 or 8.4(d) occurred. Id. at 605:18-22; 606:1-13.*

### 8.    Direct Examination of the Honorable Royce C. Lamberth by Larry Klayman

147.    *Over the course of his career, Judge Lamberth referred a number of matters to Bar Counsel. He notably did not refer Respondent. Id. at 658:12-15.*

148.    *Judge Lamberth believes that in the case of Respondent and his representation of Paul, there was a legitimate debate about the alleged misconduct. Id. at 658:15-17.*

149.    *Judge Lamberth believes that when he issued his public opinion disqualifying Respondent, there is some notion of public reprimand or finding that the counsel was wrong. Judge Lamberth did not refer this matter to Bar Counsel because he believed the public comments he made in his order were sufficient to make sure that Respondent knew of the Court's view. Id. at 659:12-22.*

150.    *Judge Lamberth believes that Paul was in a difficult position and that he was in a bind. It was a fairly unusual circumstance. Id. at 659:4-17.*

### 9.    Cross Examination of the Honorable Royce C. Lamberth by Bar Counsel

151.    *Judge Lamberth remembered an affidavit from Paul stating that he had no money or income and was not likely to have any in the future. It was clear to Judge Lamberth that it was a complicated case and he would not be able to find counsel easily. The Judge found that Paul was at a disadvantage when he disqualified Respondent. Id. at 662:3-11.*

### 10.    Direct Examination of Dan Dugan by Bar Counsel

152.    *There is a fee dispute between Dugan and Respondent and Paul and Benson. Trial Tr., Jan. 28, 2016 at 668:18-21.*

153.    *Dugan testifies that he does not recall whether he gave Respondent advice to enter an appearance in the Benson matter. Id. at 676:5-11.*

154.    *Dugan was representing Benson and Respondent was entering an appearance for Benson. At the same time, Dugan was also Respondent's attorney in another case. Id. at 685:15-22; 686:1.*

### 11.    Cross Examination of Dan Dugan by Larry Klayman

155.     *Dugan would not take any action or file any pleading, which he believed violated any D.C. Bar Rule or rule of the District Court. Id. at 687:14-19.*

156.     *Dugan has continuously been a member of good standing. Id. at 687:20-22.*

157.     *Dugan testified that he does not remember whether he gave Respondent advice regarding his appearance in the Benson matter because over eight years is a long time. Id. at 688:1-7.*

158.     *Dugan did not believe the opposition to Judicial Watch's disqualification motion was frivolous. Id. at 689:8-14.*

159.     *Dugan would not sign a pleading that he did not think he should sign. Id. at 689:15-19.*

160.     *Dugan would not sign a pleading or put his name on a pleading that he thought was in violation of any pleading rule or ethical rule. Id. at 696:13-15.*

## 12.     Aggravating and Mitigating Circumstances

161.     *Respondent voluntarily entered into a consent judgment with The Florida Bar after he represented a woman named Natalia Humm ("Humm") who was accused of doing fraudulent marriages in Florida.*

162.     *Respondent spent a lot of time with Humm and met her in the Federal Detention Center in Miami. Respondent had accepted a $25,000 non-refundable retainer and he used that. Thereafter, as Humm did with a prior attorney, she filed a Bar Complaint seeking the retainer back from Respondent. Respondent was in a difficult period of his life and was in poor financial shape. He was going through the custody proceedings with his children. Id. at 705:2-22; 706:1-8.*

163.     *Mark Solomon, the attorney who represented Humm after Respondent, sent an email to Respondent saying that he did not owe the money and that he was sure Respondent would not want to return one cent. To settle it, Respondent agreed to pay back $5,000. Id. at 706:7-22.*

164.     *The matter was only about Respondent not paying the voluntarily, agree-upon $5,000 timely. He could afford and did pay around $2,000 of the $5,000 before the Bar proceeding began. The consent judgment notes that there was no dishonesty involved and no prejudice resulted to Humm. Id. at 707:1-17.*

165.     *Respondent can obtain an affidavit from Humm's subsequent attorney, Mark Solomon, who said that Respondent did not owe her anything. Id. at 707:18-22.*

████████████████████████████████████████████[43]

### 13.     Affidavit and Admitted Evidence of Peter Paul Supplied by the Honorable Royce C. Lamberth

167.     *After his testimony, Judge Lamberth checked the U.S. District Court for the District of Columbia docket and found that he based part of his opinion on an affidavit submitted by Paul.*

168.     *In the affidavit, Paul testifies under oath that defense law firms that were contracted by Judicial Watch carried out his representation. Paul Aff. at ¶ 6.*

169.     *In the affidavit, Paul testifies under oath that Judicial Watch's motion to disqualify Respondent did not specify with any details or specific facts that privileged or confidential information was gained by Respondent during his involvement with Judicial Watch. Id. at ¶ 7.*

170.     *In the affidavit, Paul testifies under oath that Respondent did not provide or convey to him any confidential or privileged information that may belong to Judicial Watch. Id. at ¶ 8.*

171.     *In the affidavit, Paul testifies under oath that he did not receive and was not provided any confidential information belonging to Judicial Watch. Id. at ¶ 9.*

172.     *In the affidavit, Paul testifies under oath that his matter is not substantially similar to any matter that Judicial Watch handled for Paul when Respondent was an employee of Judicial Watch. Id. at ¶ 13.*

---

[43]     Withdrawn from previous brief.

173.  *In the affidavit, Paul testifies under oath that he will suffer prejudice if Respondent is disqualified. He had no financial resources to hire another lawyer who would proceed for him. Id. at ¶ 14.*

B.  **Respondent's Proposed Conclusions of Law[44]**

*1.  The scope of a "matter" for purposes of this rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. D.C. Bar Rule 1.9, cmt. 2.*

*2.  A lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client. D.C. Rule 1.9, cmt. 2.*

*3.  Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation. D.C. Rule 1.9, cmt. 3.*

*4.  The majority of the cases regarding a D.C. Bar Rule 8.4(d) violation involve a lawyer's failure to cooperate with Bar Counsel.*

*5.  A lawyer shall represent shall represent a client zealously and diligently within the bounds of the law. D.C. Bar Rule. 1.3.*

*6.  The bounds of the law in a given case are often difficult to ascertain. D.C. Bar Rule 1.3, cmt. 3.*

---

[44]  Because of space limitations, Respondent sets forth basic conclusions of law. Other relevant conclusions of law are contained in the narrative text of the brief.

7.      Neglect of client matters is a serious violation of the obligation of diligence. D.C. Bar Rule 1.3(a), cmt. 8, and unless the relationship is terminated . . . a lawyer should carry through to conclusion all matters undertaken for a client. D.C. Bar Rule 1.3(a), cmt. 9.

8.      The purpose of D.C. Bar Rule 1.9 is to assure the preservation of attorney-client confidences gained in the prior representation. D.C. Bar Ethics Opinion 272.

9.      In order for a lawyer to be disciplined, he or she must have received some information from the former client that could be used to prejudice the former client in the subsequent representation. Morgan v. North Coast Cable Co., 63 Ohio St.3d 156 (1992).

10.      Laches is the principle that equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. Beins v. Distrist of Columbia Bd. of Zoning Adjustment, 572 A.2d 122 (D.C. 1990).

11.      The equitable defense of laches applies in attorney disciplinary cases. In re Tenenbaum, 918 A.2d 1109 (Del. 2007); In re Ponds, 888 A.2d 234 (D.C. 2005).

12.      For a selective prosecution claim, Respondent need only show that enforcement against him had a discriminatory effect and was motivated by a discriminatory purpose. Wayte v. United States, 470 U.S. 598 (1985).

## VI.      CONCLUSION.

"The rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules. The rules simply provide a framework for the ethical practice of law." *In re Amendments to the Rules Regulating the Fla. Bar*, 933 So. 2d at 422. Respondent respects the D.C. Rules and the Board on Professional Responsibility. But the rules are simply a framework for the ethical practice of law. The ultimate goal as a lawyer is to *ethically practice law*. Respondent had a choice: either he could turn his back on people who had been severely damaged by his former group or he could zealously

represent these people in a wholly distinct and ethically appropriate manner, even to his own detriment. Respondent chose the latter as he believes to ethically practice law requires choosing the person who is harmed and not himself.

Respondent has dedicated his professional life to ensuring the existence of ethical and honest government institutions, and seeks to ensure the same kind of moral standard in the legal profession, just as the Board seeks to do. Bar Counsel has its job. But this job must be done fairly and certainly not as a matter of selective prosecution because of the prejudicial information that it sat on for almost a decade. Just as Bar Counsel has its job, so too does Respondent. And, as always, the truth is far less exciting than a retaliatory Bar Complaint filed by Fitton more than eight years ago. The simple truth is that Respondent did not violate D.C. Rule 1.9 or 8.4(d) because he did not represent Cobas, Benson, or Paul in the same or substantially related matter as Judicial Watch. As Bar Counsel recites, it has a dual function: to protect the public and the courts from unethical conduct by members of the District of Columbia Bar and to protect members of the District of Columbia Bar from unfounded complaints. Here, no harm was done to any court; there was no harm to the public; and Judicial Watch was not harmed.

Bar Counsel admits that Respondent has cooperated with it and that his alleged misconduct did not involve dishonesty, personal, financial gain, or even the use of confidential information. But, because of Bar Counsel's failure to comply with its own applicable law where others were not disciplined at all or, in rare cases, informally admonished, Respondent is compelled to set the record straight. Respondent has no disciplinary record in the District of Columbia despite being a member for almost thirty-seven years. Respondent still has hope in the integrity of this honorable Committee and is confident it will mete out justice as a matter of law and fundamental fairness.

Dated: March 30, 2016

Respectfully submitted,

/s/ Larry Klayman
Larry Klayman, Esq.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com
Attorney for Himself, Pro Se

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of March, 2016 a true and correct copy of the foregoing Respondent Larry Klayman's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law (Bar Docket No. 2008-D048) was served with the Board on Professional Responsibility, and served by email and mail upon the following:

Wallace E. Shipp, Jr., Esq.
H. Clay Smith, III, Esq.
Office of Bar Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
smithc@dcodc.org

Respectfully submitted,


/s/ *Larry Klayman*_____
Larry Klayman, Esq.
Attorney at Law
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

# EXHIBIT 10

District of Columbia Court of Appeals
Board on Professional Responsibility

Board Rules

Adopted June 23, 1983
Effective July 1, 1983

This edition represents a complete revision of the Board Rules.
All previous editions are obsolete.

Amended December 21, 2015
Effective December 21, 2015

BOARD RULES

Page 94

the criteria set forth in Rule 17.5.  There is no review by the Board or the Court of a rejection of a petition for negotiated discipline by a Hearing Committee.

### 17.8  Withdrawal from Negotiated Discipline

Either Disciplinary Counsel or respondent, for any reason or for no reason, may withdraw from a negotiated discipline at any time prior to the conclusion of the limited hearing.  After the limited hearing has concluded but prior to the filing of the Hearing Committee's recommendation with the Court, respondent may withdraw from the negotiated discipline for good cause shown.

### 17.9  Limitation on Reference to Negotiated Discipline in Contested Disciplinary Proceedings

Neither a Hearing Committee nor the Board may (a) inquire of Disciplinary Counsel or a respondent who is the subject of a contested disciplinary proceeding under Chapter 7 of these Rules whether the parties considered entering into negotiated discipline; (b) consider, in recommending discipline following formal proceedings under Chapter 7 of these Rules, whether respondent offered or declined to enter into negotiated discipline; or (c)  refer to any rejected or withdrawn petition for negotiated discipline, except as permitted by Rule 17.10.

### 17.10  Admissions by Respondent in Negotiated Discipline Proceedings

Admissions made by a respondent in the petition for negotiated discipline, the accompanying affidavit, or the limited hearing may not be used as evidence against respondent in a contested disciplinary proceeding under Chapter 7 of these Rules, except for purposes of impeachment at any subsequent hearing in a contested matter.

# EXHIBIT 2



CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq.  (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda.  I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume.  State and federal courts at every level have cited my treatises and articles over 1000 times.  From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline.  In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

1

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them**,** and chose to uphold his duty to these clients.  District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law."  Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012).  In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation.  When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas.  No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978).  See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed.  The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account.  Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman.  If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years.  D.C. Code § 12-301 *et seq.* "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id.* Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches.  The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.,* 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

3

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights. Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.,* 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar,* 17 Cal. 3d. 1, 6 (Cal. 1976). *Kelson* is directly on point. Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served. It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable. One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer. Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.*, No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification. Judge Lamberth took "note of Paul's

4

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.


Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of
Jurisprudence


5

# EXHIBIT 3

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**AD HOC HEARING COMMITTEE**

|  |  |
|---|---|
| In the Matter of | : |
| | : |
| **LARRY E. KLAYMAN, ESQUIRE,** | :   **Bar Docket No. 2008-D048** |
| | : |
| Respondent, | : |
| | : |
| | : |

## DISCIPLINARY COUNSEL'S LIST OF EXHIBITS

**A.**   **Registration statement**

**B.**   **Specification of Charges**

**C.**   **Answer to Specification of Charges**

**D.**   **Acknowledgment of service**

1.   Ethical complaint (without attachments), filed by Thomas J. Fitton against Larry E. Klayman, Esquire, received by the Office of Bar Counsel on January 28, 2008.

2.   Letter dated January 31, 2008 from the Office of Bar Counsel to Larry E. Klayman, Esquire, (without attachments).

3.   Letter dated March 14, 2008, from Larry E. Klayman, Esquire to the Office of Bar Counsel.

4.   Letter dated March 19, 2008, from the Office of Bar Counsel to Larry E. Klayman, Esquire.

5.   Letter dated March 20, 2008, from Thomas J. Fitton to the Office of Bar Counsel.

6.    Letter dated March 27, 2008, from Larry E. Klayman, Esquire to the Office of Bar Counsel (received March 31, 2008), (without attachments).

7.    Letter dated April 1, 2008, from the Office of Bar Counsel to Thomas J. Fitton.

8.    Letter dated April 15, 2008, from Thomas J. Fitton to the Office of Bar Counsel, (without attachments).

9.    Letter dated April 18, 2008, from the Office of Bar Counsel to Larry E. Klayman, Esquire.

10.    Letter dated October 14, 2008, from the Office of Bar Counsel to Larry E. Klayman, Esquire.

11.    Letter dated June 19, 2009, from the Office Bar Counsel to Larry E. Klayman, Esquire.

12.    Letter dated July 6, 2009, from the Office of Bar Counsel to Larry E. Klayman, Esquire.

13.    Letter dated July 22, 2009, from Larry E. Klayman, Esquire to the Office of Bar Counsel, (received August 4, 2009).

14.    Letter dated August 27, 2009, from the Office of Bar Counsel to Larry E. Klayman, Esquire.

## COUNT I
## SANDRA COBAS

15.    Judicial Watch internal memoranda:

(a) Memorandum dated June 5, 2003, from Sandra Cobas to Personnel File (redacted);

(b) Memorandum dated June 6, 2003, from Sandra Cobas to Personnel File (redacted);

2

(c)     Memorandum dated June, 2003, from Sandra Cobas to Personnel File (redacted);

(d)     Memorandum dated June 20, 2003, from Sandra Cobas to Personnel File (redacted);

(e)     Memorandum dated July, 2003, from Sandra Cobas to Personnel File (redacted); and

(f)     Memorandum dated August 29, 2003, from Sandra Cobas to Personnel File (redacted).

16.     Letter of resignation, dated September 8, 2003, from Sandra Cobas to Tom (Fitton) and Paul (Orfanedes).

17.     Civil Complaint filed August 25, 2005, in the matter styled *Sandra Cobas v. Thomas Fitton, et al.,* No. 05-17413 CA 5, filed in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

18.     Order, dated July 31, 2006, *Cobas v. Fitton, et al.,* No. 05-17413 CA 5.

19.     Docket Sheet, Third District Court of Appeal, State of Florida, *Cobas v. Fitton, et al.,* Case No. 3D 06-2178.

20.     Appellant's Merit Brief Appealing Final Order, dated December 1, 2006 filed in the Third District Court of Appeal in *Cobas v. Fitton, et al.,* Case No. 3D 06-2178.

21.     Order, dated May 2, 2007, issued by the Third District Court of Appeal, *Cobas v. Fitton, et al.,* Case No. 3D 06-2178.

## COUNT II
## LOUISE C. BENSON

22.     Letter dated November 15, 2002 from Larry Klayman to Ms. Louise C. Benson.

23.     D.C. Superior Court Docket Sheet, *Benson v. Judicial Watch, et al.,* 2007 CA 000520.

24.     Civil Complaint in the matter styled *Benson v. Judicial Watch, et al.,* filed January 25, 2007 (without attachments).

25.     Plaintiff's Answers to Defendants' Interrogatories, *Benson v. Judicial Watch, et al.,* dated June 7, 2007.

26.     Plaintiff's Witness List, *Benson v. Judicial Watch, et al.,* dated May 29, 2007.

27.     Praecipe to Enter Appearance, *Benson v. Judicial Watch, et al.,* dated June 15, 2007.

28.     Letter, dated June 18, 2007, from Richard W. Driscoll, Esquire to Daniel J. Dugan, Esquire.

29.     Defendants' Motion to Disqualify Larry Klayman, Esquire as Counsel for Plaintiff Louise Benson, *Benson v. Judicial Watch, et al.,* filed June 28, 2007.

30.     Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Disqualify, *Benson v. Judicial Watch, et al.,* filed July 12, 2007.

31.     Plaintiff's Motion for Voluntary Dismissal Without Prejudice, for Sanctions, and to Mark the Pending Motions and Mediation Moot, *Benson v. Judicial Watch, et al.,* dated August 20, 2007.

32.     Defendant's Memorandum in Opposition to Plaintiff's Motion for Voluntary Dismissal Without Prejudice, *Benson v. Judicial Watch, et al.,* filed August 22, 2007.

33.     Reply Brief in Further Support of Plaintiff's Motion for Voluntary Dismissal Without Prejudice, for Sanctions, and to Mark the Pending Motions and Mediation Moot, *Benson v. Judicial Watch, et al.,* filed August 23, 2007.

34.     Stipulation of Dismissal, *Benson v. Judicial Watch, et al.,* filed August 24, 2007.

      (a)     Letter, dated May 29, 2007, from Thomas J. Fitton to Mrs. Louise Benson.

      :

35.     United States District Court for the District of Columbia Docket Sheet, *Klayman v. Judicial Watch, et al.,* 1:06-CV-00670-CKK.

36.     Second Amended Complaint (without attachments), *Klayman et al., v. Judicial Watch, et al.,* (USDC-DC), filed June 14, 2006.

37.     Memorandum Opinion and Order, filed January 17, 2007, *Klayman v. Judicial Watch, et al.,* (USDC-DC).

## COUNT III
## PETER F. PAUL

38.     Legal Representation Agreement, dated March 20, 2001, between Judicial Watch and Mr. Peter F. Paul.

39.     First Modification to Legal Representation Agreement, dated April 23, 2001, between Judicial Watch and Mr. Peter F. Paul.

40.     Los Angeles [California] Superior Court – Case Summary, *Peter F. Paul v. William Jefferson Clinton, et al.,* Case No. BC 304174.

41.     *Ex Parte* Application to Withdraw as Plaintiff's Attorney; Memorandum of Points and Authorities in Support Thereof; Declaration of Paul J. Orfanedes, *Paul v. Clinton, et al.,* filed April 12, 2005.

42.     Order, *Paul v. Clinton, et al.,* dated April 13, 2005.

43.     Notice of Motion and Motion to Withdraw as Plaintiff's Attorney; Memorandum of Points and Authorities in Support Thereof; Declaration of Paul J. Orfanedes, *Paul v. Clinton, et al.,* filed April 14, 2005.

44.     Order, *Paul v. Clinton, et al.,* filed May 13, 2005.

5

45.    United States District Court for the District of Columbia Docket Sheet, *Peter F. Paul v. Judicial Watch*, *et al.*, CA No. 1:07-CV-00279-RCL.

46.    Civil Complaint in the matter styled, *Paul v. Judicial Watch, et al.,* (USDC-DC) (without exhibits).

47.    Notice of Appearance, *Paul v. Judicial Watch, et al.,* (USDC-DC), filed March 19, 2008.

48.    Defendants' Motion to Disqualify Opposing Counsel (without attachments), *Paul v. Judicial Watch, et al.,* filed April 22, 2008.

49.    Memorandum of Points and Authorities in Opposition to Defendants' Motion to Disqualify Larry Klayman as Counsel, *Paul v. Judicial Watch, et al.,* filed June 19, 2008.

50.    Supplement to Memorandum of Points and Authorities in Opposition to Defendants' Motion to Disqualify Larry Klayman as Counsel (without attachments), *Paul v. Judicial Watch, et al.,* dated June 25, 2008.

51.    Reply Memorandum of Defendants' in Support of Motion to Disqualify Larry E. Klayman, Esquire as Counsel, *Paul v. Judicial Watch, et al.,* filed June 26, 2008.

52.    Memorandum Opinion and Order, *Paul v. Judicial Watch, et al.,* filed July 16, 2008.

The office of Disciplinary Counsel respectfully reserves the right to supplement this list of exhibits to the extent permitted by the rules of the Board on Professional Responsibility or the directives of the Hearing Committee.

Respectfully submitted,

_____

H. Clay Smith IV
Assistant Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of January, 2016, I have caused an original and four copies of the foregoing Disciplinary Counsel's List of Exhibits A-D;1-52, to be hand-delivered to Elizabeth J. Branda, Esquire, Executive Attorney, Board on Professional Responsibility, Historic Courthouse, 430 E Street, N.W., Suite 138, Washington, D.C. 20001, and via First-Class mail to Larry E. Klayman, Esquire, at 2020 Pennsylvania Avenue, N.W., Suite 800, Washington, D.C.  20006, and via email to leklayman@gmail.com.

_____

H. Clay Smith, III

# EXHIBIT 4



# OFFICE OF BAR COUNSEL
## THE BOARD ON PROFESSIONAL RESPONSIBILITY
### DISTRICT OF COLUMBIA COURT OF APPEALS

**BAR COUNSEL**
Leonard H. Becker

**DEPUTY BAR COUNSEL**
Wallace E. Shipp, Jr.

515 Fifth Street, N.W.
Building A, Room 127
Washington, D.C. 20001-2797
(202) 638-1501
FAX (202) 638-0862

September 4, 1998

**CONFIDENTIAL**

Larry Klayman, Esquire
  c/o David Barmak, Esquire
Sherman, Meehan, Curtin & Ain
Suite 600
1900 M Street, N.W.
Washington, D.C. 20036

Re:    Klayman/Bar Counsel
Bar Docket No. 122-98

Dear Mr. Klayman:

    This office has completed its investigation in the above-referenced matter. We have evaluated this matter in light of an attorney's obligations as set forth in the District of Columbia Rules of Professional Conduct ("Rules"). It is the burden of our office to find clear and convincing evidence of a violation of the Rules in order to institute disciplinary proceedings against an attorney. "Clear and convincing" evidence is more than a mere preponderance of the evidence, which would be sufficient in a civil proceeding. We do not find such evidence in our investigation and therefore, we must dismiss the matter.

    This matter was docketed for investigation on review of an article in the October 6, 1997 edition of The New Republic. The article identifies two instances in which sanctions were imposed against you in connection with court proceedings. In one matter, it was reported that the United States Court of International Trade ("CIT") had ordered you to pay $1,500 in sanctions for "frivolous filings." In the second matter, it was reported that Judge William Keller of the United States District Court for the Central District of California sanctioned you for a "pattern of misconduct" that resulted in an order that your firm pay more than $20,000 in legal expenses to the opposing party.

Larry Klayman, Esquire
Bar Docket No. 122-98
Page 2

We sent a copy of the article to you and requested a response, which we received, through counsel, on May 11, 1998. You deny any misconduct and provide an explanation of the facts and circumstances involved in both matters.

You state that the CIT matter involved your representation of one of several parties adversely affected by the results of an antidumping investigation. The CIT's rules require that a party seeking to initiate such a challenge file a summons first and a complaint within 30 days. An associate assigned to the matter filed the summons but inadvertently failed to file the complaint within the required time. When the matter came to your attention, you filed the complaint after the expiration of the 30-day period, believing that the filing was warranted by existing law and a good-faith argument for modification of existing law. When the defendant moved to dismiss, you filed an opposition. The CIT granted the motion to dismiss, while allowing your client to intervene in a challenge to the same antidumping investigation brought by another adversely affected party. On May 26, 1994, the CIT imposed a $1,500 sanction.

In the matter before Judge Keller, you represented a Tiawanese manufacturing firm and its owner in a patent and trademark case. You believe that Judge Keller was biased against you and your clients, and provide a series of affidavits alleging inappropriate treatment by Judge Keller. You advise that your client could not afford to obtain a copy of the trial transcript and that the United States Court of Appeals for the Federal Circuit (the "Federal Circuit") affirmed the sanctions award without a full record.

We have reviewed the orders of the CIT and the Federal Circuit with respect to these matters. You correctly note that neither court referred the findings for investigation by the District of Columbia Bar or any other Bar. The CIT in its opinion confirms that the failure to file the complaint within the required time was the result of a flaw in your associate's research of the matter. The CIT further found it was not unreasonable for you to attempt to proceed with the late filing in order to attempt to preserve your client's cause of action. The CIT further concluded that ultimately no harm befell the client.

The Federal Circuit, in affirming sanctions, described your misconduct as a failure to provide advance written notice of evidence that you intended to use at trial, to have a witness appear in court on the appointed day after the trial court had granted an extension of time to allow the witness to travel from Taiwan, or to file a timely request for jury trial on patent issues after waiving jury trial on such issues at a pre-trial status conference. Judge Keller also expressed frustration with your practice of continuing to speak after he had requested silence.

The ethical rules governing attorneys require the attorney to act as a zealous advocate on behalf of the client (Rule 1.3(a)) and prohibit the attorney to engage in frivolous litigation (Rule 3.1). Here, we lack clear and convincing evidence that, in any instance, you intentionally engaged

Larry Klayman, Esquire
Bar Docket No. 122-98
Page 3

in frivolous litigation.  The attempt to file the complaint in the CIT matter involved an effort to correct a mistake of an associate and did not result in any ultimate harm to the client.  The various instances of misconduct found by Judge Keller and affirmed by the Federal Circuit involved isolated procedural mistakes in the context of lengthy, acrimonious litigation.  Discipline has been imposed for filing and maintaining frivolous litigation where the misconduct involved repeated filings devoid of any arguable merit.  Cf.  In re Solerwitz, 575 A.2d 287 (D.C. 1990) (reciprocal public censure based on one-year Federal Circuit suspension for filing series of frivolous appeals, repeatedly violating court orders, consistently failing to follow procedural rules and otherwise interfering with work of court).  We conclude that the instances of misconduct on the present record do not rise to the level of clear and convincing evidence of an ethical violation.

We trust that this letter adequately advises you of the basis of our decision to dismiss this matter.  We thank you for your cooperation with our inquiry.

Sincerely,

Michael S. Frisch
Senior Assistant Bar Counsel

MSF:dcw

# EXHIBIT 5



# The Florida Bar

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

651 EAST JEFFERSON STREET
TALLAHASSEE, FLORIDA 32399-2300

850/561-5600
WWW.FLORIDABAR.ORG

State of Florida        )

County of Leon        )

In Re:        246220
Larry Elliot Klayman
2020 Pennsylvania Ave. N.W., #345
Washington, DC

I HEREBY CERTIFY that I am the duly appointed custodian of membership records of The Florida Bar.

I FURTHER CERTIFY that the records in the office of the Clerk of the Supreme Court of Florida indicate that said attorney was admitted to practice law in the State of Florida on December 7, 1977.

I FURTHER CERTIFY that the records in the office of The Florida Bar indicate that the above attorney is an active member of The Florida Bar in good standing.

Dated this 15ᵗʰ day of March, 2016.

Pam Gerard, Manager
Membership Records Dept.
The Florida Bar

PG/JM:ksm1:R10

# EXHIBIT 6



District of Columbia Court of Appeals
Committee on Admissions
430 E Street, N.W. — Room 123
Washington, D. C. 20001
202 / 879-2710

I, *JULIO A. CASTILLO*, *Clerk of the District of Columbia Court of Appeals, do hereby certify that*

## LARRY E. KLAYMAN

*was on* **DECEMBER 22, 1980** *duly qualified and admitted as an attorney and counselor entitled to practice before this Court and is, on the date indicated below, an active member in good standing of this Bar.*

*In Testimony Whereof, I have hereunto subscribed my name and affixed the seal of this Court at the City of Washington, D.C., on* **March 11 , 2016**.

*JULIO A. CASTILLO*
*Clerk of the Court*

By: _____
*Deputy Clerk*

EXHIBIT 7

## IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

Complainant,

vs.

LARRY ELLIOT KLAYMAN,

Respondent.

_____/

Supreme Court Case
No. SC11-247

The Florida Bar File
No. 2011-70,621(11A)

## **CONSENT JUDGMENT**

Larry Elliot Klayman, Respondent, having been fully advised of his procedural rights under the Rules Regulating The Florida Bar, hereby tenders this Consent Judgment pursuant to Rule 3-7.9(b), Rules of Discipline, and says:

1.     Respondent, Larry Elliot Klayman, is and was at all times hereinafter mentioned, a member of The Florida Bar and subject to the jurisdiction and disciplinary rules of the Supreme Court of Florida.

2.     Respondent is currently the subject of a grievance file, which has been assigned The Florida Bar File No. 2011-70,621(11A).

3.     Respondent admits that the following facts are true and accurate and stipulates:

A.     On or about November 11, 2007, Natalia Humm ("Humm")

PUBLIC RECORD

- - - 2 - 2011

MDG

filed a grievance against Respondent alleging that he had had failed to provide services in her criminal case after she paid him a $25,000 retainer.

B.   The parties ultimately agreed to submit this matter to The Florida Bar Grievance Mediation Program, and a Mediation Agreement was signed on February 3, 2009.   According to the terms of the Mediation Agreement, Respondent agreed to pay Humm $5,000 within ninety (90) days from the date of the Agreement.

C.   On or about June 3, 2009, Jonathan I. Rotstein ("Rotstein"), the attorney who represented Humm in the mediation, sent a letter to The Florida Bar indicating that Respondent had failed to comply with the terms of the Mediation Agreement and further indicating that he did not think Respondent had "any intentions of honoring same."

D.   On or about June 11, 2009, The Florida Bar forwarded Rotstein's letter to Respondent, requesting his response within seven (7) days from the date of The Bar's letter.

E.   In response to The Florida Bar, Respondent indicated that he was facing a very difficult financial situation, but that he had every intention of honoring his agreement with Humm.   Respondent further indicated that he would be able to pay the outstanding amount by September 30, 2009.

F.   Respondent did not provide his payment by September 30,

2009, and therefore, on or about October 22, 2009, The Florida Bar sent him a follow-up letter advising him that failure to comply with the terms of the Mediation Agreement was a violation of Rule 14-5.1(b) of the Rules Regulating The Florida Bar and giving him a final deadline of November 20, 2009 to comply.

G.    Respondent again did not to comply with the Mediation Agreement, and therefore, on December 4, 2009, The Florida Bar sent him a letter advising him that a new file had been opened on the basis of his failure to comply with the terms of the Mediation Agreement, which would be considered by the grievance committee.

H.    Immediately prior to the grievance committee's meeting, Respondent submitted a response where he indicated that he had been unable to comply with the Mediation Agreement for financial reasons and that he was actually in the process of filing for bankruptcy. Nevertheless, Respondent advised that he still intended to honor the Agreement.

I.    Prior to making its final determination, the grievance committee requested that Respondent provide specific evidence of his financial situation, in affidavit form. Respondent provided a supplemental response, which included the financial information requested. In addition, Respondent enclosed a check in the amount of $1,000, payable to Humm, and made a promise to continue making

good faith payments of at least $500 per month until the entire $5,000 was paid in full.

J.     Based on Respondent's payment of $1,000, the financial information provided, and his assurances that he would continue making monthly good faith payments to Humm, the grievance committee ultimately determined that the matter should be closed with a finding of no probable cause and a letter of advice to Respondent.

K.     Respondent made two additional payment of $500 each, but did not make any additional payments at that time because of his claimed continued financial distress.

L.     Rotstein sent letters to The Florida Bar on May 12, August 18, and December 14, 2010 requesting its assistance in obtaining the outstanding payments from Respondent.   The Florida Bar forwarded those letters to Respondent, who initially responded and promised to continue making payments.

M.     Respondent's next communication with The Bar was on August 23, 2010, when he indicated that he had been in a serious auto accident and that he continued to suffer financial distress, but promised that he would be sending an additional payment to Humm.  Respondent moved during the interim period and he claims that he did not timely receive certain correspondence from The Bar, which

ultimately led to a probable cause finding and the filing of a formal complaint with the Florida Supreme Court.

N.    On or about March 9, 2011, after a formal complaint had been filed with the Florida Supreme Court in this matter, and after he received the correspondence referenced in paragraph M above, Respondent contacted The Bar to advise that he would accept the offer to reach a resolution of this matter. Respondent further advised that he was now in a position to make the outstanding payment in the amount of $3,000 to Humm, and he immediately made such payment, in full satisfaction of his outstanding obligation under the Mediation Agreement.

4.    Respondent admits that by reason of the foregoing facts, he has violated Rules 3-4.3 (misconduct and minor misconduct), 4-8.4(a) (a lawyer shall not violate or attempt to violate the Rules of Professional Conduct), 4-8.4(g) (failure to respond to The Florida Bar), and 14-5.1(b) (effect of respondent's failure to attend or comply with mediation) of the Rules Regulating The Florida Bar.

5.    Pursuant to Rule 3-7.9(b) of the Rules Regulating The Florida Bar, Respondent hereby tenders a Consent Judgment wherein Respondent agrees to the following discipline:

A. Public Reprimand, to be administered by publication.

6.    Respondent submits that the following factors apply in mitigation:

- 9.32(a) (absence of prior disciplinary record) – Respondent has been continuously a member of The Florida Bar in good standing for nearly thirty-five (35) years.

- 9.32(c) (personal or emotional problems) – Respondent maintains that since the time the Mediation Agreement was entered into he has sustained significant financial distress, which prevented him from making timely payments to Humm and from providing timely responses to The Florida Bar.  Respondent further maintains that he agreed to submit Humm's claim to mediation and agreed to the terms of the Mediation Agreement simply to save valuable time and resources for all concerned.  Respondent had agreed to represent Humm in a criminal proceeding, but she subsequently decided to retain new counsel when the case was transferred from Miami to Orlando federal court.  Respondent maintains that Humm was never entitled to any refund and further asserts that Humm's subsequent counsel admitted as much in an e-mail he sent to Respondent, where he stated, "[i]t is unlikely that (you) would want to refund a cent so please provide me with an explanation so that I may pass it along to Ms. Humm."  Respondent also maintains that Humm had similarly asked her prior counsel for a refund and even requested that Respondent sue him, which Respondent refused to do.  Respondent thus claims a pattern in Humm's

behavior toward counsel.  Nevertheless, in an effort to promptly resolve the claim and to save valuable time and resources, Respondent ultimately agreed to the terms of the Mediation Agreement, as the mediator had urged.

With respect to his failure to provide timely responses to The Bar, Respondent submits that he did not timely receive correspondence from The Bar, as his address had changed and he inadvertently did not immediately change the address with The Florida Bar.  As a result, Respondent claims he did not timely receive notice that the Grievance Committee had made a probable cause finding or that a formal complaint had been filed in this matter, and consequently, that he did not have a timely opportunity to argue against the probable cause finding or to resolve this matter prior to a formal complaint being filed.  Respondent acknowledges that he should have provided his new address to The Bar, but inadvertently forgot to do so in time for the referenced correspondence to arrive timely.

- 9.32(g) (character or reputation) – Respondent has been a respected member of The Bar for nearly thirty-five (35) years.
- 9.32(l) (remorse) – Respondent is remorseful for his delay in satisfying the terms of the Mediation Agreement, which ultimately led to the filing of a formal complaint in this matter.  Moreover, Respondent has now fully satisfied

his outstanding obligation to Humm and made such payment without conditioning it on any consent judgment.

7.   Respondent agrees to pay all costs reasonably incurred by The Florida Bar in the investigation of the aforesaid matter within thirty (30) days of the entry of the Supreme Court's final order, plus interest at the prevailing statutory rate to accrue on all costs not paid within said time, unless time for payment is extended by the Board of Governors.

8.   Respondent agrees that the costs indicated below have been incurred.

Administrative fee
Rule 3-7.6(o)(1)(I) ....................................   $      1,250.00

**TOTAL:**                                                 **$      1,250.00**

9.   Respondent agrees that he will not attempt to discharge the restitution to the client, nor the obligation for the payment of the Bar's costs in any future proceedings, including but not limited to, a Petition for Bankruptcy.

10.   Respondent recognizes that the disciplinary sanction to be imposed will ultimately be determined by the Supreme Court of Florida which will not be bound to follow the recommendation of The Florida Bar, the Board of Governors, or the Referee in these proceedings.

11.   Respondent agrees that this Consent Judgment and every factual admission contained herein, and specifically the admissions set forth in paragraph three (3) shall have full force and effect regardless of any subsequent

recommendation or action taken with respect to the terms of discipline offered by Respondent pursuant to this Consent Judgment.

12.     Respondent agrees that in the event that the terms of discipline offered herein are not approved by the Board of Governors of The Florida Bar (or their designee), the Referee, then this matter shall proceed accordingly in the ordinary course.

13.     Respondent acknowledges that this document is tendered freely, voluntarily and without fear, threat or coercion.


DATED this _14th_ day of ____July____, 2011.




                            _____
                            LARRY ELLIOT KLAYMAN
                            Respondent
                            Florida Bar No. 246220
                            2000 Pennsylvania Avenue, No. 345
                            Washington, DC 20006
                            (310) 595-0800




                            _____
                            **DANIELA ROSETTE**
                            Bar Counsel
                            Florida Bar No. 64059
                            The Florida Bar
                            444 Brickell Avenue, Ste M-100
                            Miami, Florida 33131
                            (305) 377-4445

# EXHIBIT 8



## Biography

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com.

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

EXHIBIT 9

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

| | |
|---|---|
| **In the Matter of** | : |
| | : |
| **LARRY E. KLAYMAN, ESQUIRE,** | : |
| | : |
| **Respondent** | : |
| | : |
| **Member of the Bar of the District of** | : |
| **Columbia Court of Appeals** | : |
| **Bar Number: 334581** | : |
| **Date of Admission: December 22, 1980** | : |
| | : |

Bar Docket No. 2008-D048

**RECEIVED**

**JUN 2 3 2014**

**Board on Professional Responsibility**

## AFFIDAVIT OF NEGOTIATED DISPOSITION

I, Larry E. Klayman, affiant, pursuant to D. C. Bar Rule XI, §12.1(b)(2) and Board Rule
17.3(b), and in furtherance of my wish to enter into a negotiated disposition, declare as follows:

1.      I understand that I have the right to the assistance of counsel in this matter.  I am
not represented by counsel.

2.      I am aware that there is currently pending a petition and specification of charges
alleging misconduct, which is also set forth in the petition for negotiated discipline.

3.      I have carefully reviewed both the petition for negotiated discipline and this
affidavit.

4.      I affirm that the stipulated facts in the accompanying petition and this affidavit are
true and support the stipulated misconduct and the agreed upon sanction.

5.      I am agreeing to this negotiated discipline because I believe that I could not
successfully defend against disciplinary proceedings based on the stipulated misconduct.

6.      I am freely and voluntarily entering into the negotiated disposition.  I am not
being subjected to coercion or duress.

RECEIVED

JUN 2 3 2014

Board on Professional Responsibility

7.      I acknowledge that Bar Counsel has made no promises or inducements other than what is contained in the accompanying petition for negotiated discipline.

8.      I understand that the petition for negotiated discipline and this affidavit shall become public once they are filed with the Executive Attorney for the Board on Professional Responsibility, at which time all proceedings before the Hearing Committee shall become open to the public, and any exhibits introduced into evidence, any pleadings filed by the parties, and any transcript of the proceeding shall be available for public inspection.

9.      I am fully aware of the implications of this negotiated discipline including, but not limited to, that by entering into this negotiated discipline I am giving up the following rights:

(a)      My right to a contested hearing before a Hearing Committee at which I could cross-examine adverse witnesses and compel witnesses to appear on my behalf;

(b)      My right to require that Bar Counsel prove each and every charge by clear and convincing evidence;

(c)      My right to seek review of an adverse determination by a Hearing Committee by filing exceptions with the Board to the Hearing Committee's report and recommendations; and

(d)      My right to appeal to the District of Columbia Court of Appeals ("Court") by filing exceptions to the Board's report and recommendations.

10.      I understand that the negotiated disposition, if approved, may affect:

(a)      My present and future ability to practice law, and

(b)      My bar memberships in other jurisdictions.

2

11.    I understand that this negotiated disposition could be rejected by the Hearing Committee pursuant to D.C. Bar Rule XI, § 12.1(c) and Board Rule 17.7, or by the Court pursuant to D.C. Bar Rule XI, § 12.1(d).

12.    I understand that any sworn statement made by me in the petition for negotiated discipline, the accompanying affidavit, or the limited hearing may be used for purposes of impeachment at any subsequent hearing on the merits.

13.    I understand that the negotiated discipline proposes that, for my stipulated misconduct, I should receive a public censure.

14.    In mitigation of my misconduct, I submit the following:

    (a)    I accept full responsibility for my misconduct;

    (b)    I have fully cooperated with Bar Counsel; and

    (c)    My conduct did not involve dishonesty or personal gain.

Larry E. Klayman, Esquire
Respondent

SUBSCRIBED and affirmed before me this 23rd day of June 2014.

12/21/2018
My Commission Expires:                               Notary Public

Larry E. Klayman, Esquire
Respondent

# DOCUMENT SEPARATOR

# FOR OFFICE USE ONLY

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of                :

     **LARRY E. KLAYMAN, ESQUIRE,**    :

     **Respondent**                :

**Member of the Bar of the District of**    :
   **Columbia Court of Appeals**
**Bar Number: 334581**            :
**Date of Admission: December 22, 1980**
                                  :

**Bar Docket No. 2008-D048**

**RECEIVED**

**JUN 2 3 2014**

**Board on Professional Responsibility**

### PETITION FOR NEGOTIATED DISCIPLINE

Bar Counsel and Respondent, Larry E. Klayman, Esquire, agree to enter into a negotiated discipline pursuant to D.C. Bar Rule XI, § 12.1 and Board Rule 17.3. Respondent is the subject of the above-referenced investigations by Bar Counsel pursuant to D.C. Bar Rule XI §§ 6(a)(2), 8(a) and Board Rule 2.1.

Respondent is an attorney admitted to practice before the District of Columbia Court of Appeals, having been admitted on December 22, 1980.

## I. STATEMENT OF THE NATURE OF THE MATTER

This matter was docketed for investigation January 28, 2008, upon Bar Counsel's receipt and review of an ethical complaint filed by Mr. Thomas J. Fitton, President of Respondent's former client, Judicial Watch, reporting that Respondent engaged in a conflict of interest in three different matters.

## II. STIPULATION OF FACTS AND CHARGES

1.     From or about July 29, 1994, until September 19, 2003, Respondent, who founded Judicial Watch, served as the Chairman and General Counsel of Judicial Watch. As General

RECEIVED

JUN 2 3 2014

Board on Professional Responsibility

Counsel, Respondent served as the organization's lead attorney and observed all legal matters associated with or affecting Judicial Watch.

### A. COUNT I

2.  Sandra Cobas was formerly employed as the Director of Judicial Watch's Miami Regional Office.

3.  While employed with Judicial Watch, Ms. Cobas claimed she was in a hostile work environment. The conduct she complained of occurred between June 5 through August 29, 2003, prior to the time that Respondent ended his employment as General Counsel of Judicial Watch.

4.  Also prior to ending his employment as General Counsel of Judicial Watch, Respondent was aware of Ms. Cobas's concerns giving rise to her claim of a hostile work environment, and was requested by Ms. Cobas to intercede.

5.  On or about August 25, 2005, Ms. Cobas filed a civil complaint against Judicial Watch through an attorney other than Respondent in the Circuit Court of the 11th Judicial Circuit in and for Miami, Dade County, Florida, styled *Cobas v. Fitton, et al*. The lawsuit alleged, *inter alia*, a hostile work environment.

6.  On or about July 31, 2006, the trial court dismissed Ms. Cobas's case.

7.  Ms. Cobas's original attorney did not continue with the case. On or about August 7, 2006, Respondent entered his appearance on behalf of Ms. Cobas. Respondent did not seek or obtain Judicial Watch's consent to Respondent's representation of Ms. Cobas. Respondent filed a motion with the trial court to vacate its order of dismissal. The trial court denied the motion.

8.  On August 25, 2006, Respondent filed a Notice of Appeal on behalf of Ms. Cobas.

9.     On or about December 1, 2006, Respondent filed an appellate brief on behalf of Ms. Cobas with the Third District Court of Appeals for the State of Florida.

10.    On May 2, 2007, the appellate court affirmed the trial court's dismissal of Ms. Cobas's law suit.

11.    Respondent's conduct violated the following Rule Governing the Florida Bar:

> Rule 4-1.9(a), in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation.

## B. COUNT II

12.    In or about November, 2002, Judicial Watch initiated a campaign to raise funds to purchase a building in Washington, D.C., to serve as its headquarters ("Building Fund").

13.    On November 15, 2002, Respondent, as Chairman and General Counsel for Judicial Watch, directly solicited a donation from Louise Benson for the Building Fund.

14.    In or about December, 2002, in response to Respondent's solicitation, Ms. Benson pledged to donate $50,000 to Judicial Watch for the Building Fund. Thereafter, Ms. Benson paid $15,000 of her $50,000 pledge to Judicial Watch.

15.    After Respondent left Judicial Watch in September 2003, Judicial Watch's management did not purchase a building for its headquarters.

16.    On or about April 12, 2006, Ms. Benson joined Respondent as a plaintiff in the matter styled, *Klayman, et al. v. Judicial Watch, et al.*, in the United States District Court for the District of Columbia. Respondent and Ms. Benson alleged, *inter alia*, fraudulent misrepresentation, breach of contract, and unjust enrichment in connection with her donation to

Judicial Watch for the Building Fund.  Both Respondent and Ms. Benson were represented by other counsel and had separate claims.

17.     On January 17, 2007, the District Court dismissed Ms. Benson's claims in *Klayman v. Judicial Watch* for lack of subject matter jurisdiction because the amount in controversy did not exceed $75,000, as required in federal diversity matters under 28 U.S.C. § 1332(a).

18.     On January 25, 2007, Ms. Benson filed a lawsuit, individually, against Judicial Watch in the Superior Court for the District of Columbia, alleging, *inter alia*, breach of contract, unjust enrichment, and fraudulent misrepresentation in connection with her donation to Judicial Watch for the Building Fund.  That matter was styled, *Benson v. Judicial Watch, et al.*

19.     On or about May 29, 2007, Judicial Watch voluntarily returned $15,000 to Ms. Benson in settlement of her unjust enrichment claim.

20.     On June 15, 2007, Respondent entered his appearance as co-counsel for Ms. Benson in the *Benson v. Judicial Watch* matter.  Respondent did not seek or obtain Judicial Watch's consent to the representation of Ms. Benson.

21.     On June 28, 2007, Judicial Watch filed a motion to disqualify Respondent as counsel for Ms. Benson, citing, *inter alia*, Respondent's ethical obligations to it pursuant to Rule 1.9.

22.     On August 24, 2007, the parties filed with the court a stipulation of dismissal of Ms. Benson's case.

23.     Respondent's conduct violated the following District of Columbia Rule of Professional Conduct ("DCRPC"):

> Rule 1.9, in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or

4

substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation.

## C. COUNT III

24.     On or about March 20, 2001, Mr. Peter Paul retained Judicial Watch to evaluate his legal claims and defenses concerning his communications with certain law enforcement authorities in connection with his fundraising activities for the 2000 New York State Senate Campaign. The retainer agreement was executed by Mr. Paul and Respondent. Respondent signed the retainer agreement as the Chairman and General Counsel of Judicial Watch.

25.     On or about April 23, 2001, the March 20, 2001, retainer agreement was modified such that Judicial Watch undertook to provide legal representation for Mr. Paul for, *inter alia*, alleged criminal securities violations arising from his above-described fundraising activities. The modified retainer agreement further contemplated the pursuit of civil litigation on behalf of Mr. Paul. The modified retainer agreement was also executed by Mr. Paul and Respondent. Respondent signed the retainer agreement as the Chairman and General Counsel of Judicial Watch.

26.     In 2003, Judicial Watch filed a lawsuit on behalf of Mr. Paul, styled *Paul v. Clinton*, in the Los Angeles (California) Superior Court, and hired criminal defense counsel to defend Mr. Paul in connection with the criminal matter.

27.     On or about April 11, 2005, Judicial Watch withdrew from the representation of Mr. Paul in *Paul v. Clinton*. Judicial Watch also withdrew from the criminal matter.

28.     On or about February 5, 2007, Mr. Paul filed a lawsuit against Judicial Watch, alleging breach of contract, breach of fiduciary duty and unjust enrichment, based in part, upon Judicial Watch's withdrawal from the representation of Mr. Paul in the *Paul v. Clinton* matter,

allegedly in derogation of the retainer agreement(s).  That matter was styled *Paul v. Judicial Watch, et al.*, and filed in the United States District Court for the District of Columbia.

29.      On or about March 19, 2008, Respondent entered his appearance as counsel for Mr. Paul in the *Paul v. Judicial Watch* matter.  Respondent did not seek or obtain Judicial Watch's consent to the representation of Mr. Paul.

30.      On April 22, 2008, Judicial Watch filed with the court a motion to disqualify Respondent from representing Mr. Paul against it arguing, *inter alia,* Respondent's ethical obligations to them pursuant to Rule 1.9.

31.      On June 19, 2008, Respondent filed an opposition to Judicial Watch's motion to disqualify, and on June 25, 2008, Respondent filed a supplement to his opposition to Judicial Watch's motion to disqualify.

32.      On July 16, 2008, the District Court entered an order disqualifying Respondent as counsel for Mr. Paul for, *inter alia*, representing a client against a former client in the same or substantially related matter.

33.      Respondent's conduct violated the following DCRPC:

    a.  Rule 1.9, in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation; and

    b.  Rule 8.4(d), in that Respondent engaged in conduct that seriously interfered with the administration of justice.

## IV.      AGREED UPON SANCTION

The parties agree that the appropriate sanction in this matter is a public censure.

## V.   **RELEVANT PRECEDENT**

A.   **Conflict of Interest**

Rule 4-1.9 of the Rules Governing the Florida Bar (the "RGFB") provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."

DCRPC 1.9 which is virtually identical to RGFB 1.9(a) provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

Comment [2] to DCRPC 1.9 provides pertinently:

The scope of a "matter" for purposes of this rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other client's with materially adverse interests clearly is prohibited.

Comment [3] to DCRPC 1.9 provides pertinently:

Matter are "substantially related" for purposes of this Rule if they involved the same transaction or legal dispute or if there otherwise is a substantial risk that confidential information as would normally have been obtained in the prior representation would materially advance the client's position in a subsequent matter . . . . In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; *on the other hand, knowledge of specific facts gained in the prior representation that are relevant to the matter in question ordinarily will preclude such a representation* . . . [emphasis added].[1]

---

[1]   Comments [2] and [3] to RGFB, while different in some respects, nonetheless repeat substantially verbatim, the above-quoted text of Comments [2] and [3] to DCRPC 1.9.

**B.**   **Conduct That Seriously Interferes With the Administration of Justice**

Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to engage in conduct that seriously interferes with the administration of justice."

To establish a violation of the rule, Bar Counsel must prove that Respondent's conduct was (1) improper; (2) bore directly upon the judicial process with respect to an identifiable a case or tribunal; and (3) tainted the judicial process in more than a de minimus way, *i.e.,* it had or potentially had an impact upon the process to a serious and adverse degree. *In re Hopkins*, 677 A.2d 55, 60-61 (D.C. 1996). The Rule is violated, *inter alia,* where the attorney's conduct causes the unnecessary expenditure of time and resources in a judicial proceeding. *In re Cole*, 967 A.2d 1264, 1266 (D.C. 2009).

**COUNT I - Cobas**

Respondent violated RGFB 1.9. Stipulations of Fact ("SOF") 1-10. While Respondent served as General Counsel for Judicial Watch, Ms. Cobas, an employee of Judicial Watch, complained to him about her working in a "hostile work environment" in the Miami Region Office of Judicial Watch. Indeed, Ms. Cobas directly requested Respondent to intercede in the matter.

Thereafter Ms. Cobas sued Judicial Watch in a Florida state court alleging, *inter alia,* a "hostile work environment." Ms. Cobas's case was dismissed by the court. No longer working for Judicial Watch, Respondent entered his appearance on behalf of Ms. Cobas in the matter and adverse to Judicial Watch before the trial court and an appellate court. Respondent neither sought nor obtained the permission of Judicial Watch to represent Ms. Cobas against it.

**COUNT II - Benson**

Respondent violated DCRPC 1.9. SOF 1, 12-22.

8

As the Chairman and General Counsel for Judicial Watch, Respondent directly solicited a donation from Ms. Louise Benson for Judicial Watch's Building Fund. In response to the solicitation, Ms. Benson remitted to Judicial Watch $15,000 of her $50,000 pledge. Subsequent to Respondent's separation from Judicial Watch, the organization did not purchase the building.

Thereafter, Respondent and Ms. Benson became co-plaintiffs in a federal civil action against Judicial Watch. In that case, Ms. Benson alleged, *inter alia*, fraudulent misrepresentation, breach of contract and unjust enrichment in connection with her donation to the Building Fund. Ms. Benson's claims were dismissed by the United States District Court for the District of Columbia for lack of diversity.

Thereafter, Ms. Benson filed another lawsuit against Judicial Watch, individually, in the Superior Court for the District of Columbia, alleging, *inter alia*, fraudulent misrepresentation, breach of contract and unjust enrichment in connection with her donation to the Building Fund. Several months later, Respondent entered his appearance as co-counsel for Mr. Benson and adverse to Judicial Watch in the lawsuit. Respondent did not seek or obtain the consent of Judicial Watch to represent Ms. Benson against it.

Judicial Watch filed a motion to disqualify Respondent from representing Ms. Benson against them, citing Respondent's ethical responsibilities to it under Rule 1.9. The case was settled and dismissed before the trial court ruled on the motion.

## COUNT III - Paul

Respondent violated DCRPC 1.9 and 8.4(d). SOF 1, 24-30.

As the Chairman and General Counsel for Judicial Watch, Respondent executed two retainer agreements with Mr. Peter Paul. The agreements provided that Judicial Watch would provide legal representation for Mr. Paul in connection with alleged securities violations incident

to his fundraising activities. In 2003, Judicial Watch filed a lawsuit on behalf of Mr. Paul. In April 2005, Judicial Watch withdrew from the representation.

Thereafter, Mr. Paul through other counsel filed a lawsuit against Judicial Watch in the United States District Court for the District of Columbia alleging breach of contract and breach of fiduciary duty, based in part upon Judicial Watch's withdrawal from the representation and in derogation of the above-described retainer agreements.

On or about March 19, 2008, Respondent entered his appearance as counsel of record for Mr. Paul in the matter adverse to Judicial Watch. Respondent did not seek or obtain the consent of Judicial Watch to represent Mr. Paul against it.

Respondent was on notice since June 28, 2007, that Judicial Watch objected to his representation of clients against it when it filed the motion to disqualify him in the Benson matter. Nonetheless, ten months later Respondent again entered his appearance on behalf of Mr. Paul against Judicial Watch, and opposed his former client's motion to disqualify him from the case. On July 16, 2008, the court entered an order disqualifying Respondent from the case. Respondent's conduct was (1) improper; (2) bore directly upon the judicial process before the United States District Court for the District of Columbia; and (3) caused an unnecessary expenditure of the time and resources of the District Court.

## VI.   **MITIGATION**

Respondent has cooperated with Bar Counsel's investigation of this matter and has accepted responsibility for his misconduct. Respondent's misconduct did not involve dishonesty.

Respondent has been a member in good standing of the District of Columbia Bar continuously for nearly thirty-seven (37) years, and has never been disciplined in the District of

Columbia in any way or had his license suspended. In addition, Respondent is a public interest attorney who founded Judicial Watch and now Freedom Watch.

In these matters, Respondent stepped in to represent Ms. Cobas and Mr. Paul (Counts I and III) when their original attorneys no longer represented them, and they lacked the financial resources to pay for other counsel. A Hearing Committee may well find that Respondent believed, on the advice of counsel, that he did not have a conflict of interest in the Benson and Paul matters (Counts II and III). Respondent will testify that he did not realize a financial gain in representing Benson, Cobas, and Paul, and in fact represented these persons pro bono at his own time and expense. A Hearing Committee may well find that Respondent did so because he believed that Cobas and Paul would have no other recourse in their lawsuits against his former organization, Judicial Watch.

## VII.   AGGRAVATION

Witnesses for Judicial Watch would testify, and a Hearing Committee may well find that Respondent's decision to represent Cobas, Benson, and Paul against Judicial Watch was a product of ongoing acrimony in connection with his separation from Judicial Watch in 2003, and that those adverse representations were vindictive in nature. Witnesses for Judicial Watch would testify that Respondent did realize a financial gain in his representation of Cobas, Benson, and Paul because these lawsuits were featured in Respondent's fundraising campaign titled "Saving Judicial Watch."

## VIII.  PUBLIC CENSURE

The range of sanction for attorneys found to have engaged in a conflict of interest is from an Informal Admonition to a suspension from the practice of law. The parties have agreed that Respondent should receive a public censure for his misconduct in this matter.

11

In *In re Sofaer*, 728 A.2d 625 (D.C. 1999), the Court affirmed the report and recommendation of the Board that the attorney be informally admonished for violating the revolving door proscription of Rule 1.11(a). In that matter, the attorney had served as Legal Advisor for the United States Department of State at the time that Pan American Flight 103 was downed over Lockerbie, Scotland, as a result of Libyan terrorism. The attorney thereafter was retained by the government of Libya to represent it in connection with criminal and civil actions arising from the downing of the airplane.

In *In re Butterfield*, 851 A.2d 513 (D.C. 2004), the Court affirmed the report and recommendation of the Board that the attorney be suspended for 30 days, where the attorney engaged in a conflict of interest in violation of Rule 1.7(b)(1) and (2). There, the attorney failed to conduct a conflict check that would have revealed that his new client matter was in conflict with an existing client of the firm. After learning of the conflict, the lawyer failed to either obtain the appropriate consents or withdraw from the representation.

Longer suspensions from the practice of law have been imposed in cases where the conflict of interest were accompanied by other rules violations, including dishonesty. *See In re Shay*, 756 A.2d 465 (D.C. 2000) (90-day suspension for conflict of interest and dishonesty); *In re Jones-Terrell*, 712 A.2d 496 (D.C. 1998) (60-day suspension for conflict of interest along with other violations including dishonesty).

In this matter, Respondent has engaged in three separate violations of Rule 1.9, by representing parties against his former client. Respondent may have arguably been unaware of his ethical obligations in connection with his representation of Sandra Cobas in Count I. However, in Count II, which involved his representation of Louise Benson, Respondent was the subject of a motion to disqualify on the grounds that the representation was inconsistent with his

ethical obligations to his former client, Judicial Watch, in violation of Rule 1.9. Respondent did not immediately withdraw from the case, but instead opposed the motion. The underlying case was settled and dismissed before the trial court ruled on the motion to disqualify. In Count III, the Peter Paul representation, Respondent's 1.9 conflict of interest occurred approximately 10 months after the motion to disqualify him was filed in the Benson matter (Count II). In the Paul matter, Judicial Watch again filed a motion to disqualify Respondent, which Respondent opposed. The trial court granted Judicial Watch's motion and entered an order disqualifying Respondent from representing Mr. Paul in the matter.

In sum, Respondent violated Rule 1.9 on three separate occasions. Moreover, he did so intentionally and over his former client's objections in Counts II and III. Respondent also violated Rule 8.4(d) in Count III. Accordingly, Respondent's conduct is more serious than that in *Sofaer*. On the other hand, there is no evidence that Respondent was remunerated by Cobas, Benson, or Paul, for his services in these cases. Moreover, there is no evidence of dishonesty and Respondent has accepted responsibility for his misconduct. Accordingly, Respondent need not be suspended for his misconduct.

The parties agree that a public censure strikes the correct balance of protecting the public and deterring future misconduct.

**WHEREFORE**, the Office of Bar Counsel requests that the Executive Attorney assign a Hearing Committee to review the petition for negotiated disposition pursuant to D.C. Bar Rule XI, § 12.1(c).

13

Wallace E. Shipp, Jr.
Bar Counsel

Larry E. Klayman, Esquire
Respondent

H. Clay Smith, III
Assistant Bar Counsel

OFFICE OF BAR COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501

14