Anthony T. Dephue
2012 S. Hervey St.
Boise, ID 83705
717-368-1494



Honorable Chief Judge Gloria M. Navarro
Honorable Magistrate Judge Peggy A. Leen
333 S. Las Vegas Blvd.
Ste. 6073
Las Vegas, NV 89101

Re: 2:16-cr-00046-GMN-PAL-11

Honorable Chief Judge Navarro and Honorable Magistrate Judge Leen,

Thank you for taking time to read my remarks regarding the case against Eric J. Parker, brought forth by the U.S. Attorneys on behalf of the United States of America, for his involvement on Saturday, 12 April 2014 in what has become colloquially known as "The Bundy Ranch Standoff". My letter to both of you has three distinct purposes. First, I would like to provide balance to the narrative put forth by the U.S. Attorney's Office as it relates to why people, Mr. Parker included, myself almost included, responded en masse to Bunkerville, NV. Second, I intend to testify to the character of Mr. Parker, as I know him, in stark contrast to what was presented by the U.S. Attorney(s) at his detention hearing. Finally, I intend to assert that his continued pretrial detention is not only not necessary, but potentially a fundamental violation of his right to the presumption of innocence under the conditions set forth by the Bail Reform Act in 18 USC 3142.

The primary reason that the issue surrounding Cliven Bundy's Bunkerville ranch was so polarizing is because the action taken by the Bureau of Land Management was nonsensical and excessively heavy handed. The issue at hand, as it involves Mr. Parker, has nothing to do with Cliven Bundy's legal battle(s) over the remittance of grazing fees for his herd of cattle. From the perspective of the everyday citizen, BLM's decision to round up Bundy's cattle didn't amount to any level of sense congruent with prudence, reasonable measure, or applicable justice. The media widely reported three facts:
   1. Bundy was reported to owe $1M in grazing fees and penalties
   2. BLM hired a Utah-based contractor for almost $900K to roundup the cattle
   3. The value of Bundy's herd in 2014, if it could be sold, was estimated to be worth about $1M

Herein lies questionable nature of BLM's action. Why spend $1M to round up $1M in cattle to satisfy a $1M debt? From this perspective, the action of BLM was nonsensical. To compound the negative perception held by many people, armed agents utilized helicopters and heavy firepower to assist the contractor in rounding up the cattle. This is disturbing because it is widely known that agencies have substantial avenues of approach to collect debt. Governments on the Federal and State level have the ability to lien real property and assets, seize money directly out of bank

accounts, dissolve corporate business entities, garnish wages, withhold tax returns, deny entitlements; the list could go on. Given these available avenues weighed against the choice to engage in an armed roundup of cattle when the action had little, if any, chance of financial solvency, constituted to many an egregious use of Federal resources in a manner perceived to be heavy-handed. From the outset, a large number of citizens considered the actions taken by the Federal Government to be excessive, unnecessary, aggressive, and potentially lawless. Further exacerbating the situation was the establishment of cordoned off "First Amendment Zones".

This is where my "almost" involvement, referenced previously, enters into relevance. I woke up on the morning of Friday, 11 April 2014 and saw video of the "First Amendment Zones". Not having a solidly defined opinion either way about the events in Bunkerville, NV; that image was enough to cause me to consider mobilization. I decided that I would drive to Nevada, kick the sign down in protest, have a look at the situation for myself, spend some money in town to help the local economy, and then return home. I made plans to rent a vehicle and drive through the night after work. For reasons beyond the scope of this letter, I did not drive down that day.

The bottom line is that Federal Agencies acted unnecessarily aggressively. It is well documented that they established these "First Amendment Zones". Their aggression toward protesters in the days leading up to the incident on the bridge was the basis for and the genesis of the large scale protest that we all witnessed. Eric Parker didn't drive to Nevada looking for a fight with the Federal Government. He drove down to protest obvious egregious actions by the BLM. There is nothing unlawful surrounding his decision to go to Bunkerville.

Transitioning to my testimony to the character of Mr. Parker, we spoke one day about what happened on Saturday, 12 April 2014. He too saw the First Amendment Zones and also the video where protesters were tased, thrown to the ground, and subjected to attack from canine resources. As far as I understand, he left that Friday for nearly the same reason I almost did.

He drove through the night and found himself the next morning in the middle of an intense, terrifying situation. Standing on a bridge overlooking a group of men, women, and minor children protesters… some with hands up… walking toward a guarded area containing Bundy's cattle; a bullhorn announced that authorization was given to gas or, if necessary, use lethal force on these individuals. Eric Parker was not acting as part of a larger clandestine conspiracy to threaten, intimidate, or otherwise extort the Federal government and its agents. He acted that day out of reasonable fear for his own safety and the safety of others.

Having met Eric on several occasions, attended various lawful, peaceful political rallies, spoken with him in person, and even met his family; I am prepared to testify that I would stake my honor, integrity, personal fortune, and very freedom on the premise that he is not a threat to himself, his community, or any other citizen. Whether or not the action of pointing a weapon at Federal Agents on that day constitutes a crime (an action that will be judged by a jury of his peers), the circumstances surrounding that decision do not warrant either the avalanche of charges and

litigation brought forth against him or his denial of release under the supervision of Pretrial Services.

While Judge Candy Dale interpreted the indictment to satisfy 18 USC 3142(g)(1) in favor of detention, I believe that his court appointed attorney did not sufficiently address the other factors that point to his eligibility for release. Specifically:

- (g)(2): There really isn't very much "evidence" against Eric Parker.
    - He drove to Nevada. Not a crime.
    - He traveled with weapons. Not a crime.
    - He stood on a bridge with a weapon. Not a crime.
    - The only evidence is the photo of him lying prone on the I-15 overpass. A jury of his peers will ask "why", and a side of the story not told by the U.S. Attorneys will be weighed in court.
    - No one got hurt.
    - Weapons were pointed at him and protesters well before his actions on the bridge. It is reasonable to conclude that there is a strong possibility that he acted in self defense and the defense of others because of a reasonable fear that himself or others could have been subjected to grave injury or death.
- (g)(3)(a): Eric Parker was at the time of the incident and up to his arrest gainfully employed. Had he been released following his detention hearing his employer, knowing full well who he is and his involvement at the Bundy Ranch, was prepared to allow him to continue to work and provide for his wife and two children. This speaks both to his character and mental condition. The people who know Eric Parker outside of the incident on Saturday, 12 April 2014 know that he is not the violent extremist that the U.S. Attorneys would want people to believe. He provides for his wife and children, participates in lawful, peaceful grassroots organized rallies that encourage citizens to speak up and make their opinions known. The U.S. Attorneys asserted that Eric Parker was in Burns, Oregon to convince Dwight and Steven Hammond to refuse to report to prison. Nothing could be farther from the truth. I was in Burns with Eric. He flat refused to participate in the takeover of the Malheur Refuge and he actively, vocally, and affirmatively supported the Hammond's decision to report back to prison. When Eric learned that he was under indictment for his participation in the protest at the Bundy Ranch, he promptly met with his local Sheriff and agreed to peacefully submit to his imminent arrest. This is not behavior indicative of someone that poses a danger to anyone. To the contrary, his only request was that he not be arrested at home in front of his children; testimony to his enduring sense of duty in parenting his young children.
- (g)(3)(b): Eric has no substantial or relevant criminal history that would imply that he is a flight risk.
- (g)(4): With my sacred honor and full integrity on the line, I swear before the court in the District of Nevada the Eric J. Parker poses no threat to himself, his family, his community, or the public at large. It took federal authorities 692 days; 1 year, 10 months, and 21 days to get around to indicting Eric Parker and arresting him, without incident, on his way to work. No one who poses an imminent, existential threat to society is allowed to remain out

of custody for this long. The only relevant consideration is the incident on the bridge. A cursory examination of all of the evidence reveals that it is reasonable to conclude that he acted defensively. When the threat of grave bodily injury or death passed, he returned to Idaho without incident.

If Eric Parker is to fully receive a presumption of innocence, then he needs to be allowed to return to his family, return to his job, and prepare his defense strategy. Eric has a vested interest in returning to the District of Nevada for trial. He, like many others, believe that it was Federal Agencies who acted lawlessly (and thus far with impunity) during the events in Bunkerville, NV in April of 2014. Regardless of the outcome of his trial, it is bringing to light issues that need to be addressed as it relates to Federal overreach and aggression.

I am asking that you will consider the possibility that Eric Parker should be released to his family under the supervision of Pretrial Services, and under whatever conditions you deem appropriate. He will abide by them.

I swear, under oath, and on my sacred honor... that Eric Parker will return to Nevada to stand trial for the charges levied against him.

Anthony T. Dephue
2021 S. Hervey St.
Boise, ID 83705

---

STATE OF IDAHO
COUNTY OF Ada

On this 6th day of April, in the year of 2016, before me, Nathan Branahl, a Notary Public, personally appeared Anthony T. Dephue, known or identified to me (or proved to me on the oath of _____), to be the person whose name is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same.

Notary Public
Printed Name: Nathan Branahl
Commission Expires: 09/26/2019

NATHAN BRANAHL
NOTARY PUBLIC
STATE OF IDAHO