DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>GREGORY P. BURLESON,<br><br>       Defendant. | 2:16-CR-00046-GMN-PAL<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR REVOCATION OF PRETRIAL DETENTION ORDER** |

The United States, by and through the undersigned, respectfully submits its Response in Opposition to defendant Gregory P. Burleson's Motion to Reconsider Magistrate's Decision to Deny Pretrial Release Doc. #214 ("Motion for Revocation"). As demonstrated below, Burleson submits nothing to rebut the presumption of detention that attaches in this case, Burleson having been charged with four counts of Section 924(c) violations. Moreover, the Government has proffered overwhelming evidence to show that Burleson presents both a danger to the community and a risk of flight. Accordingly, the Motion for Revocation should be denied.

On March 2, 2016, a federal Grand Jury seated in the District of Nevada returned a Superseding Criminal Indictment, charging defendant Gregory Burleson

("Burleson") and 18 other defendants with, among other things, conspiring to assault federal officers, obstruct justice, extort federal officers, and use and carry a firearm in relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371; 372; 111(a)(1) and (b); 1503; 1951; and 924(c).

On March 3, 2016, Burleson was arrested in the District of Arizona pursuant to an arrest warrant issued from the Superseding Indictment.  Burleson made an initial appearance, waived an identity hearing, and requested that his detention hearing be held in this District.  On March 16, 2016, Burleson appeared in this District and the Government moved for detention both as a risk of flight and a danger to the community, filing a Memorandum in Support of Its Motion for Detention, which proffered additional facts supporting pretrial detention.   Doc. #127.

On March 8, 2015, Burleson file a memorandum for pretrial release and on March 21, 2016, Burleson received a fully-adjudicated detention hearing before United States Magistrate Judge Peggy A. Leen.   *See* Exhibit A (Transcript of Burleson's March 21, 2016 Detention Hearing).  At the hearing, the Government argued for detention and also relied upon the facts charged in the Superseding Indictment and those proffered in its memorandum in support of its motion for detention.

At the conclusion of the detention hearing, Judge Leen ordered Burleson detained pending trial finding that the government had shown by clear and convincing evidence that Burleson is a danger to the community.  Judge Leen made

findings on the record and issued the following written findings:

> The defendant is ordered detained as a danger to the community as that term is defined by The Bail Reform Act for the following reasons: The defendant is charged with crimes of violence involving the use of weapons for which the law creates a rebuttable presumption that he should be detained. In this case, the weight of the evidence is very strong. Both video and photographic evidence depicts the defendant's armed participation in the advance on the BLM impoundment site on the day of April 12, 2014. The defendant is not being prosecuted for his speech or his beliefs, but for his conduct. The defendant's speech and his interviews, including a tape-recorded conversation with an FBI Agent acknowledged what he did and that he was proud of what he did. The defendant made statements a month before traveling to Bunkerville, NV that "it's time to start shooting cops." Some of the defendant's most inflammatory statements were made afterwards about "being a berserker" and "wanting to die in battle," and he continually made statements along those lines, about what would happen if anyone came to arrest any of the people who were involved in the Bunkerville incident, and about "burning people to the ground, including their wives and their children." The defendant bragged about having federal agents in his sights. Although the defendant is blind, the Court does not believe for a minute that the views the defendant espouses are just going to go away and that he will suddenly abide by Court orders.

Doc. #196.

On March 31, 2016, Burleson filed a Motion for Revocation pursuant to 18 U.S.C. § 3145(b). This Court reviews the order of the Magistrate Judge de novo. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990); *see also United States v. King*, 849 F.2d 485, 491 (11th Cir. 1988); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). This Court can review the evidence presented to the magistrate judge and makes its own independent determination. *Koenig*, 912 F.2d at 1193. "Clearly, the district court is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist…" *Id.* However, this Court can also hear

additional evidence and argument.  *Id.*

The Government adopts and incorporates by reference the Superseding Indictment, Doc. #27, its Memorandum in Support of Pretrial Detention,  Doc. #150 and all the evidence and arguments it proffered at the detention hearing.  It is the Government's understanding that Pretrial Services will provide the Court with Burleson's pretrial reports prepared in the District of Arizona and in this District.

The Superseding Indictment charging four violations of 18 U.S.C. § 924(c) provides a presumption, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required, and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(B).  Because of the nature and circumstances of the offenses charged against Burleson which give rise to the presumption of detention, the Government submits that no evidence will be sufficient to rebut the presumption of detention.  However, even if rebutted, the presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) *quoting United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

Burleson is a danger to the community, most specifically, federal agents and officers, particularly law enforcement officers.  If Burleson were released, he would be supervised by the same federal officers who he has continually threatened to kill. The only fact Burleson proffers in support of release is his health condition.[1]

---

[1] The Government notes that Burleson has not provided much of any evidence documenting his health issues and the prognosis of those issues.

However, as Judge Leen correctly found, nothing in the record supports a finding that Burleson will abide by federal court orders. Judge Leen did not simply "rely on the presumption." The Government provided numerous examples of Burleson advocating violence against law enforcement, people who practice the Islamic religion, President Obama, and others. Burleson's threats, combined with the strong evidence of his violent actions in this case, including his admission that he had the BLM's Special Agent in Charge's head in in his sights, and his road rage conviction overwhelmingly demonstrate that Burleson is a danger to the community and that no combination of conditions could be reasonably fashioned that would protect the community.

The fact that Burleson's eyesight is impaired would not prevent Burleson from violently resisting court orders with the assistance of others. Burleson has strong connections to self-described "militia" groups in Arizona and many of those who participated in the April 12, 2014 assault were from Arizona. In short, Burleson and others have already demonstrated that they are willing to use violence to disobey court orders.

Although Judge Leen did not find that Burleson should be detained as a flight risk, the Government believes that the same reasons which make Burleson a danger to the community support a finding that he is a flight risk. Burleson is not a traditional flight risk in the sense that he is not expected to flee the country, but rather a risk of armed resistance to law enforcement, including any law enforcement efforts to bring him to appear in court. Burleson has already disregarded the orders of this Court, by force. There is no reason to believe he

would not be willing to use force, or have others use force on his behalf, to resist federal court orders or impede federal officers to his own benefit as well.

Burleson has done nothing to renounce or disavow the actions of his co-conspirators, or renounce or disavow his own actions. All he has done is state that he cannot personally resort to violence because of his health conditions. That claim neither rebuts the presumption nor mitigates his continuing danger to the community.

**WHEREFORE**, for all the foregoing reasons, the government respectfully requests that the Court deny the Motion for Revocation.

**DATED** this 18th day of April, 2016.

Respectfully,

DANIEL G. BOGDEN
United States Attorney

__/s/ Steven W. Myhre_____
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys

Attorneys for the United States

### CERTIFICATE OF SERVICE

I certify that I am an employee of the United States Attorney's Office.   A copy of the foregoing **Notice of Change of Address** was served upon counsel of record, via Electronic Case Filing (ECF).

Dated this 18th day of April, 2016.


_/s/ Mamie A. Ott_
MAMIE A. OTT
Legal Assistant

7

# Exhibit A

1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2      BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

3


4    UNITED STATES OF AMERICA,          :
                                        :
5           Plaintiff,                  :
                                        : No. 2:16-CR-00046-GMN-PAL-16
6        vs.                            :
                                        :
7    GREGORY P. BURLESON,               :
                                        :
8           Defendant.                  :
     _____   :
9


10


11              TRANSCRIPT OF DETENTION HEARING

12

                      March 21, 2016
13

14                    Las Vegas, Nevada

15

16

17
     FTR No. 3A/20160321 @ 9:47 a.m.
18

19

20   Transcribed by:        Donna Davidson, CCR, RDR, CRR
                            (775) 329-0132
21                          dodavidson@att.net

22

23

24

25   (Proceedings recorded by electronic sound recording, transcript
     produced by mechanical stenography and computer.)

2

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    Nicholas D. Dickinson
      Steven W. Myhre
 5    Nadia Janjua Ahmed
      Erin M. Creegan
 6    United States Attorney's Office
      333 Las Vegas Boulevard South
 7    Las Vegas, Nevada 89101
      nicholas.dickinson@usdoj.gov
 8    Steven.Myhre@usdoj.gov
      nadia.ahmed@usdoj.gov
 9    erin.creegan@usdoj.gov

10

11
      FOR THE DEFENDANT:
12
      Terrence M. Jackson
13    Law Office of Terrence M. Jackson
      624 South Ninth Street
14    Las Vegas, Nevada 89101
      (702)386-0001
15    Fax: (702)386-0085
      Terry.Jackson.Esq@gmail.com
16

17

18

19

20

21

22

23

24

25
```

1          LAS VEGAS, NEVADA, MARCH 21, 2016, 9:47 A.M.

2                           --oOo--

3                   P R O C E E D I N G S

4

5          THE COURT:  Turning next to Mr. Burleson.

6          Who will be arguing the government's position?

7          MR. DICKINSON:  I will be, Your Honor.

8          THE COURT:  Mr. Dickinson?

9          MR. DICKINSON:  May I approach?

10         THE COURT:  Yes.

11         MR. DICKINSON:  Thank you, Your Honor.  I know

12 the Court's read our memo, read the indictment.  We

13 incorporate both of those into our argument on

14 Mr. Burleson.

15         I'm not going to repeat everything and all the

16 quotes and all the Facebook postings.

17         I do want to hit on just a little bit of the

18 background of the salient points of Mr. Burleson's conduct

19 on the 12th.  I want to focus a little bit on -- we

20 referenced the January 16th, 2015, recorded call with the

21 FBI.  I want to spend a few minutes on that.

22         I want to talk about Mr. Burleson's associations

23 with other co-defendants and other self-described militia,

24 patriots, like-minded individuals both that were present in

25 the wash from Arizona on the 12th of April 2014 and others

1     that weren't, and then obviously talk about Mr. Burleson's

2     health issues.  Because really the government believes

3     that's the only argument Mr. Burleson has for any

4     conditions that can be fashioned for his release.

5          And obviously we're operating under the

6     presumption based on the 924(c) counts in this case.

7          To start with, Your Honor, Mr. Burleson is a

8     self-described militia member, member of the Arizona

9     Independent Militia, which is essentially himself, but

10    worked -- has worked in the past quite a bit with other

11    militia groups in Arizona, we don't focus on this in our

12    memo, but doing border operations down in the lower Tucson

13    area, which is prevalent with these groups.

14         But fast forwarding, on April 11th and 12th, you

15    can see in some of the Facebook postings that Mr. Burleson

16    was fully aware of what's going on.

17         And it's beyond a shadow of a doubt Mr. Burleson

18    did not travel to Nevada to protest.  He traveled to Nevada

19    to chest up with federal agents and was looking for an

20    armed conflict.  And that's exactly what he did.

21         Mr. Burleson was not present at the staging area

22    when Mr. -- when Cliven Bundy gave his call to action to go

23    get his cattle and told Sheriff Gillespie to go get the

24    guns.

25         Mr. Burleson actually left Arizona with, he

5

1   says, 10 people, which is supported by the government's

2   evidence, one of which is another individual who I'm going

3   to reference later on.  But the individual he drove up with

4   was a member of the Arizona First Pathfinders.

5              And they approached the area where the assault

6   occurred, where traffic's being shut down.  Mr. Burleson

7   gets out of his car, engages with the other

8   co-conspirators, and gets into that wash armed with his

9   assault rifle.

10             The individual he was with also got into the

11   wash, did not take his assault rifle, but he had a handgun

12   on him and carried a gas mask.

13             Mr. Burleson approached the left side of the

14   wash.  Some of the pictures -- and those are just a few

15   pictures we provided the Court.  But you can see one before

16   the crowd moved up into the skirmish line where Ammon

17   Bundy's clearly looking at the defendant.  He's on the left

18   side.

19             Mr. Burleson then -- I'll show you another

20   picture where the crowd was clearly moved up, and he's on

21   the left -- left skirt of the underpass, approximately 15

22   to 20 yards away from when the special agent in charge

23   approached to diffuse the situation.

24             The evidence shows, and I'll get to later,

25   Mr. Burleson admitting weaving in and out of the crowd.

1          If you go through the pictures, some of the

2     photographic pictures and the pictures taken from videos,

3     the screenshots, you can plot Mr. Burleson moving in and

4     out.  He was there.  He was there through the impoundment

5     and through when the cattle -- when BLM surrendered.  When

6     the cattles were brought back on the range he posted

7     pictures.  His quotes about victory and succeeding and

8     battle are all laid out in the government's memo.

9          And as he stated, they put BLM in a kill box.

10    Mr. Burleson's words.

11         And that's exactly what occurred that day.  They

12    were surrounded by the sides.  They were flanked by the --

13    on the sides of the skirts of the underpass and then the

14    gunmen on the bridge.

15         And Mr. Burleson, by his own words, was upset

16    that there wasn't any violent -- more violent encounter

17    that day.  And some of the -- one of the quotes we put in

18    there how next time it's going to be different because he's

19    going to be the force to do that.

20         I just want to go forward to that January 16th,

21    2015, call.  That -- the FBI had had previous interactions

22    with Mr. Burleson related to some of his activities on the

23    border with his militia groups.  And that was right after

24    the road-rage incident.

25         And fair to say the FBI was concerned and

1    reached out to Mr. Burleson, just to sort of see what

2    the -- the lay of the land, so to speak.

3            The conversation with Mr. Burleson wasn't

4    exactly a probing FBI interview.  That being said,

5    Mr. Burleson fully admitted his conduct that day and

6    exactly what he did to an FBI -- someone he knew was an FBI

7    agent.

8            It's somewhat chilling, Your Honor.  He talked

9    about how he went down to -- or he came to Nevada because

10   BLM was stealing the land and stealing the cattle and

11   pissing people off, including him, you know, not the fact

12   that they were enforcing court orders issued by this court

13   that, quote, We went down there and started grabbing people

14   with guns.  And we took everybody with weapons out of the

15   crowd.  Talking about him going into the wash.

16           And the evidence supports that.  The gunmen took

17   the flanks and, as the Court has mentioned, left women and

18   children and -- you don't really see the firearms right

19   there directly in front of the BLM.

20           I was kind of in charge of the left side of the

21   strategy.  Mr. Burleson was on the left side weaving in and

22   out.  I sighted a couple of guys, talking about the special

23   agents and the BLM law enforcement officers.  Quote, Every

24   single one of them had at least two or three guns trained

25   on them.

1          Mr. Burleson said he positioned guys on the left

2     side underneath the overpasses, again supported by the

3     evidence.

4          And most chilling, as he stated, he said he had

5     the special agent in charge, who he names and describes

6     what he was wearing, sighted.  He had his heads in his

7     sight.

8          And just to put that into more context, the BLM

9     special agent in charge will testify that he finally went

10    to the gate because he had to diffuse the situation.  He

11    had been up, and he had heard not only the -- you know, had

12    heard there were people in the wash with firearms and on

13    the bridge, but when he started hearing that people were

14    pointing guns at federal law enforcement agents, he needed

15    to do something and he needed to do something now.

16          He didn't exactly know what he was going to do

17    when he went to that gate, but something had to be done.

18    And as he walked towards that gate, he saw the guns pointed

19    to him.  And he said to himself -- he was wearing a chest

20    plate, Please just shoot me in the chest plate, don't shoot

21    me in the head.  Because he wanted to get back to his

22    family.

23          That's what Mr. Burleson was doing that day.  He

24    wasn't just in the wash standing there.  By his own

25    admission he had the special agent in charge, who was

9

1    enforcing court orders, a gun pointed at his head.

2              Everything, as we've stated before, went against

3    those officers' training not to engage that day.  But

4    that's what happened.  And thankfully, as the Court has

5    stated, a blood bath didn't occur.

6              And then you can see Mr. Burleson just ranting

7    about what went on there, when Metro officers were quoted

8    about what they saw that day, ranting about how dare they,

9    and he -- if he sees them, he will engage them, that he's

10   Greg Burleson and he's not going to put up with it.

11             Fast forwarding, the road-rage incident is laid

12   out.  And there's a picture of Mr. Burleson and what he had

13   that day.  He was armed to the teeth.

14             But when he posts the victim's information,

15   which we allude to and state in our memo, he actually

16   posted the victim's information on his co-defendant Eric

17   Parker's Facebook page.

18             And that was in regards to a discussion of

19   another individual who late last year was arrested in the

20   Western District of Washington, Schuyler Barbeau.

21             Mr. Barbeau was present at Bundy Ranch and is

22   pictured.

23             At the staging area that morning, armed body

24   guard for Mr. Bundy.

25             Well, Mr. Barbeau was charged in a separate

1    weapons violation late last year in the Western District of

2    Washington.

3              Well, that got Mr. Burleson and his

4    co-defendants spun up because this was going to be -- the

5    federal government's coming now, they got Barbeau because

6    he was at Bundy Ranch, and they're getting everybody else.

7              So that's sort of what -- this Facebook posting.

8    And then Mr. Burleson was upset because he's like, Hey,

9    Barbeau, you know, had it coming.  If he was dumb enough to

10   possess an unregistered weapon, so be it.

11             But look what happened to me.  I had this

12   weapons violation, and no one came to my, you know,

13   defense.  And then he's posting about his victim's

14   information.

15             This also goes to Mr. Burleson's association

16   with his co-defendants in this case.  Whether it be the

17   person he rode up there with, the guy with the gas mask

18   from -- who he remains in very close contact with, from

19   October to December 2015, 380 phone calls between them,

20   totalling 13 and a half hours.

21             That individual, when Mr. Bundy was arrested

22   earlier this year, took to Facebook and was posting about

23   how the local sheriffs and the state representatives in

24   Arizona and Utah need to come together and not let people

25   get prosecuted or taken into custody for what occurred at

1    Bundy Ranch.

2              That also goes -- you know, we lay forth some of

3    the information regarding Mr. Burleson's participation and

4    some of the mosque protests in Phoenix.  Not to, oh, lock

5    him away because he's exercising his First Amendment rights

6    in a mosque protest.

7              One, because he'd come on that protesting with

8    his violent rhetoric about burning mosques goes to

9    Mr. Burleson's propensity to violence.  But, two, he was

10   out there at those protests with Jon Ritzheimer who, while

11   not present at Bundy Ranch, was later present in what

12   occurred in Oregon at the takeover up there, but he's also

13   a member of -- we reference in our indictment Operation

14   Mutual Aid, but then it changed and morphed into Operation

15   Mutual Defense.  And he's a board member on that with Ryan

16   Payne.

17             The message and purpose of that group is when

18   they view things of being -- the federal government

19   overreach, if the person being -- you know, for example,

20   Mr. Burleson and the Bundys want their help, they ask for

21   it, and they will come and will chest up with the federal

22   government.

23             Mr. O'Shaughnessy, co-defendant, was out there.

24   Mr. Cooper was out there.  The person -- the guy with the

25   gas mask was out there.  These are the people he associates

1    with.  And then obviously the violent rhetoric associated

2    with those.

3            And those were in October, Your Honor, so not

4    too far away, which again goes back into -- or which ties

5    into his health, which is -- whatever is going on with

6    Mr. Burleson and his eyesight is a recent occurrence.

7            You know, the Obama posts we cite in our memo

8    just again to show his propensity to violence.

9            Start now on the medical issues, Your Honor.

10   You know, we had some information.  We noted it in our

11   memo.  And that was before he even appeared in Arizona that

12   something was going on with his eyesight, which I note he

13   references in a November 29th post almost mocking law

14   enforcement that he's been prescribed steroids and they

15   better approach him with caution, it's best to steer clear

16   and not make aggressive contact with him.

17           And, you know, but the records provided to the

18   Court, they say something he's had a procedure, he has

19   eyesight issues, he's obviously being prescribed medicine.

20   But that's all that's been provided to the Court.

21           I'm not a doctor, so I don't know what the

22   prognosis is or anything else related to that.

23           That being said, even if Mr. Burleson can't see

24   right now, the overwhelming weight of the evidence and his

25   violent rhetoric -- and not just the rhetoric, but he did

1    it.  He's fully, fully advertising that to anybody that

2    will listen, including the FBI.  I went out there and

3    chested up with the government and pointed my gun at law

4    enforcement agents.  And I'll do it again.

5            And even if he, as we sit here today, would be

6    unable to stand at a wash, he can still insight, he can

7    still insight other people.  He still associates with these

8    people.  Not just the people in this indictment.

9            There were numerous people, based on evidence,

10   that came from Arizona.  There's a large, quote/unquote,

11   militia/patriot group community in Arizona.

12           And the government's not saying that everyone

13   involved in those groups is somehow going to go out and

14   cause violence.  But there's been enough rhetoric.  And

15   there's nothing to say that Mr. Burleson won't associate

16   with those individuals to prevent coming to court or to

17   hole up somewhere, you know, because, in his own words,

18   Never mess with a man who wants -- or, Never mess with a

19   man who lives to die in battle.  And that's Mr. Burleson.

20           Your Honor, just to go into that, there's been,

21   almost from right after Bundy Ranch through today,

22   increasing rhetoric from individuals that participated at

23   Bundy Ranch how they're going to protect each other.

24           Mr. Burleson references that on May -- the May

25   13th, 2004, post.  Quote, If you arrest just one -- or, If

14

1    you arrest just one person from Bundy Ranch, quote, we will

2    quote -- I'm sorry.  If you arrest just one person from

3    Bundy Ranch, we will, quote, burn you to the ground, that

4    includes your wife and children too.

5              All the way to Ryan Payne in December, going

6    back to the Barbeau arrest in the Western District of

7    Washington, Mr. Payne takes to Facebook to post about this.

8              He talks a little bit about Barbeau being

9    arrested.  Then he says, quote, Those who are at the ranch

10   were made a promise by the leadership in their

11   participation in that great effort.  As long as your

12   actions are lawful, according to the constitution, and

13   upright in morality, you will be protected.  We must not

14   let this promise be without conviction.

15             He goes on.  Watch one another's sixes.  And at

16   some point we're going to have to think about not allowing

17   one another to be arrested.  The time to assemble must be

18   coming in multiple locations to act as reserves in order to

19   directly protect each other.  If this shows itself as part

20   of a larger effort, then we must consider that and are

21   swinging into full action against the community and respond

22   accordingly.

23             That's who Mr. Burleson associates with.  That's

24   Mr. Burleson's history and characteristics, Your Honor.

25             There is no conditions or combination of

1    conditions that this Court can impose that would protect

2    the community or that would assure Mr. Burleson would

3    appear before Your Honor or Chief Judge Navarro in this

4    case.  With or without whatever is going on with

5    Mr. Burleson's eyesight.

6              Unless the Court has any questions, I'll submit.

7              THE COURT:  Mr. Jackson, have you had an

8    opportunity first to go over the reports with your client,

9    those that were prepared in Arizona and here?

10             MR. JACKSON:  Yes, Your Honor.

11             THE COURT:  Is there anything in either of the

12   reports that you wish to note for the record as inaccurate?

13             MR. JACKSON:  No.

14             THE COURT:  Let me hear from you on the merits

15   then, please.

16             MR. JACKSON:  Well, I disagree with Assistant US

17   Attorney on a couple of things, as far as whether or not

18   there are conditions that can protect the population from

19   my client, Mr. Burleson.

20             Your Honor can take a look at Mr. Burleson right

21   now.  You notice he was brought in on a wheelchair.

22             When I first went to see him in the lockup, the

23   marshals had to walk him over to a chair because he

24   couldn't see where it was.

25             Now, if the prosecutor doesn't think he's blind,

1     I can supply information of that.  He's totally blind.

2     Can't see a thing.

3               That condition has -- started back in about

4     August of this year, and has progressed until January.  He

5     had surgery several weeks ago.  And there's no hope he's

6     going to get his sight back.  There's going to be a magic

7     cure where he's going to see again.

8               He isn't going to be driving a car out to

9     Bunkerville, or he isn't going to be able to be grabbing a

10    gun and running after and shooting people.  He's blind.

11              Now, whether he can use a keyboard or not, we

12    can restrict him from getting a typewriter or an Internet

13    computer.  We can make that a condition.  So he won't be

14    able to insight people by getting on the Internet.

15              Whether he was two years ago or a year and a

16    half ago or even six months ago saying things he shouldn't

17    say, and I'm not disputing that, some of which were

18    protected by free speech, some of it may have been

19    borderline, right now there's no chance that he can hurt

20    anybody because of his medical condition.

21              He not only has a serious problem with his

22    eyesight, and something that can never be healed, he also

23    has seizure disorders.

24              And the other thing, he's not getting any

25    treatment, none at all in the jail.  He's not getting his

1    seizure medication.  He's not getting his eyedrops, and

2    he's not getting follow-up treatment from his eye doctors,

3    which he could get if he were out.

4             You know, I suggested several conditions that

5    would meet what the bail reform statute says are

6    appropriate conditions that would protect society and make

7    sure that he's not going to flee.

8             Restrict his movement to Phoenix, Arizona, where

9    he lives in a small apartment where his mother comes in and

10   takes care of him, brings him his groceries, checks in on

11   him everyday.  His mother and significant other, who I've

12   spoken to and I believe pretrial has.

13            His mother is in contact with me by email and

14   also has talked to my investigator and is accepting that

15   (inaudible).  He's 70-some years old, which he sees him

16   everyday.

17            But restrict his movement to Phoenix, Arizona,

18   and/or Clark County for legal appearances when he needs to

19   be brought up here.

20            Surrender any passport he has.  I don't even

21   know if he has one.  But if he does, he can give it up.

22            Surrender any firearms or any weapons in his

23   possession.

24            Forbid the defendant from communicating with any

25   other of the co-defendants.  He's willing to do that.

1          He doesn't want a communication with them.  He

2    was a very minor participant in this incident.

3          He didn't own that ranch.  He didn't have any

4    communication with the people on the ranch before this

5    happened.

6          He thought there may have been an injustice

7    done.  He went up to be of assist to the people there.  But

8    he's willing to abide by any condition.  He'll stay away

9    from the other people involved in this indictment.  And

10   that can be strictly monitored.

11         Forbid the defendant from using the Internet

12   while on pretrial release.  Keep him from communicating

13   with other people commun- -- convict him from doing any

14   insighting or anything that the government might be worried

15   about.

16         Forbid him from making stupid statements over

17   the Internet.  You know, some of the statements are similar

18   kind of hyperbolic statements made, you know, for the last

19   40 years by every radical group I've seen, from the Black

20   Panthers to the Weathermen to the -- all, you know, every

21   group.

22         Even now we have political candidates now making

23   stupid statements.

24         But when people get their emotions in control

25   instead of the reason they make stupid statements how much

1      they hate the police and how tough they're going to be.

2                    But if we look at the facts of this case,

3      defendant never shot anybody.  He never even fired any

4      shots.  He had a gun.  He was licensed to have a gun.

5                    As far as the defendant's criminal record, he

6      had an arrest for road rage.  What happened with that case?

7      He was put on probation.

8                    Now, if he was really, really a bad guy, and he

9      was put on that probation on that case after this incident

10     at the Bundy Ranch happened, he was really a bad guy, they

11     would have looked at, you know, all the bad things he's

12     done and said, you know, Mr. Burleson, you're a pretty bad

13     guy, you're not worthy of probation.

14                   And if he was really having problems on

15     probation, what would have happened?  What happens when

16     you're on probation if you're causing trouble, if you're

17     using a weapon or threatening people or breaking the law?

18                   Your probation officer calls a hearing and they

19     say, Judge, he's been causing trouble.  We want you to

20     revoke his probation.  But his probation wasn't revoked.

21                   Look at his criminal record over 52 years.

22     What's the bottom line?  Has he spent years in jail?

23     Months in jail?  He spent a total of 11 days in jail in 52

24     years.  That's how much he spent for this terrible,

25     horrible criminal record.  11 days in jail he spent before

1    this offense.

2              Now he's in -- locked up in federal prison, in

3    federal detention, blind, has a seizure disorder.  He's not

4    getting his medicine.  This case may go on for years.  It's

5    not going to go to trial, I believe, on May 2nd, even

6    though it's been set then, if we've got a terabyte of

7    information to go through.  The government says they've

8    interviewed 150 witnesses.

9              I haven't got any discovery at all.  The

10   government argues all the facts of the case from what I've

11   read in the indictment.  I haven't had a chance to

12   cross-examine any of these witnesses.  And as far as I

13   know, the defendant's still presumed innocent.

14             From what I know, the defendant hasn't shot

15   anybody, killed anybody, even fired his weapon.  But the

16   government says he must be detained, this blind man in a

17   wheelchair.  He's a danger to the community.

18             He said some bad things.  He associates with

19   some bad people.  Because he associates with people,

20   because he's said things, detain him.

21             The Eighth Amendment is a real amendment.  It

22   protects people's rights to be released.

23             The 1984 Bail Reform Act protects people's

24   rights to be released.

25             If anybody is not a danger to escape, a man in a

21

1    wheelchair who's blind, he's not going to get in his

2    wheelchair and start wheeling out the door and escape.  Or

3    if you let him go, let him go back down and have his mother

4    come and pick him up from the lockup and take him down to

5    Phoenix, he's not going to get on his wheelchair and get on

6    an airplane and go without people knowing it.

7           He's not going to get on his wheelchair and go

8    back up to the Bundy Ranch and start committing violence.

9    He can't see.

10          Now, the only reason to keep him detained is to

11   punish him pretrial without a conviction.  To keep him

12   locked up without a conviction in violation of the Eighth

13   Amendment.

14          Yeah, there may be some evidence -- there may be

15   evidence suggesting he did this.  But he's got a right to

16   go in a court, in a court of law, and challenge that

17   evidence.

18          I submit that under the facts of this particular

19   case -- I've never seen one stronger, where you've got a

20   blind man in a wheelchair with other medical disorders,

21   that he does not present a danger to the community or

22   danger to flee.  And that's a standard.

23          I think he should be released at this time with

24   the conditions I have suggested.  The conditions I have

25   suggested are more than enough to make sure that he's not

22

1    going to be a problem.  Or any other conditions the Court

2    would suggest.

3              And I'll ask the Court to -- any questions the

4    Court has.  I do have a letter from -- or an email from the

5    mother that she sent me just recently, if the Court wants

6    to see it, verifying some of this information.

7              THE COURT:  I'll accept your representation as

8    an officer of the Court, Mr. Jackson.

9              MR. JACKSON:  Okay.  Does the Court have any

10   questions?

11             THE COURT:  No, sir.

12             MR. JACKSON:  Thank you.

13             THE COURT:  Mr. Burleson, I also agree that --

14   with Mr. Jackson, that there are conditions of release that

15   may be imposed to assure you would not flee.  However --

16             THE DEFENDANT:  Can you repeat that, Your Honor?

17             THE COURT:  I agree with your lawyer, that I

18   could probably impose conditions that would be stringent

19   enough to reasonably assure that you would appear in court

20   in this case.  But with respect to your risk of

21   reoffending, I am going to order you detained.

22             You're charged with crimes of violence involving

23   use of weapons for which the law creates a rebuttable

24   presumption that I should detain you.

25             THE DEFENDANT:  Yes.

23

1              THE COURT:  And in this case -- you're charged

2      with the law creates what is called a rebuttable

3      presumption that I should detain you.

4              In this case the weight of the evidence is very

5      strong.  Both video and photographic evidence depicts your

6      armed participation in the advance on the BLM impoundment

7      site on the day of April the 12th, 2014.

8              You are not being prosecuted for your speech or

9      your beliefs but for your conduct.  Your speech and your

10     interviews, including a tape-recorded conversation with an

11     FBI agent, acknowledge what you did and that you were proud

12     of what you did.

13             You made statements before you ever went to

14     Bunkerville, the month before, that it's time to start

15     shooting cops.

16             THE DEFENDANT:  Your Honor --

17             THE COURT:  Some of your most inflammatory

18     statements were made afterwards about being a berserker,

19     about wanting to die in battle.  Continually you made

20     statements along those lines and about what would happen if

21     anyone came to arrest any of the people who were involved

22     in the Bunkerville incident, about burning people to the

23     ground, including their wives and their children.

24             You bragged about having federal agents in your

25     sites.

24

1          And so although you're blind, I do not believe

2     for a minute that these views that you have espoused for

3     years are going to go away and that all of a sudden you

4     will abide by federal court orders.

5          And for those reasons you are ordered detained

6     pending further proceedings.

7          You have the right to appeal my order to Judge

8     Navarro.

9          You're remanded to the custody of the Marshals

10    Service.

11        (The proceedings concluded at 10:15 a.m.)

12                         *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

25

-o0o-

1

2      I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____      4/12/16

7      Donna Davidson                          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25