# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA     )
     )
             v.     )     No. 1:16-mj-00024-AJ
     )
GERALD DELEMUS     )

## UNITED STATES' MOTION FOR PRETRIAL DETENTION

The United States of America, moves that the Court order the defendant be detained

pending the trial of this matter in the District of Nevada. Grounds supporting the United States'

motion are set forth in the supporting memorandum of law, which was prepared by the United

States Attorney's Office for the District of Nevada.

The defendant, through his counsel, Jonathan Saxe, Esq., objects to this motion.

Respectfully submitted,

EMILY GRAY RICE
United States Attorney

Dated: March 3, 2016     By: /s/Mark S. Zuckerman
     Mark S. Zuckerman
     Assistant United States Attorney
     New Hampshire Bar No. 4865
     United States Attorney's Office
     53 Pleasant Street, 4th Floor
     Concord, NH  03301
     (603) 225-1552
     mark.zuckerman@usdoj.gov

## <u>CERTIFICATION</u>

I hereby certify that a copy of this motion has been served electronically, through ECF, and in hand on Jonathan Saxe, Esq., 22 Bridge Street, Concord, NH 03301, counsel for the defendant on March 3, 2016.


/s/ Mark S. Zuckerman
Mark S. Zuckerman
Assistant United States Attorney

DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) GOVERNMENT'S MEMORANDUM ) IN SUPPORT OF PRETRIAL ) DETENTION |
| GERALD DELEMUS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

The United States, by and through undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act, Title 18, United States Code, Section 3142. As explained herein, the government seeks the continued pretrial detention of defendant Gerald DeLemus ("DeLemus") both as a risk of non-appearance and as a danger to the safety of others and the community.

DeLemus was a gunman and mid-level organizer who joined in a conspiracy to commit an unprecedented and extremely violent and massive armed assault on federal law enforcement officers that occurred on April 12, 2014, while those officers

were performing their duties as part of a court-ordered cattle impoundment operation near Bunkerville, Nevada. But for the courage of the victim officers to back away from their assaulters and abandon the cattle, the actions of the conspirators would have resulted in catastrophic death or injury to the officers and others. The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.

Having knowingly and intentionally joined the conspiracy, DeLemus did not make it to Bunkerville before the assault took place. Having driven from New Hampshire to Nevada with firearms and ammunition and stopping in Utah to "line" his weapons before entering the fray, DeLemus arrived late. That did not, however, stop him from quickly assimilating to the conditions on the ground and joining forces to prevent and deter any law enforcement actions against Bundy and his co-conspirators. He quickly became a leader and organizer of gunmen on the ground at Bundy Ranch, the "base commander" and a recruiter of other armed gunmen. He is depicted below in the center of the photograph, holding a .50 caliber machinegun.



DeLemus was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly stop federal law enforcement officers from the executing court orders to impound his cattle. In response to the call, DeLemus knowingly traveled from New Hampshire to Nevada with firearms and ammunition and the intent to use them against law enforcement officers.

Knowingly joining Bundy's conspiracy, DeLemus's actions on April 12 and in the aftermath of the assault and extortion betrayed his desire and willingness to kill cops. This alone compels the conclusion that DeLemus is a grave danger to the community and a flight risk.

DeLemus, however, is charged in the instant Superseding Indictment with crimes of violence including using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c). As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community. Here, no evidence has been adduced during the investigation that rebuts that presumption. DeLemus used guns and threats of violence to intimidate and interfere with federal law enforcement officers. The factors that motivated DeLemus to commit these crimes have not changed – the laws he reviles and the law he sought to impede still exist and still must be executed. DeLemus has not changed his mind about those laws, about the officers that must enforce them, or about his use of violence to prevent them from being executed. He should be detained.

# I.    INTRODUCTION

DeLemus was charged in a Superseding Indictment returned by a federal grand jury sitting in the District of Nevada on March 2, 2016, with: conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, conspiracy to injure or impede a federal officer, in violation of 18 U.S.C. § 372, assault on a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111, threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115, obstruction of justice, in violation of 18 U.S.C. § 1503, interference with interstate commerce by extortion, in violation of 18 U.S.C. § 1951, interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952, and four counts  of using or carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

## A.    Background.

Gerald DeLemus is a 61-year old Marine Corps veteran residing in Rochester, New Hampshire. He is married with children and has no known criminal history. DeLemus is self-employed as a carpenter.

His co-defendant, Cliven Bundy, 69, is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state. Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada.   Bundy Ranch is

surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area or the Bunkerville Allotment. Bundy uses that entire range of land to graze his cattle unlawfully.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution. These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially. Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands. The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season. It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail. But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order"). Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit, but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle. He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail. The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

- 6 -

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

A motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days. The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle. Thus, the 2013 Orders in hand, the BLM commenced impoundment operations beginning around April 5, 2014.

From the outset, Bundy interfered. The Superseding Indictment details Bundy's numerous threats to "do whatever it takes" to prevent the BLM from impounding his cattle and the escalating violence and threats of violence he used to impede and disrupt the impoundment, including blocking convoys, assaulting law enforcement officers and terrorizing civilian employees.

Most nefariously – and perhaps most relevant to the detention decision here – Bundy recruited gunmen to come to Nevada to confront the federal officers,

- 7 -

issuing calls-to-arms over the internet to anyone who would listen to come to Bundy Ranch to confront the officers who were executing the federal court orders to impound the cattle.

DeLemus answered that call. He traveled from New Hampshire to Nevada with firearms and with the intent to use them against federal law enforcement officers. There is no evidence that he won't answer the call again.

### B.    The April 12, 2014, Armed Assault

By April 12 hundreds of people, including gunmen, had answered Bundy's calls-to-arms against the BLM. As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing over 400 Followers, including at least 60 of them armed, to converge on and assault the BLM's impoundment site, demanding the release of the impounded cattle corralled there. The Superseding Indictment sets out the nature of the assault that day. While the government does not intend to repeat those allegations here, it incorporates them by reference and further proffers as follows.

- **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer. And contrary to the fiction incanted by Bundy, DeLemus, and other Followers, to stir up support, there is no First or Second Amendment right, or other right recognized in the law

anywhere, that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not. While that should be obvious to any law abiding citizen, Bundy and DeLemus, espouse to the contrary.

On April 12, Bundy had mustered more than 60 armed gunmen to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry array of more than 270 people directly in front of them, their formation being backed up by gunmen brandishing or carrying rifles and firearms in the wash, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges. The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded. Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day. Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment charges, and the investigation shows, that Bundy was responsible for recruiting gunmen, including DeLemus. Bundy and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back

down, to surrender, and other similar exhortations. The justification, according to Bundy and his followers: BLM was acting unconstitutionally in impounding his cattle. In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act. The gunmen traveled great distances in a short period of time, DeLemus being only one example among many, answering the call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12. The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his gunmen and other Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site. Indicative of his intent that day was his statement to another person as he drove his truck to the impoundment site: "These federal agencies have a lot of power and they are not just going to give that power up. The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and coercing the officers into leaving by threatening violence, Ammon Bundy was asked whether BLM was gone for good. Ammon responded: "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

> We the people expressed our power and as a result the Sheriff took control of his county. The Sheriff must protect the agency of man. The people have the power -- it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, have pledged to support Bundy again if BLM takes any action against him.

### C. Post-Assault: April 13 and thereafter.

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse for their violent criminal acts – they were proud of them. In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence." *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016). In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12: "we haven't won the war, we've just won one chapter of it." *Id.* Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault. These individuals, including DeLemus, who emerged as one of their leaders, were camping in and around what the Bundys designated as "militia camps," engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return. Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, the local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family." The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014. Additionally, evidence shows that telephone lists with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch. The purpose of these missions was to ensure Cliven Bundy was not

arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D.    DeLemus's Role in the Conspiracy.

Evidence adduced from the investigation shows that DeLemus contacted Bundy after reading an article about the situation at Bundy Ranch and that Bundy requested DeLemus travel to Bundy Ranch. DeLemus then drove over 40 hours straight to reach the ranch, stopping briefly in Utah for target practice to "line" the rifles. DeLemus described his role in a public interview in June of 2014.  He arrived too late to take part in the assault but remained at the Ranch for three weeks after the assault, being placed in charge of "Camp Liberty"—one of the so-called militia camps where Bundy and his co-conspirators housed the gunmen.

Numerous pictures depict DeLemus in tactical gear and well-armed at the Bundy Ranch.





DeLemus acknowledged his role as the base commander in a video segment of a news broadcast which aired after the assault. The reporter stated DeLemus claimed to be a former marine out of New Hampshire and was leading about one hundred individuals providing security around the ranch. In the video, DeLemus stated: "What we are out here to do is to keep the Federal Government, that is acting in a lawless nature, from shooting the Bundy's or anyone else. If in fact, the Federal Government and their agencies come after the Bundy's and shoot at them, we will defend the Bundy's. Absolutely, and we have all the capability in the world to do that. Do we want to do that? Absolutely not." DeLemus continued "what we will do is we will all die right here in place to defend the Bundy's and the freedom of this country. And if nobody else in this country will stand up, by god, you can look around here and see what true heroism is."



DeLemus recruited gunmen for Bundy. He gave an interview to Stewart Rhodes, posted to YouTube under the title "Bundy Ranch: We Came Risking Never Coming Home Jerry DeLemus." In the video, DeLemus encouraged those with guns and training to come to the ranch, and that they may not go home (after a violent confrontation with the federal government). In the video, DeLemus admits that he traveled to Bundy Ranch to join the "offense" at Bundy Ranch, and that "we will stand and we will fight and we will die if the government tries to oppress the Bundys." DeLemus stated that "freedom is worth fighting for and worth dying for" and that he would rather the "other guys (referring to law enforcement) die trying to take it, but if that sacrifice needs to be made, by God, we'll make it." DeLemus continued by adding "what we are fighting here is a lawless government."

Rhodes referred to Bunkerville as "sacred ground" because Americans stood up "because even though we didn't have to fight, we faced them off." Rhodes called this action "the battle of Bunkerville." DeLemus agreed and said that he needed the support from other veterans: "if you can get out here, come out, we can certainly use the help. But bring your gear, as much as you possibly can."



DeLemus provided an armed escort for Ryan Bundy as he tended to cattle that had been extorted from the law enforcement officers. DeLemus posted the following to Facebook:



DeLemus's contact with his co-conspirators from Bundy Ranch continued into January of this year, when DeLemus traveled to Burns, Oregon, where conspirators from Bundy Ranch had occupied the Malheur National Wildlife Refuge ("MNWR"). While claiming to the FBI that his avowed purpose was to persuade the occupiers of the MNWR to leave, DeLemus remained in close telephone contact with Cliven Bundy, Ammon Bundy, Ryan Payne, and Brian Cavalier from November 2015 (the beginning of the conspiracy according to the indictment in that case) and onward.

Despite his stated purpose to help stop the occupation, DeLemus instead produced a number of sympathetic videos which he posted to Facebook. Videos titled "The rest of the story," "the Untold Story-Jerry DeLemus interview with ranchers" and "the Untold Story with Jerry DeLemus in Harney County Oregon-Burns daily 2." These videos show DeLemus in Burns, Oregon, interviewing local ranchers and the recounts their self-serving views of the BLM. Another video, titled "the Untold Story-Ammon with Jerry DeLemus extended cut," shows an interview on the MNWR between Ammon Bundy and DeLemus.

## II. ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance. *United States v. Tortora*, 922 F.2d 880, 884 (1st. Cir. 1990); *Motamedi*, 767 F.2d at 1406.

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of

the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight. *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.").

**A. The Offenses Charged Are Based on DeLemus's Crimes of Violence and On-Going Defiance of Federal Court Orders and Law Enforcement Authority.**

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." See 18 U.S.C. § 3156(a)(4)(A). Here, several counts in the Indictment are crimes of

violence: assault on a federal officer with a firearm and deadly weapon; extortion by force and violence; Section 924(c) counts as to each; and conspiracy to commit same.

DeLemus's charges are grounded not only in violence and his lawless acts, but also in his complete disregard for the rule of law. DeLemus is unapologetic for his role in leading an armed occupation of the Bunkerville area to prevent federal agents from enforcing a court order merely because he disagrees with the order. DeLemus brought multiple firearms with him, lining them in advance in case he got into a violent confrontation with the federal government.

## B.    Substantial Evidence Exists Establishing the Defendant's Guilt

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation. Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature. The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault

weapons in the militia camps, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

The most damning evidence against DeLemus is his free and unrepentant statements that he has given to interviewers for public dissemination. DeLemus told a local news station he was the "base commander." He told an interviewer in a video posted to YouTube that he wanted people with weapons and military training to come to Bundy Ranch to support the Bundys. He told a radio interviewer that he had lined his weapons in preparation for confront federal agents at Bundy Ranch.

Most telling, however, is the absence of any evidence to suggest that DeLemus has changed his mind about any of the events of April 12 and its aftermath and his participation in it. His public statements show that he is proud of the crimes that he and his co-conspirators committed and that he considers the law and court orders governing the public lands to be worthy of his continued

contempt. In DeLemus's world, the federal courts don't really matter – what matters is what DeLemus believes and he believes the government is "oppressive." His answer then, according to his words and actions, is to pick up a gun.

### C. The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

DeLemus has no known criminal history and has served in the military. His willingness to use his military skills, however, to prepare to lead a military-style confrontation with law enforcement officers betrays DeLemus's willingness to use force and violence.

### D. The Defendant Poses A Significant Danger to the Community

DeLemus joined a conspiracy to assault federal officers – an assault that risked the lives of many and forced the release of cattle gathered pursuant to federal court order. When he arrived at Bundy Ranch, DeLemus immediately took a leadership position on the ground, providing training and logistic support to gunmen as they prepared to confront law enforcement officers who they believed were preparing to arrest Bundy and his co-conspirators. He was there to stop them.

But for the courageous restraint of the victim law enforcement officers, both leaving and avoiding the area afterward, this violent assault and the one DeLemus was preparing to occur if federal authority were reasserted, would likely have met with violent and deadly ends.

### E. Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance

- 22 -

A presumption applies that the Defendant shall be detained and the Defendant cannot overcome that presumption. The charges, the evidence, the defendant's history and the danger posed establish that there are no conditions or combination of conditions that can address these risks.

As discussed above, DeLemus answered Bundy's call-to-arms to confront law enforcement officers who were executing court orders to gather and remove Bundy's cattle from the public lands. Because of the crimes committed by DeLemus and his co-conspirators, Bundy's cattle remain on the public land in violation of federal court orders and other federal laws. Many of the gunmen who joined the conspiracy remain at large. There is no evidence to suggest that DeLemus will not answer another call to arms should any law enforcement action be taken against the cattle or other co-conspirators. This is especially true given his obvious pride in having taken part in the first armed confrontation with law enforcement.

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of the Defendant given that ultimately, they must rely on the Defendant's good faith compliance. *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance"). In *Tortora*, an alleged member of a prominent

- 23 -

mafia family stood trial for crimes under the racketing and organized crime statute. The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts. Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated." *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that the Defendant's crimes in this case are rooted in his defiance of federal court orders and that his commitment to flouting federal authority has been maintained in word and deed through the present.

## III.    CONCLUSION

For the reasons stated herein, the defendant is a danger to the community and a poses a risk of non-appearance and no conditions or combination of conditions will reasonably assure the safety of others or his appearance at future proceedings. Accordingly, the Government respectfully requests that the Court order the Defendant detained pending trial.